**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| CITY OF AUSTIN, | § | |
| CITY OF SAN MARCOS, | § | |
| TRAVIS COUNTY, | § | |
| HAYS COUNTY, | § | |
| BARTON SPRINGS EDWARDS | § | |
| AQUIFER CONSERVATION | § | |
| DISTRICT, | § | |
| LARRY BECKER, ARLENE BECKER, | § | |
| JONNA MURCHISON, AND | § | |
| MARK WEILER | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **CASE NO. 1:20-cv-00138** |
| | § | **COMPLAINT FOR DECLARATORY** |
| | § | **AND INJUNCTIVE RELIEF** |
| | § | |
| KINDER MORGAN TEXAS PIPELINE, | § | |
| LLC, PERMIAN HIGHWAY PIPELINE, | § | |
| LLC, UNITED STATES DEPARTMENT | § | |
| OF INTERIOR, DAVID BERNHARDT, | § | |
| in his Official Capacity as Secretary of | § | |
| Interior, UNITED STATES FISH AND | § | |
| WILDLIFE SERVICE and AURELIA | § | |
| SKIPWITH, in her Official Capacity as | § | |
| Director of the U.S. Fish and Wildlife | § | |
| Service, | § | |
| | § | |
| Defendants | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW, Plaintiffs City of Austin, City of San Marcos, Travis County, Hays County,

Barton Springs Edwards Aquifer Conservation District, Larry Becker, Arlene Becker, Jonna

Murchison and Mark Weiler ("Plaintiffs"), and file this complaint against Defendants Kinder

Morgan Texas Pipeline, LLC, Permian Highway Pipeline, LLC, United States Department of

Interior, David Bernhardt, in his Official Capacity as Secretary of Interior, U.S. Fish and Wildlife

Service, and Aurelia Skipwith, in her Official Capacity as Director of the U.S. Fish and Wildlife Service, and would show the Court as follows:

## **INTRODUCTION**

1.      Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC (collectively "Kinder Morgan") are constructing a 42-inch wide, 430-mile long natural gas pipeline (the "Permian Highway Pipeline" or "PHP") through the Central Texas Hill Country, which will transverse sensitive environmental features, including the Edwards and Trinity Aquifer recharge zones as well as habitat for many federally listed species that are protected under the Endangered Species Act ("ESA"). Kinder Morgan has failed to apply for or obtain an Incidental Take Permit under Section 10 of the ESA ("Section 10 ITP"), which is required for private construction, operation, maintenance and related activities that will harm the various imperiled species on non-federal property along the PHP route. Kinder Morgan has made  many public statements about its progress on the PHP construction and its intent to begin construction in the Hill Country imminently, but has provided very little information to affected landowners and local governments regarding the final route, timing, construction methods, permitting, and plans to avoid, minimize, and mitigate adverse impacts to vulnerable aquatic and terrestrial species that will be adversely affected by Kinder Morgan's actions.

2.      U.S. Fish and Wildlife Service (the "Service") is the primary federal agency responsible for permitting and authorizing "take" of federally listed species under the ESA. For private actions and projects occurring on private (non-federal) lands, the Service allows "take" of federally listed species through the issuance of an ITP under Section 10 of the ESA.

3.      The Service has recently, through a letter exchange with the U.S. Army Corps of Engineers (the "Corps"), agreed to a new consultation process under Section 7 of the ESA when the Corps is

considering permitting an action where the Corps' involvement is limited to making a permitting decision for a small component of a larger project. This new process is called the Process for Section 7 Consultation in Small Federal Handle Situations ("Small Handle Process") which is being used to expedite processing of private (non-federal) actions such as the pipeline construction and operation sought by Kinder Morgan. Adoption of the Small Handle Process occurred without public notice or comment in violation of the Administrative Procedure Act ("APA"). Furthermore, no public information has been made available by the Service or the Corps regarding the review and approval process for Kinder Morgan's apparent request for authorized "take" of federally listed species under the ESA. While no permits have been granted nor any other purported authorization issued, on information and belief Plaintiffs expect that: a) the Service and the Corps will shortly issue some form of permits or authorization; b) the permits or authorization will be defective for failure to comply with the APA and other federal requirements; c) Kinder Morgan will immediately begin destroying and damaging federally listed species and their habitats before Plaintiffs and the Court have the opportunity to review or address the legality of their activities; and d) Kinder Morgan will argue that Plaintiffs' ability to seek redress from the Court has been rendered moot by their expedited clearing activities.

4.      Plaintiffs are local governmental entities, a groundwater conservation district, and affected landowners who seek relief from the Court to: a) prevent unlawful harm to protected species and habitat modification that will harm those species; and b) require the Service to comply with the ESA, APA, NEPA, and all other federal laws and regulations in its review and approval of Kinder Morgan's activities associated with the PHP.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c); *see also id.* § 1540(g)(1)(C) (citizen suit provision). The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA and the APA. The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201–02, 1361; and 5 U.S.C. §§ 704–06.

