**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **CITY OF AUSTIN,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | **Case No. 1:20-cv-00138-RP** |
| | § | |
| **KINDER MORGAN TEXAS** | § | |
| **PIPELINE, LLC,** *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

<u>**DEFENDANTS KINDER MORGAN TEXAS PIPELINE, LLC AND
PERMIAN HIGHWAY PIPELINE, LLC'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER**</u>

Plaintiffs ask this Court to suspend pipeline right-of-way clearance work in four counties that the U.S. Fish and Wildlife Service ("Service") has stated must be completed by March 1 to *avoid impacts* to warblers—or else the pipeline's construction will be halted for six months at an estimated cost of in excess of $135 million to Defendants Permian Highway Pipeline, LLC and Kinder Morgan Texas Pipeline (collectively, "PHP").  With a very small window of time remaining for PHP to perform clearing work—which is being undertaken in assiduous compliance with all federal regulations—an injunction of *any* length will have a devastating impact on PHP and the Pipeline. Plaintiffs know this; it is their end game, and a TRO achieves their goal of harming PHP, even if a preliminary injunction is ultimately denied, and in fact, even if they are denied ultimate relief in this case.[1]

Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction is due on Friday, February 14th, and Defendants need to make full use of the 48 pages this Court has granted them – Defendants anticipate filing that opposition prior to the hearing now set for Friday, February 14 at 2 p.m. Given the necessity of a swift response to Plaintiffs' latest request for expedited relief, and the ten-page limit on responses to non-dispositive motions, Defendants could not begin to comprehensively address in this Opposition all of the arguments and authorities found in Plaintiffs' various filings including their 54-page Preliminary Injunction papers (which the TRO Application incorporates by reference). Nonetheless, Defendants provide this concise statement of some, but not all, of the many reasons why the Court should deny Plaintiffs' requested relief, all to be more fully developed and supported in Defendants' forthcoming Opposition to Preliminary Injunction.[2]

---

[1] For example, Hays County Commissioner Mark Jones has explained that what "we're looking at is to make it as uncomfortable as we can and to make it as expensive as we can to where an alternative route is more attractive than bringing it through here." Hay Free Press, *Permian Highway Pipeline outcry builds as residents seek answers* (Mar. 13, 2019), https://haysfreepress.com/2019/03/13/permian-highway-pipeline-outcry-builds-as-residents-seek-answers/.

[2] In support of this Opposition, PHP attaches declarations and supporting materials from Sital K. Mody (Ex. A); Dr. Kemble White (Ex. B); Michael S. Crow (Ex. C); and Amanda L. Aurora (Ex. D). PHP also incorporates by reference its forthcoming Opposition to Plaintiffs' Application for Preliminary Injunction.

1.      **Applicable standard.**

This Court has succinctly stated the standard for issuing a TRO:

> The movant for a temporary restraining order must show: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the restraining order is not granted, that is, there is no adequate remedy at law, such as monetary damages; (3) the movant's threatened injury outweighs the threatened harm to the party whom the movant seeks to enjoin; and (4) that granting the request for a temporary restraining order will not disserve the public interest.

*Alexander Dubose Jefferson & Townsend LLP v. Vance*, No. 1:17-CV-133-RP, 2017 WL 7052299, at *1 (W.D. Tex. Feb. 22, 2017) (Pitman, J.). "A temporary restraining order is an *extraordinary remedy* which should *not* be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* (emphasis added). Contrary to Plaintiffs' arguments, there is no relaxed standard for seeking an injunction under the National Environmental Policy Act ("NEPA") or the Endangered Species Act ("ESA"). The Fifth Circuit has concluded that a court "claiming a 'relaxed standard' for granting injunctive relief" under the ESA is reversible error. *Aransas Project v. Shaw*, 775 F.3d 641, 64 (5th Cir. 2014).

2.      **Plaintiffs cannot show a substantial likelihood that they will prevail on the merits.**

The essence of Plaintiffs' claims against PHP under the ESA is that PHP should have *voluntarily* sought a Section 10 incidental take permit under 16 U.S.C. § 1539 as a "safe harbor" from the ESA's prohibitions against "taking" endangered species. Without the Section 10 process, Plaintiffs claim (without citation to law), PHP and the Pipeline will violate the ESA. *See* TRO App. at 4-5. Plaintiffs also allege that reliance on this process somehow violates NEPA (although the TRO Application fails to identify *who* is subject to this claim; NEPA is solely a federal responsibility).[3] Plaintiffs are wrong, and they are unlikely to succeed on the merits of their claim.[4]

---

[3] To be clear, PHP has no obligations under NEPA. On its face, NEPA applies to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

[4] PHP does not concede that Plaintiffs have met the notice requirements in 16 U.S.C. § 1540(g)(2).