6.     Pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702, sovereign immunity as to Defendants U.S. Department of the Interior, the U.S. Fish and Wildlife Service, Secretary Bernhardt, and Director Skipwith has been waived.

7.     In compliance with 16 U.S.C. § 1540(g)(2)(C), plaintiffs gave notice to defendants of the plaintiffs' intent to file suit under the ESA for the violations described in this complaint more than 60 days ago. The violations complained of in the notice have not been remedied, nor have Defendants contacted Plaintiffs to attempt to remedy these violations.

8.     Venue is proper in this district pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(a)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of this action is situated in this district. Furthermore, Kinder Morgan's actions that will result in the "take" of federally listed species are occurring in this district and the Service's failure to provide an opportunity for notice and comment on the Small Handle Process occurred in this district.

## PARTIES

9.     <u>The City of Austin.</u> Plaintiff City of Austin ("Austin") is a home rule city and political subdivision of Texas. To ensure protection of water quality and endangered species such as the Barton Springs salamander and Austin blind salamander, which will be harmed or harassed by the

PHP construction, operation, and maintenance, Austin has approved more than $150 million in funding over the past 20 years to conserve sensitive lands over the Edwards Aquifer, creating Water Quality Protection Lands. These permanently protected lands comprise 25% of the recharge zone of the Barton Springs Segment of the Edwards Aquifer and more than 28,000 total acres of land. Austin is obligated, under an existing Habitat Conservation Plan approved by the Service, to ensure that its actions have minimal impact on the federally listed salamanders and to mitigate any incidental take of federally listed species, in part through advocating for water quality and quantity protection in the Barton Springs Segment of the Edwards Aquifer. Moreover, the Edwards Aquifer is a component of Austin's long-range water supply plan. Without adequate safeguards to protect the sensitive, complex karst features of the Edwards Aquifer, Kinder Morgan's actions in constructing and operating the PHP will harm Austin's financial, recreation, and conservation interests in Barton Springs, the Barton Springs salamander, and the Austin blind salamander, as well as compromise its long-range water plan. In addition, Austin has partnered with Travis County to develop and implement the Balcones Canyonland Conservation Plan ("BCCP") to mitigate development impacts on endangered karst invertebrates and the endangered Golden Cheek Warbler ("GCW"). Kinder Morgan's actions in constructing and operating the PHP in endangered species habitat and the recharge zone of the Barton Springs Segment, without adequate safeguards, will adversely affect the extensive investment of the City of Austin in the preservation of protected species and water resources.

10.     The City of San Marcos. Plaintiff City of San Marcos ("San Marcos") is a home rule city and political subdivision of Texas located in Hays County. The San Marcos Springs ecosystem, which flows directly from the Edwards Aquifer, provides recreational and tourism benefits to San Marcos. San Marcos undertook a lengthy, public, deliberative process to generate the Edwards

Aquifer Recovery Implementation Program to protect the federally listed species affected by the management and use of the Edwards Aquifer. Kinder Morgan's actions in constructing and operating the PHP over the Edwards Aquifer will impair the San Marcos Springs and the protected species that depend on the aquifer, and harm the San Marcos's financial, recreation, and conservation interest in the Springs.

11.   <u>Travis County.</u>  Plaintiff Travis County is a political subdivision of Texas.  The Edwards Aquifer, which extends through Travis County, is a source of drinking water for many Travis County residents.  It also supplies the water for many of Travis County's renowned springs, including Barton Springs, which is the only known habitat for the endangered Barton Springs and Texas blind salamanders.  The Edwards Aquifer and the Edwards Aquifer Recharge Zone extend into Hays County, where Kinder Morgan's proposed PHP will be routed.  Without adequate safeguards, Kinder Morgan's actions in constructing and operating the PHP over the Edwards Aquifer and the Edwards Aquifer Recharge Zone will cause erosion and sedimentation that will impair drinking water in Travis County, as well as adversely affect Barton Springs and the protected species in that Spring.  These impacts will harm Travis County's financial, recreation, and conservation interest in the Edwards Aquifer, Barton Springs, and the endangered species in Barton Springs.  In addition, Travis County has partnered with Austin to develop and implement the BCCP, a 32,000 acre preserve that provides habitat to the endangered GCW as well as six endangered karst invertebrates found in caves, and 27 species of concern. The BCCP is an important recreation and conservation asset in Travis County. To date, Travis County has invested more than $200,000,000 in preserving land in the BCCP.  Kinder Morgan's actions in constructing and operating the PHP in GCW habitat will harm Travis County's financial, conservation, and recreational interests in the continued viability of the GCW.