Plaintiffs have chosen to ignore entirely the well-established lawful, thorough, and appropriate Section 7 consultation process that is mandatory for both the Service and the U.S. Army Corps of Engineers ("Corps") under 16 U.S.C. § 1536 and that PHP followed at the direction of those agencies.[5] In working with both agencies on environmental reviews, analyses, project changes, conservation measures, and mitigation throughout this lengthy and detailed regulatory process, *see generally* Exs. A and C, PHP has satisfied its ESA obligations. As required by the ESA, the Corps and the Service assessed potential impacts to federally protected species that might arise in connection with the Corps' action issuing verifications to PHP under the Corps' Clean Water Act Nationwide Permit ("NWP") 12 for utility lines. *See* 33 U.S.C. § 1344(e)(1); 82 Fed. Reg. 1,860, 1,999 (Jan. 6, 2017).[6]

As the Service and the Corps have done for many similar projects in Texas and across the country, the agencies worked with PHP over nearly 18 months. This process culminates in the Service's Biological Opinion and Incidental Take Statement ("ITS") issued under Section 7, Dkt. 12-1, and the Corps' NWP 12 verifications.[7] Therefore, once it has received the Corps' verifications, PHP satisfied its obligations under the ESA and will be protected from takings claims by virtue of the Biological Opinion and ITS.[8] *See* Biological Op. at 51-53.[9]

Plaintiffs also claim (again, without citation) that a Section 10 permit is necessary because the Corps does not exercise jurisdiction over all of the Pipeline sufficient to justify coverage of the entire

---

[5] There are two ways to gain a "safe harbor" from the take prohibitions in Section 9: Section 10 and Section 7, which was the approach used here. *See Maine Council of Atlantic Salmon Fed'n v. Nat'l Marine Fisheries Serv.*, 858 F.3d 690, 692 (1st. Cir. 2017).
[6] NWPs are general permits, and consistent with Congress' goal, "regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. §§ 330.2(b), 330.1(b).
[7] The Corps' Fort Worth District and Galveston District issued verification on February 13, 2020.
[8] This NWP process also satisfies the Corps' obligations under NEPA. *See, e.g.,* U.S. Army Corps' of Eng'rs, Decision Document, Nationwide Permit 12 at 79 (Dec. 21, 2016) (concluding that, pursuant to NEPA, reissuance of NWP 12 "will not have a significant impact on the quality of the human environment."); 82 Fed. Reg. at 1,860.
[9] Even if this were not so, success on the merits of their ESA Section 9 claim requires Plaintiffs to establish (by a preponderance of the evidence) that the Pipeline will result in actual death or injury to members of a listed species—a burden Plaintiffs have not carried. *Defs. of Wildlife*, 204 F.3d at 925.

project under Section 7. TRO App. at 4-5. Again, Plaintiffs are wrong. In fact, the Service directly addressed this issue in its Biological Opinion, explaining that the approach is:

> consistent with the Service's longstanding and oft-used practice of (1) analyzing the full effects of agency actions under section 7 of the Act, including effects from private development that occur on non-federal land outside of the federal action agency's jurisdiction where that development is reasonably certain to occur and would not occur but for the agency action, and (2) including any resulting take from such development in the [ITS] of the section 7 biological opinion.

Biological Op. at 6. The Service further explains that "at multiple points" Section 7 expressly recognizes the potential for the involvement of private applicants and the opportunity for those applicants to obtain "an exemption for incidental take of listed species" under Section 7. *Id*; *see also* 16 U.S.C. § 1536(a)(3) (federal agency consultation in cooperation "with, the prospective permit or license applicant); *id.* § 1536(b)(1)(B) (action may involve a permit applicant); *id.* § 1536(b)(3)(A) (opinion should be provided to an applicant). With respect to the conclusion of the process:

> the Secretary shall provide the Federal agency and **the applicant concerned**, if any, with a written statement—(i) specifies the impact of such incidental taking on the species; (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact, . . . (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) **that must be complied with by the Federal agency or applicant (if any)**, or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4)(C) (emphasis added). Under Section 7, "**any taking** that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned." *Id.* § 1536(o)(2) (emphasis added); *see also Maine Council of Atlantic Salmon Fed'n*, 858 F.3d at 692.