6

12.   <u>Hays County.</u> Plaintiff Hays County is a political subdivision of Texas. The proposed route of the PHP runs through Hays County for approximately 30 miles and will have a substantial adverse impact on Hays County's conservation investments to protect water resources, GCW, and 57 additional rare or threatened species. The Hays County Regional Habitat Conservation Plan ("RHCP") protects 776 acres of GCW habitat and has approximately 152 acres of conservation credits available for mitigation. Among other water resources affected by the PHP, Hays County created an 81-acre natural area for the protection of Jacob's Well (a karst spring originating in the Middle Trinity Aquifer), which is approximately one mile from the currently proposed PHP route. The proposed PHP construction will adversely affect Hays County's financial, recreation, and conservation interests in the preservation of protected species and water resources.

13.   <u>BSEACD.</u> Plaintiff Barton Springs Edwards Aquifer Conservation District ("BSEACD") is a groundwater conservation district created by the Texas legislature covering 247 square miles in Caldwell, Hays, and Travis Counties overlaying substantial portions of the Trinity and Edwards aquifer recharge zones. Among other responsibilities, BSEACD maintains a Habitat Conservation Plan for the protection of the Barton Springs and Austin blind salamanders, which will be harmed by the construction and operation of the PHP. The harm to these species will undermine BSEACD's conservation efforts and impair its mission.

14.   <u>Arlene and Larry Becker.</u> Plaintiffs Arlene and Larry Becker ("the Beckers") own and reside on 10 acres of land in Hays County Texas. The original proposed route of the PHP was directly through the Beckers' property; however, the current proposed route is immediately adjacent to their property line. The Beckers' property contains high quality GCW breeding habitat, including mature Ashe juniper trees and various oak and other native hardwood species. The Beckers enjoy bird watching, including sightings of GCWs on their property. The current proposed

7

PHP route is approximately 500 feet from the Beckers' front porch and 600 feet from their water well. The construction and operation of the PHP will adversely affect the Beckers' property by: a) causing adverse edge effects to, and fragmentation of, GCW habitat; b) the increased risk of spreading oak wilt; c) the risk of leak or explosion affecting their safety, their home, and their water well; and d) diminishing the market value of their home and land due to the pipeline's proximity. These impacts will permanently harm the Beckers' recreational, aesthetic, economic, and other interests.

15.     <u>Jonna Murchison.</u> Plaintiff Jonna Murchison owns and resides on 26 acres in Hays County Texas. The original proposed route of the PHP was directly through Ms. Murchison's property; however, the current proposed route is immediately adjacent to her property line. Ms. Murchison's property contains high quality GCW breeding habitat, including mature Ashe juniper trees and various oak and other native hardwood species. Ms. Murchison has enjoyed sightings of GCWs on her property. The current proposed PHP route is close to Ms. Murchison's home and her water well. The construction and operation of the PHP will adversely affect Ms. Murchison's  property by: a) causing adverse edge effects to and fragmentation of GCW habitat; b) the increased risk of spreading oak wilt; c) the risk of leak or explosion affecting her safety, her home, and her water well; and d) diminishing the market value of her home and land due to the pipeline's proximity. These impacts will permanently harm Ms. Murchison's recreational, aesthetic, economic, and other interests.

16.     <u>Mark Weiler.</u>  Plaintiff Mark Weiler owns 12 ½ acres in Blanco County Texas. The proposed route of the PHP runs directly through Mr. Weiler's property. He purchased this property in 2014 with the intent to build a rustic home, collect rain-water, and live off-grid and away from development on his acreage. Mr. Weiler's property contains high quality GCW breeding habitat,

including mature Ashe juniper trees, mature oaks (some of which are 100 to 150 years old), and other native hardwood species. Mr. Weiler has consulted with an arborist to ensure that his oaks are free from oak wilt. Mr. Weiler has sought and obtained a Wildlife Exemption for his property under the Texas Tax Code, which requires him to maintain habitat and water sources for indigenous birds and other wildlife. Mr. Weiler enjoys watching birds on his property, and although he has not yet sighted a GCW he hopes to do so in the future. The construction and operation of the PHP will adversely affect Mr. Weiler's  property by: a) clearing known GCW habitat; b) increasing the risk of spreading oak wilt to all his oaks, and especially the irreplaceable oaks that are more than a century old; c) interfering with his plans to live off-grid and away from all development; and d) diminishing the market value of his land due to the pipeline's location on the property. These impacts will permanently harm Mr. Weiler's recreational, aesthetic, economic, and other interests.

17.     Kinder Morgan Texas Pipeline, LLC. Defendant Kinder Morgan Texas Pipeline, LLC is a Delaware limited liability corporation, with its principal offices located at 1001 Louisiana Street, Houston, Texas 77002.  KMTP is identified in filings with the Railroad Commission of Texas as the "operator" of the Permian Highway Pipeline.  KMTP may be served through its registered agent Corporation Service Company at 800 Brazos, Austin, Texas 78701.