Additionally, the regulations implementing Section 7 *require* the agencies to consider the entirety of the Pipeline once the consultation obligation is triggered by federal action. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012) (quotation omitted); 50 C.F.R. § 402.02 (defining "action" as any activity "carried out, *in whole or in part*, by Federal agencies . . . .") (emphasis added). Under the regulations, all "effects of the action" must be

considered, which here includes any effects to species caused by the entirety of the Pipeline. 50 C.F.R. § 402.02. As the Biological Opinion further explains: "Pursuant to the Act's section 7 implementing regulations, even though the Corps has jurisdiction over a small extent of the overall PHP project, potential consequences to species must be considered for the entire pipeline." Biological Op. at 5.

This Section 7 process reflects the longstanding approach of these agencies to linear projects where the Corps has limited statutory jurisdiction but the ESA requires a broader review with respect to impacts of an overall project on listed species. *See Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Circuit 2015).  In a recent revision to its Section 7 regulations, the Service codified its well-established process, explaining that "[w]hen the Services write an [ITS] for a biological opinion, under section 7(b)(4)(iv) of the ESA they can assign responsibility of specific terms and conditions of the [ITS] to the Federal action agency, the applicant, or both, taking into account their respective roles, authorities and responsibilities." 84 Fed. Reg. 44,976, 44,977 (Aug. 27, 2019).

The Biological Opinion and ITS follow this statutory and regulatory construct precisely, explaining that while the Biological Assessment for the Pipeline "considers the entirety of the project," there are "USACE Action Areas" and "Applicant Action Areas" where reasonable and prudent measures will be assigned to either the applicant, the Corps, or both depending on whether the Corps has CWA jurisdiction over the relevant portion of the Pipeline. Biological Op. at 7. Either way, the measures are nondiscretionary. The Service states that "taking by the Corps and/or the Applicant (PHP, LLC.) that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act, provided that such a taking is in compliance with this Incidental Take Statement." Biological Op. at 51 (Incidental Take Statement).

Finally, despite Plaintiffs' claims to the contrary, it is well established law that an incidental take permit "is not mandatory and a party can choose whether to proceed with the permitting process." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 927 (9th Cir. 2000) (quotation omitted). "Thus a party

may proceed without a permit, but it risks civil and criminal penalties if a 'take' occurs." *Id.* As the Service recently observed, it is "vital that Service Staff recognize that whether to apply for a section 10(a)(1)(B) [incidental take] permit is a decision of the applicant." Greg Sheehan, Principal Deputy Dir., U.S. Fish & Wildlife Serv., Guidance on trigger for an incidental take permit at 1 (Apr. 26, 2018).[10]

**3.      Plaintiffs have not shown a substantial threat that they will suffer irreparable injury.**

Plaintiffs do not allege harms that will impact any federally listed endangered species *as a population. See Aransas Project v. Shaw*, 775 F.3d 641, 663 (5th Cir. 2014) (reversing a district court's preliminary injunction because it found that plaintiffs had not proven that there was "a reasonably certain threat of imminent harm to a protected species"); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 422 F.3d 782, 796 (9th Cir. 2005); *Water Keeper All. v. United States Dep't of Def.,* 271 F.3d 21, 34 (1st Cir. 2001).[11] The Service's Biological Opinion and ITS provides the best evidence that there will no irreparable harm to species: it concluded the Pipeline will not jeopardize any endangered species. Biological Op. at 47. The Court should rely on the Service's expertise on these issues and conclude that Plaintiffs have not shown a substantial threat of irreparable harm. *See San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("The technical determinations made as part of this Biological Opinion are entitled to the 'highest' deference."); *Save Our Springs All. v. Cooke*, No. A-01-CA-855-SS, 2002 WL 31757473, at *10 (W.D. Tex. Nov. 12, 2002) (Sparks, J.).

Moreover, the harms Plaintiffs allege simply will not come to pass. Environmental harms, like all other harms, must not be speculative or remote. *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001). As required by the Biological Opinion, PHP will conduct clearing in possible warbler habitat

---

[10] https://www.fws.gov/endangered/esa-library/pdf/Guidance-on-When-to-Seek-an-Incidental-Take-Permit.pdf.

[11] Plaintiffs' claims regarding the warbler rely extensively on the Blair Report (attached to Pls.' Ex. 4). However, the Blair Report suffers from numerous methodological and scientific deficiencies that have led to significantly overstated and unfounded descriptions of harm. *See, e.g.,* Aurora Decl. ¶ 6 ("Nearly all the text in Chapter 2.1 . . . is copied verbatim" from the work of the declarant); ¶ 8 (noting the lack of source attribution), ¶ 10 (listing numerous recent relevant scientific publications not considered).

only when the warblers are not present. Biological Op. at 55. Plaintiffs vastly overestimate the total number of acres that will be cleared or indirectly affected by the Pipeline's construction, *see* Aurora Decl. ¶¶ 13-14, when (at most) PHP will clear only 282 noncontiguous acres of the total estimated 3.9 *million* acres of potential warbler habitat across central Texas. Biological Op. at 32. The Service has concluded much of these 282 acres of potential habitat are not of optimal quality. *Id.* at 48.