18.     Permian Highway Pipeline, LLC. Defendant Permian Highway Pipeline, LLC, is a Delaware limited liability corporation with its principal offices located at 1001 Louisiana Street, Suite 1000, Houston, Texas 77002.  Permian Highway Pipeline, LLC is identified in filings with the Railroad Commission of Texas as the "owner" of the Permian Highway Pipeline. Permian Highway Pipeline, LLC may be served through its registered agent Capitol Corporate Services, Inc. at 206 E. 9th St., Ste. 1300, Austin, TX 78701.

19.     U.S. Secretary of the Interior David Bernhardt. Defendant David Bernhardt, sued only in his official capacity, is the U.S. Secretary of the Interior and has the ultimate responsibility for implementing the ESA, including the responsibility to provide public notice of, and the opportunity to submit written comments on, any guidelines or regulations, including any amendment thereto, established to ensure that the purposes of the ESA are achieved efficiently and effectively.

20.     U.S. Department of the Interior. Defendant U.S. Department of the Interior is an agency of the United States charged with administering the ESA for most terrestrial and non-marine species.

21.     Aurelia Skipwith, Director of the United States Fish and Wildlife Service. The Secretary of the Interior has delegated his authority for terrestrial and non-marine species to the Fish and Wildlife Service. 50 C.F.R. § 402.01(b). Defendant Aurelia Skipwith, sued solely in her official capacity, is the Director of the United States Fish and Wildlife Service. As Director, Defendant Skipwith is the federal official with the responsibility for implementing and enforcing the ESA and its regulations.

22.     U.S. Fish and Wildlife Service. Defendant U.S. Fish and Wildlife Service is the federal agency within the Department of the Interior that is authorized and required by law to protect and manage the fish, wildlife, and native plant resource of the United States, including enforcing and implementing the ESA.

## STATUTORY AND REGULATORY FRAMEWORK

23.     Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of [such species]." 16 U.S.C. § 1531(b). The Supreme Court has described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and stated that the "plain intent of Congress in enacting th[e]

statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978).

24.     Section 9 of the ESA prohibits any "person" from "taking" any member of an endangered or threatened species. 16 U.S.C. § 1538(a). The term "take" is defined broadly to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id*. § 1532(19). By regulation, the Service has defined "harm" to mean "an act which actually kills or injures wildlife," and "include[s] significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Likewise, the Service has defined "harass" to include "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, including breeding, feeding, or sheltering." *Id*.

25.     Section 10 of the ESA provides a limited exception to the otherwise strict prohibition against the "take" of endangered or threatened species where there is no federal nexus for all or part of a private project.  A section 10(a)(l)(B) Incidental Take Permit is needed in situations where a non-federal project is likely to result in "take" of a listed species of fish or wildlife. Chapter 3 of the Fish and Wildlife Service's Habitat Conservation Plan Handbook explains that an incidental take permit is needed if a non-federal party's activity is "in an area where ESA-listed species are known to occur and where their activity or activities are reasonably certain to result in incidental take." Specifically, the Service may issue an Incidental Take Permit allowing the taking of a listed species where such taking is "incidental to, and not the purpose of, carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

26.     An applicant seeking an ITP under Section 10 of the ESA must submit a detailed habitat "conservation plan," referred to as an HCP, describing, among other things:

a.      the impacts of the proposed taking;

b.      procedures the applicant will use to mitigate, monitor, and minimize such impacts;

c.      an explanation of why there are no feasible alternatives to the proposed taking; and

d.      information establishing that sufficient funding exists to implement the plan. *Id*. § 1539(a)(2)(A); see also 50 C.F.R. § 17.22.

27.     Before granting a Section 10 ITP, the Service must independently find that the HCP ensures that (i) the taking authorized by the Section 10 ITP will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild. *See* 16 U.S.C. § 1539(a)(2)(B). Because the Service's issuance of a Section 10 ITP to a private person or entity is itself a major Federal action, the Service must subject its proposed action of whether to issue the Section 10 ITP to analysis under the National Environmental Policy Act ("NEPA") in an Environmental Impact Statement ("EIS") or, at bare minimum, an Environmental Assessment ("EA"), subject to public comment. Additionally, a Section 10 ITP may be issued only after an opportunity for public comment on the application and HCP, and after findings by the Service that, among other things, the applicant will "minimize and mitigate the impacts of such taking" and "the taking will not appreciably reduce the likelihood of the survival and recovery of the species." *Id*. § 1539(a)(2)(B).

28.     Section 7(a)(1) of the ESA makes clear that all Federal agencies shall "utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation

of endangered species and threatened species listed pursuant to … this Act." 16 U.S.C. §1536(a)(1).

29.     Section 7 of the ESA establishes a consultation process pursuant to which '[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction of or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). This consultation must take place "[s]ubject to such guidelines as the Secretary [of Interior] may establish." 16 U.S.C. § 1536(a)(3).