Additionally, based on desktop mapping of potential warbler nesting/breeding habitat within an 800-foot-wide area along the length of the Pipeline in Kimble, Gillespie, Blanco, and Hays counties, PHP has determined that it will not be clearing potential warbler habitat on *any* land owned by Plaintiffs. *See* Crow Decl. ¶ 12-13, Attach C-5, C-6, C-7. The Pipeline route does not go through the cities of Austin or San Marcos; Travis County; or land owned by the Becker or Murchison Plaintiffs. Crow Decl. ¶ 12, Attach. C-5, C-6. PHP's analysis further indicates that the Murchison and Becker properties is unlikely to be warbler habitat due to fragmentation. *See* Crow Decl. ¶12, Attach. C-6; *see also* Aurora Decl. ¶¶ 17-18. Although the Pipeline crosses Plaintiff Weiler's property, analysis upon which the Service's conclusions are based did not identify any potential warbler habitat on his property. *See* Crow Decl. ¶ 12, Attach. C-7; Aurora Decl. ¶ 19.

Additionally, Plaintiffs' claims that clearing and construction will "increase the risk of spreading Oak Wilt on their property and destroying their oak trees," TRO App. at 7, completely ignore causation. TRO App. at 7; Pls.' Ex. 4 (Blair Report at 10-11). As the Blair Report acknowledges, oak wilt is already present, wide-spread, and expanding even before the Pipeline right-of-way is cleared. Blair Report at 10-11; Aurora Decl. ¶ 14. That aside, the Biological Opinion requires PHP to take specific precautions recommended by professional arborists to prevent the spread of oak wilt when it is encountered. Biological Op. at 12; Crow Decl. ¶ 14.[12]

---

[12] *See also* Aurora Decl. ¶¶ 14, 20.

Similarly, Plaintiffs claims of harm regarding seven other species are also highly speculative. *See* TRO App. at 5; Pls.' Ex. 6 (Herrington Decl. ¶¶ 10, 11).[13] Plaintiffs offer no evidence that these species will be present in potential habitat near the Pipeline. In fact, the Pipeline's route is over five miles away from observed locations of the Barton Springs salamander and 18.4 miles away from observed locations of the Austin blind salamander—the two aquatic species that the federal agencies concurred are unlikely to be adversely affected by the Pipeline. Biological Op. at 2-3; White Decl. ¶¶ 6, 9; Crow Decl. Att. C-8. And, the Service concluded there will be no take of any individuals of these species. Biological Op. at 4. In addition, PHP will conduct construction activities pursuant to a highly protective Void Mitigation Plan that PHP voluntarily developed to minimize the likelihood that sediments (or other possible contaminants) would enter groundwater and adversely affect the habitat of either salamander. Biological Op. at 3; White Decl. at ¶ 6.[14] In short, it would take an unlikely chain of events for construction sediment or a contaminant to reach these creatures in the groundwater (even assuming they are there).[15]

Finally, Plaintiffs are mistaken that the failure to enter a TRO will undermine this Court's ability to render a meaningful judgment if they ultimately succeed on the merits of their claims. TRO App. at 8. For the many reasons expressed above, there will be no irreparable harm to any endangered species in the absence of TRO, and alleged violations of law can be remedied by additional process and further mitigation even after the fact. *See, e.g., Or. Nat. Res. Council v. U.S. Bureau of Land Mgmt.,*

---

[13] The Complaint lists these species. Compl. ¶ 45.

[14] *See generally* White Decl.; Ex. A, Attach. A-2 (PHP Response to Notices of Intent to Sue).

[15] Plaintiffs also allege a host of other supposed risks and injuries, including (1) explosion; (2) herbicides; (3) diminished property values and enjoyment; and (4) impacts to economic investments regarding habitat, drinking water, and recreation. TRO App. at 7-8. None of these bald allegations supports an injunction because "there must be more than an unfounded fear on the part of the applicant." *See Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985). Finally, several of these speculative harms are economic and are therefore not "irreparable."

470 F.3d 818, 823 (9th Cir. 2006) (rejecting mootness challenge and requiring additional environmental review on mitigation); *see also* Pls.' Ex. 12 (noting availability of warbler mitigation credits).