30.     Pursuant to Section 7 of the ESA, the Service, along with the National Marine Fisheries Service, promulgated, after notice and comment, regulations governing the consultation process ("Joint Regulations"). 50 C.F.R. ch. 402. These regulations provide comprehensive guidelines that dictate how the consultation process must proceed.

31.     Under the ESA and these Joint Regulations, once a permit application is submitted to a Federal action agency such as the Corps, the application must be reviewed to determine if a federally-listed species *may be present* in the action area. Upon determining that a federally-listed species *may be present* in the Federal action area, the Federal action agency is then obligated to determine whether the proposed action "may affect" a listed species. 50 C.F.R. §402.14(a) (providing that agencies should review their actions at the "earliest possible time to determine whether an action may affect listed species or critical habitat."). The term "*may affect*" is not defined in the ESA or the Joint Consultation Regulations, but the Service and NMFS Consultation Handbook defines it as: "the appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat." Consultation Handbook at xvi.

32.     Consultation under Section 7 may be "formal" or "informal" in nature. Informal consultation is "an optional process" consisting of all correspondence between the action agency and the consulting agency, which is designed to assist the action agency, rather than the consulting agency, in determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal consultation, the action agency requests information from the consulting agency as to whether any listed species may be present in the action area or located proximately enough that the project may result in impacts to the species. If listed species may be present, the action agency is required by Section 7(c) of the ESA to prepare and submit to the consulting agency a "biological assessment" that evaluates the potential effects of the action on listed species and critical habitat in the area. As part of the biological assessment, the action agency must make a finding as to whether the proposed action may affect listed species and submit the biological assessment to the consulting agency for review and potential concurrence with its finding. *See* 16 U.S.C. § 1536(c). If the action agency finds that the proposed action "may affect, but is not likely to adversely affect" any listed species or critical habitat and the consulting agency concurs with this finding, then the informal consultation process is terminated. 50 C.F.R. § 402.14(b).

33.     If the Federal action agency determines that the activity in the permit application may affect and is likely to adversely affect an endangered or threatened species or their critical habitat, the Federal action agency must initiate formal consultation procedures with the Service. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14 (a) and (b). The formal consultation process begins with a written request from the Federal action agency to the Service, and ends with issuance by the Service of a biological opinion ("BO"). 50 C.F.R. § 402.02 (definition of formal consultation).

34.     Section 402.04 of the Joint Regulations provides a mechanism for tailoring the consultation process to the specific needs of specific federal agencies. 50 C.F.R. §402.04. In particular, "[t]he

consultation procedures set forth in this part may be superseded for a particular Federal agency by joint counterpart regulations among that agency, the Fish and Wildlife Service, and the National Marine Fisheries Service." Notably, this provision also mandates that "such counterpart regulation shall be published in the Federal Register in proposed form and shall be subject to public comment for at least 60 days before final rules are published." 50 C.F.R. §402.04.

35.     Section 402.04 of the Joint Regulations makes clear that rules and guidelines implementing the consultation requirement of the ESA are not exempt from the notice and comment procedures of the APA, 5 U.S.C. § 553. Section 553 of the APA requires that general notice of all proposed federal rules be published in the Federal Register and that "interested persons be afforded an opportunity to participate in the rulemaking by submission of written data, views, or argument." 5 U.S.C. § 553(b), (c). Finally, Section 553 requires that, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

36.     In addition, Section 7 of the ESA contains a provision intended to safeguard the integrity of the consultation process by prohibiting applicants for federal permits that are subject to the consultation requirement from making any "irreversible or irretrievable commitment of resources" if that commitment would have the "effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would protect endangered and threatened species. 16 U.S.C. § 1536(d). This provision is intended to prevent situations in which applicants short-circuit the consultation process by proceeding with major investments in planning and infrastructure that will limit the options available for protecting endangered and threatened species. Congress added Section 7(d) to the ESA in 1978 following a situation where the Tennessee Valley Authority had substantially constructed Tellico Dam, thereby eliminating any reasonable and

prudent alternatives to the proposed dam construction, which upon closing, would inundate the critical habitat of the endangered snail darter. Thus, a principal purpose of Section 7(d) is "to prevent Federal agencies from 'steamrolling' activity in order to secure completion of the projects regardless of the impacts on endangered species." *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv*., 230 F. Supp. 3d 1106, 1135 (N.D. Cal. 2017).

37.     This lawsuit seeks relief from the Court to remedy Defendants' failure to comply with the requirements of the ESA, the APA, and NEPA with regard to the proposed construction of the PHP.

## STATEMENT OF FACTS

38.     The PHP is designed to transport about 2 billion cubic feet of natural gas a day. The planned pipeline will originate near Coyanosa in Pecos County, Texas—in an area known as the "Waha Hub"—and run approximately 430 miles across more than a thousand tracts of private property in seventeen Texas counties to a termination point near Sheridan, Texas.