### 4. Plaintiffs' threatened injury does not outweigh the threatened harm to PHP.

The Court should deny the Plaintiffs' motion because PHP would suffer significant harm by the interruption of construction and the delay of the planned in-service date, and these *actual* harms greatly outweigh the purely speculative and remote harms alleged by Plaintiffs. Contrary to Plaintiffs' application, in balancing these competing claims of injury, there is no presumption in favor of alleged environmental injuries over economic injuries. While the ESA indicates that Congress has recognized the value of protecting wildlife, it does not establish a presumption in favor of issuing injunctions in the absence of irreparable harm or without regard to the balance of harms and equities. *Aransas Project*, 775 F.3d at 663. Courts have made clear that serious economic harms can outweigh reparable injuries or injuries that are unlikely to occur. *See, e.g., Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987) (unlikely injury to aboriginal fishery outweighed by $70 million investment in offshore oil exploration if leasing enjoined); *see also Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1231 (10th Cir. 2008).

When the Corps' authorizations are received, all the necessary clearing in potential warbler habitat will be done in accordance to the requirements of the Biological Opinion. Any delay in clearing in potential warbler habitat by March 1 *will* cost PHP $135 million consisting of construction standby costs and inspection and survey standby costs. Mody Decl. ¶ 35.  PHP has spent approximately $1.2 billion of the $2.15 billion project budget to date. An injunction would risk these investments. Halting construction *will* lead to lost revenues on the order of $32.8 million per month (approximately $1.08

million per day), and/or expose PHP to liability based on existing commercial and delivery contracts. Mody Decl. ¶ 36.[16]

In contrast to this significant harm that will surely result, Plaintiffs have alleged only speculative and attenuated harm that is unlikely to come to pass, let alone significantly impact any of the species at issue *as a whole*.[17]

**5.     If a TRO is granted, Plaintiffs must post a bond of at least $135 million to cover the extensive damages to PHP that would come from being wrongfully enjoined.**

Federal Rule of Civil Procedure 65(c) makes a bond a necessary condition to any TRO the Court might issue. Although Plaintiffs argue they are exempt, the Rule explicitly exempts only the "United States, its officers, and its agencies" from this "requirement"—not local governments. Fed. R. Civ. P. 65(c). And, although courts have found in limited situations that a public-interest plaintiff's advocacy might justify a lower bond, *see, e.g., Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009), such cases are inapt here where Plaintiffs include highly-populated municipalities with substantial revenues. If the Court issues a TRO, it should order Plaintiffs to post a bond of at least $135 million. *See Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).

* * *

FOR THESE REASONS, Defendants Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC request that the Court deny Plaintiffs' Application for Temporary Restraining Order, and grant them such other relief to which they are entitled.

---

[16] Plaintiffs' wrongly blame on PHP for the present "time pressures." TRO App. at 3. Sixty days after serving their NOIs, Plaintiffs were nowhere to be found, despite knowing that PHP's intent to construct the Pipeline. Only in the eleventh hour did Plaintiffs file this case in which they assert no claims of which they were unaware several months ago and challenge no final agency action taken in the meantime. Additionally, Plaintiffs' claims about lack of public engagement are untrue. *See* Ex. A, Attach. A-2 at 9.

[17] Enjoining the Pipeline (partially or temporarily) will disserve the public interest. The Pipeline will support local jobs; generate billions in state revenues; and reduce natural gas flaring and venting in the Permian Basin. ¶¶ 9-10, 37-40.

Dated February 13, 2020.                    Respectfully submitted,

                                            /s/ W. Stephen Benesh
                                            W. Stephen Benesh
                                            Texas State Bar No. 02132050
                                            steve.benesh@bracewell.com
                                            BRACEWELL LLP
                                            111 Congress Avenue, Suite 2300
                                            Austin, Texas 78701
                                            Tel.: 512.494.3680
                                            Fax: 800-404-3970

                                            Ann D. Navaro (*admitted pro hac vice*)
                                            ann.navaro@bracewell.com
                                            Brittany M. Pemberton (*admitted pro hac vice*)
                                            brittany.pemberton@bracewell.com
                                            BRACEWELL LLP
                                            2001 M Street NW, Suite 900
                                            Washington DC 20036
                                            Tel: 202.828.5811
                                            Fax: 800.404.3970

                                            **Attorneys for Defendants Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 13, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

The undersigned further certifies that he caused a true copy of this document to be served on the following counsel via e-mail and USPS first class mail:

Lynn E. Blais
Attorney at Law
Texas Bar No. 02422520
727 E. Dean Keeton Street
Austin, TX 78705
lblais@law.utexas.edu

*/s/ W. Stephen Benesh*
W. Stephen Benesh