39.     The pipeline's chosen route crosses some of the most sensitive environmental features in Central Texas and the Texas Hill Country, including the recharge zones of the Edwards and Edwards-Trinity Aquifers (which provide the drinking water supply for over two million Texas residents, including towns such as Fredericksburg and Blanco) and habitat for many ESA-listed species. It will transect sites that contain artifacts of substantial cultural and historical significance. Its path will bring massive volumes of pressurized, combustible natural gas near residential subdivisions every day.

40.     According to news reports, as of December 29, 2019, Kinder Morgan had made substantial progress on the western portion of the PHP, having built more than half of the initial 100-mile route starting in Pecos County. Also, in December 2019, Kinder Morgan stated that it was "in the

final stages of the permitting process" for the remainder of the pipeline route and that it was expecting final permits to issue early in 2020. On January 29, 2020, Kinder Morgan announced that it had secured all legal rights-of-way necessary to build out the PHP across Texas.  Kinder Morgan has informed reporters that by mobilizing contractors, setting up staging areas, and delivering pipe, it plans to "be ready to go literally when [they] get the permit."

41.     The PHP construction will entail clearing a 125-foot wide swath across thousands of acres of private land and trenching and excavating on or near sensitive karst features (such as caves, fissures and voids) of the Edwards Aquifer. There are many federally endangered and threatened species, as well as essential habitat for those species, within the footprint of the pipeline's route and within the immediate vicinity surrounding the pipeline's route. These include birds, salamanders, and aquifer-based species.

42.     The Golden Cheeked Warbler is a small insectivorous songbird that breeds only in central Texas where mature Ashe juniper-oak woodlands occur. Due to accelerating loss of breeding habitat, the warbler was emergency listed as endangered in 1990. The principal threats to the species and the reasons for its listing are habitat destruction, modification, and fragmentation from urbanization and range management practices. Because of the GCW's narrow habitat requirements, and its site fidelity of returning to the same area every year, habitat destruction often leads to local population extirpation. Occupied GCW habitat lies within the PHP construction boundaries and its buffer zones, with an estimated 548 acres of GCW habitat occurring within the pipeline's footprint, and an estimated 2,355 acres of habitat within 300 feet of the project's footprint. Although Kinder Morgan has not provided public information about the precise route of the PHP, it is expected that a minimum of 548 acres of GCW habitat will be cleared for the pipeline.

43.     GCWs are highly territorial and show strong fidelity to breeding sites—i.e., birds often return to their previous breeding territory after the winter season. Clearing habitat even while no members of a species are present is expected to result in a direct take if individuals later return to their territorial nesting range and the clearing has removed the vegetation they need for shelter, food, and nesting materials. Clearing wide swaths of vegetation near GCW habitat will also result in indirect effects to adjacent habitat that rise to the level of take. These effects include edge effects, habitat fragmentation, and displacement.

44.     Mature oaks are a crucial component of GCW habitat, and are important ecosystem resources in other ways. Oak wilt is one of the most destructive tree diseases in the United States and is currently killing oak trees in Central Texas at epidemic proportions. Oak wil is a highly infectious fungal disease spread in part by beetles who carry diseased spores from tree to tree. This transmission is exacerbated by cutting and pruning oak trees, particularly in the spring. Accordingly, experts strongly advise against cutting or pruning oak trees between February 1 and June 1.

45.     The Barton Springs salamander (Eurycea sosorum), the Austin blind salamander (Eurycea waterlooensis), the San Marcos salamander (Eurycea nana), the Texas blind salamander (Eurycea rathbuni), the Fountain darter (Etheostoma fonticola), the Comal Springs dryopid beetle (Stygoparnus comalensis), and the Comal Springs riffle beetle (Heterelmis comalensis) are all listed by the Service as endangered, entirely aquatic species whose only habitat is in the vicinity of the PHP. These species rely on clean, well-oxygenated spring water with sediment-free substrates to survive. The water these species rely on to survive is likely to be adversely affected (or contaminated) by the construction, operation, and ongoing maintenance of the pipeline.

46.     More specifically, groundwater contamination can occur from construction activities, catastrophic hazardous material spills, chronic leakage or acute spills of petroleum and petroleum products, and pipeline ruptures. The degradation in groundwater quality that is likely to occur from the construction, operation, and maintenance of the pipeline is likely to "take" many members of these species, and may well jeopardize the continued existence and/or recovery efforts of these listed species and significantly modify critical habitat for these species.

47.     The Austin blind salamander resides in only one spring system, Barton Springs, which is a feature of the Edwards Aquifer. When the Service listed this salamander as endangered, it determined that hazardous material spills pose a potentially significant threat to the species. According to the Service, energy pipelines are a source of potential hazardous material spills. If the water quality in the spring system is degraded because of an energy pipeline, the degradation could by itself cause irreversible declines, extirpation, or significant declines in habitat quality for the Austin blind salamander. In addition to hazardous material spills, the Austin blind salamander's habitat could be affected by tunneling for underground pipelines. The degradation imminently threatened by construction and operation of the pipeline could kill, injure, harm, harass or otherwise take the Austin blind salamander and its habitat in violation of Section 9 of the ESA. The construction and operation of the pipeline could similarly kill, injure, harm, harass or otherwise take the Barton Springs salamander and its habitat.

48.     Kinder Morgan has begun construction on the PHP, although information on the exact locations and extent of that construction is not publicly available. Kinder Morgan has either already begun, or is poised to imminently begin, clearing and other activities that will harm habitat for the GCW, Barton Springs salamander, Austin blind salamander, the San Marcos salamander, the Texas blind salamander, the Fountain darter, the Comal Springs dryopid beetle, and the Comal

Springs riffle beetle. Kinder Morgan's intrusive staking, clearing, trenching, boring, construction and installation of the PHP in the Hill Country threatens the killing, injury, and other forms of "take" of these endangered and threatened species.

49.     Kinder Morgan has not obtained a Section 10 ITP pursuant to 16 U.S.C. §1539(a)(1)(B). By moving forward with construction and other activities associated with the PHP project without obtaining a Section 10 ITP, Kinder Morgan will cause unpermitted "take" of federally listed species, and will continue to unlawfully "take," endangered species in numerous ways, including killing, harming, wounding, and harassing members of those species, as those terms are defined by the ESA. 16 U.S.C. § 1532(19).

50.     By beginning staking, clearing, trenching, boring, construction and installation of the PHP, Kinder Morgan's actions constitute an "irreversible or irretrievable commitment of resources" to the PHP project "which has the effect of foreclosing the formulation of implementation of any reasonable and prudent alternative measures," prior to completion of the Section 7 consultation process between the Service and the Corps in violation Section 7(d) of the ESA, 16 U.S.C. § 1536(d).

51.     Kinder Morgan has applied for approval of numerous individual verifications under Nationwide Permit 12 ("NWP 12") from the Corps under Section 404 of the Clean Water Act for the individual, discrete portions of the PHP that fall under the Corps jurisdiction. Before it can approve these individual NWP 12 verifications, the Corps is required to consult with the Service under Section 7 of the ESA. In a series of letters in 2017, the Service and the Corps appear to have agreed to alter the Section 7 consultation process for certain Section 404 permit applications (the Small Handle Process), without publishing the new Section 7 Small Federal Handle Process or providing notice and comment as required by the ESA and the APA. Upon information and belief,

the ESA Section 7 consultation for the PHP is proceeding under the substantively and procedurally flawed Small Handle Process.

52.     The Small Handle Process purports to amend the jointly issued regulations governing the consultation process under Section 7 of the ESA (*see* 50 C.F.R. § 402) and has wide-ranging effects with the potential to negatively impact many federally listed species nationwide. The adoption of the Small Handle Process without public notice or comment is a violation of the APA, 5 U.S.C. § 553(b)-(c). Furthermore, the invalid adoption of the Small Handle Process renders any permit, authorization, or other permission purported to be granted to Kinder Morgan for the PHP pursuant to the Small Handle Process void and invalid. Accordingly, any take of any federally listed species by Kinder Morgan pursuant to any permit or other authorization issued pursuant to the Small Handle Process constitutes an illegal take in violation of the ESA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim 1 – Violations of ESA Section 9

53.     Plaintiffs incorporate the allegations of paragraphs 1-52 by reference. Kinder Morgan has not obtained a Section 10 ITP pursuant to 16 U.S.C. § 1539(a)(1)(B). By moving forward with the PHP project without obtaining a Section 10 ITP Kinder Morgan will unlawfully "take" endangered and threatened species in numerous ways, *id.* § 1538(a)(1)(B), including killing, harming, wounding, and harassing members of those species, as those terms are defined by the ESA. 16 U.S.C. § 1532(19). In addition, because the Small Handle Process is substantively and procedurally invalid, any take of endangered or threatened species resulting from Kinder Morgan's activities is unlawful. For all of these reasons, Kinder Morgan lacks lawful authorization to take endangered or threatened species in connection with construction, operation, and maintenance of

21

the PHP, and thus is violating and will continue to violate Section 9 of the ESA through actions that take federally listed species. 16 U.S.C. § 1538(a)(1)(B).

### Claim 2 – Violations of ESA Section 7

54.     Plaintiffs incorporate the allegations of paragraphs 1-52 by reference. To the best of Plaintiffs' knowledge, the ESA Section 7 consultation regarding Kinder Morgan's applications for approval of individual NWP 12 verifications under Section 404 of the Clean Water Act for the PHP has not been completed. Yet, Kinder Morgan has already begun the irreversible or irretrievable commitment of resources to the PHP in violation of Section 7 of the ESA by constructing miles of pipeline and other activities. These ongoing activities constitute an irreversible or irretrievable commitment of resources to the PHP project which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternative measures, in violation of Section 7(d) of the ESA. 16 U.S.C. § 1536(d).

### Claim 3 – Violations of the APA

55.     Plaintiffs incorporate the allegations of paragraphs 1-52 by reference. The Service and the Corps have not completed the ESA Section 7 consultation regarding Kinder Morgan's applications for approval of individual NWP 12 verifications under Section 404 of the Clean Water Act for the PHP. However, upon information and belief, the Service and the Corps are conducting such consultation utilizing the Small Handle Process. The Small Handle Process—which constitutes a significant amendment to the ESA's regulatory framework governing Section 7 consultation between the agencies—was adopted without public notice or comment in violation of the APA. For this reason, the Service's adoption and application of the Small Handle Process is arbitrary, capricious, and not in accordance with law, and the Service adopted this process and policy without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

### Claim 4 – Violations of NEPA

56.    Plaintiffs incorporate the allegations of paragraphs 1-52 by reference. Upon information and belief, when the Service and the Corps complete their Section 7 consultation regarding Kinder Morgan's applications for approval of individual NWP 12 verifications utilizing the Small Handle Process, the Service will purport to offer Section 7 ITS coverage to Kinder Morgan for its PHP actions in the non-federal portion of the PHP. But Section 7 consultation does not offer coverage for non-federal private actions, and the Service cannot issue a Section 10 ITP without complying with NEPA, which requires all federal agencies to prepare an EIS for any major federal action that will significantly affect the human environment. 42 U.S.C. §§ 4321, *et seq.* Because the Service has not prepared an EIS (or at least an EA) subject to public comment, any purported Section 7 coverage in non-federal portion of the PHP is a violation of NEPA. 42 U.S.C. 4332 (C).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(1)    Declare that Kinder Morgan is violating Section 9 and Section 7(d) of the ESA;

(2)    Declare that the Service adopted the Small Handle Process in violation of the ESA and APA;

(3)    Enjoin Kinder Morgan from engaging in any staking, clearing, development, construction, installation or other activities that are likely to take any individual endangered or threatened species in violation of Section 9 of the ESA unless and until a Section 10 Incidental Take Permit issues under the ESA;

(4)    Enjoin Kinder Morgan from engaging in any further staking, clearing, development, construction, installation or other activities constituting an irreversible or irretrievable commitment of resources to the PHP project which has

the effect of foreclosing the formulation of implementation of any reasonable and prudent alternative measures in violation Section 7(d) of the ESA;

(5)      Enjoin Kinder Morgan from engaging in any staking, clearing, development, construction, installation or other activities that are likely to take any individual endangered or threatened species in violation of Section 9 of the ESA unless and until the Service completes NEPA review of any Section 10 Incidental Take Permit it issues for the non-federal portions of the PHP;

(6)      Set aside and remand the Small Handle Process for further consideration consistent with the substantive and procedural requirements of the ESA and APA;

(7)      Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to 16 U.S.C. § 1540(g)(4), 28 U.S.C. § 2412, and any other applicable provision; and

(8)      Grant Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Clark Richards*
Daniel R. Richards
State Bar No. 00791520
drichards@rrsfirm.com
Clark Richards
State Bar No. 90001613
crichards@rrsfirm.com
RICHARDS RODRIGUEZ & SKEITH, LLP
816 Congress Ave, Suite 1200
Austin, TX  78701
Tel: 512-476-0005

*/s/ Lynn E. Blais*

Lynn E. Blais
Attorney at Law
Texas Bar No. 02422520
727 E. Dean Keeton Street
Austin, TX 78705
(512) 653-5987
lblais@law.utexas.edu


*/s/ Renea Hicks*

Renea Hicks
Attorney at Law
State Bar No. 09580400
LAW OFFICE OF MAX RENEA HICKS
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

**ATTORNEYS FOR PLAINTIFFS**


**DAVID A. ESCAMILLA**
**TRAVIS COUNTY ATTORNEY**
P. O. Box 1748
Austin, Texas  78767
(512) 854-9415
(512) 854-4808 FAX


By: */s/ Sherine E. Thomas*

Sherine E. Thomas
Assistant County Attorney
State Bar No. 00794734
sherine.thomas@traviscountytx.gov
Sharon K. Talley
Assistant County Attorney
State Bar No. 19627575
sharon.talley@traviscountytx.gov
Tim Labadie
Assistant County Attorney
State Bar No. 11784853
tim.labadie@traviscountytx.gov
**ATTORNEYS FOR PLAINTIFF**
**TRAVIS COUNTY**