IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:20-CV-138-RP |
| KINDER MORGAN TEXAS PIPELINE, LLC, et al., | § § § § | |
| Defendants. | § § | |

# ORDER

Before this Court is the Plaintiffs City of Austin, City of San Marcos, Travis County, Hays County, Barton Springs Edwards Aquifer Conservation District, Larry Becker, Arlene Becker, Jonna Murchison, and Mark Weiler's ("Plaintiffs") Application for a Temporary Restraining Order ("TRO Application") filed on February 11, 2020. (Dkt. 18). Defendants Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC (collectively, "Kinder Morgan") filed a response in opposition. (Dkt. 28). United States Department of Interior, David Bernhardt, in his official capacity as Secretary of Interior, United States Fish and Wildlife Service and Aurelia Skipwith, in her official capacity as Director of the U.S. Fish and Wildlife Service (collectively, "Federal Defendants") also filed a response in opposition. (Dkt. 29). The Court held a hearing on Plaintiffs' TRO Application on February 14, 2020. Having considered the parties' briefing, the arguments presented at the hearing, and the relevant law, this Court will deny Plaintiffs' TRO Application.

## I. BACKGROUND

This case is about Kinder Morgan's proposed natural gas pipeline that would intersect through several hundred miles of land, including the scenic Central Texas Hill Country. Kinder Morgan intends to begin construction immediately, first by clearing the land. That land contains habitat for the Golden-cheeked Warbler ("warbler") which is endangered.

1

**A. Endangered Species Act**

Section 9 of the Endangered Species Act ("ESA") makes it illegal to "take" any members of an endangered species. The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" in the definition of "take" under the ESA means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.350. "Harm" means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

However, the incidental taking of an endangered species is permitted under two exceptions embodied in § 7 and § 10 of the ESA, codified at 16 U.S.C. § 1536 and 16 U.S.C. § 1539, respectively. Under the § 10 exception, private parties may apply for an incidental take permit after navigating a rather rigorous and time-consuming procedure. By contrast, the § 7 exception provides a procedure whereby federal agencies and certain "applicants" may obtain determinations in the form of incidental take statements through a comparatively informal process.

**B.  Overview of the Section 7 Process**

Under Section 7, a federal agency must "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (citing 16 U.S.C. § 1536(a)(2)). Here, the relevant federal agency is the U.S. Army Corps of Engineers (the "Corps"). Before beginning any "major construction activities," the Corps must prepare a biological assessment to determine whether an endangered

species or critical habitat is "likely to be adversely affected" by the proposed action. *Id.* (citing 50 C.F.R. § 402.12). After the Corps determines that a proposed action may affect listed species or critical habitat, it must initiate the formal consultation process with the appropriate wildlife agency, in this case the U.S. Fish and Wildlife Service ("Service"). 50 C.F.R. § 402.14(a). After the Corps initiates the formal consultation process, neither the Corps or the applicant shall "make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

Formal consultation is a mandatory process for proposed projects that may adversely affect listed species. *See id.* The process is initiated in writing by the relevant federal agency (here, the Corps) and concludes with the issuance of a Biological Opinion by the Service. 16 U.S.C. § 1536(b)(3)(A). The Biological Opinion states the opinion of the Service as to whether the proposed action is likely "to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" as required under § 7(a)(2). 16 U.S.C. § 1536; 50 C.F.R. § 402.14(g)(4). If the Service concludes that jeopardy or adverse modification is likely, any take resulting from the proposed action violates section 9 of the ESA (unless that take is authorized by other provisions of the [ESA]). *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012)

In cases where the Service concludes that no jeopardy or adverse modification is likely, and that the proposed action is likely to result only in the "incidental take" of an endangered species, then the Service will provide an incidental take statement along with its biological opinion. *Id.* (citing 50 C.F.R. § 402.14(i)). The incidental take statement will specify the extent of the incidental take and indicate "those reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact." 50 C.F.R. § 402.14(i).

Any taking of an endangered species in compliance with the terms and conditions of the incidental take statement is not a prohibited taking under the Endangered Species Act and no other authorization or permit is required. 16 U.S.C. § 1536(h) and (o)(1); 50 C.F.R. § 402.14(i)(5). Importantly, the Biological Opinion and the Incidental Take Statement do not become effective for the Corps or the applicant until the Corp issues all required Clean Water Act authorizations for the project.

While it is up to the Corps to determine whether and to what extent it will comply with the incidental take statement issued by the Service, the Corps and the applicant must comply with the incidental take statement in its entirety if they wish to be insulated from take liability under § 9 of the Endangered Species Act. *See Fath v. Texas Dep't of Transportation*, No. 1:16-CV-234-LY, 2016 WL 7442868, at *6 (W.D. Tex. Sept. 6, 2016).

Here, the Corps determined that the pipeline project may adversely affect golden-cheek warbler habitat and accordingly initiated the formal consultation process with the Service. *See* 50 C.F.R. § 402.14(a). On February 3, 2020, the Service issued the Biological Opinion based on its review of the pipeline project and its effects on the endangered golden-cheek warbler. 16 U.S.C. § 1536(b)(3)(A). The Biological Opinion concluded that the proposed action was "not likely to jeopardize the continued existence of the [warbler]." (Biological Opinion, Dkt. 12-1, at 48). The Service further noted that it "does not expect, directly or indirectly, that the proposed project will reduce appreciably the likelihood of both the survival and recovery of the [warbler] in the wild by reducing the reproduction, numbers, or distribution of [warbler]. (*Id.* at 50).

As part of the incidental take statement, the Service specified several reasonable and prudent measures to minimize the incidental take of the warbler. (*Id.* at 55); *see also* 50 C.F.R. § 402.14(i). Importantly, the incidental take statement specifies that Kinder Morgan is prohibited from clearing vegetation within the warbler habitat from March 1 to July 31. (*Id.* at 56). "Vegetation clearing within defined project workspaces shall be cleared prior to March 1." (*Id.*). Kinder Morgan received authorization from the Corps pursuant to the Clean Water Act on

February 13, 2020, which made the Biological Opinion and the Incidental Take Statement effective.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 65 permits the Court to issue a temporary restraining order without notice to the adverse party only where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). The party moving for a temporary restraining order must establish that: "(1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). The party seeking relief has the burden of proving each element. *Id.* Upon reviewing the Plaintiffs' motion, the Court concludes that Plaintiffs have not met their burden under Rule 65 and the Fifth Circuit's requirements.

## III. DISCUSSION

In considering the four requirements and deciding whether to grant injunctive relief, courts must keep in mind that the granting of a TRO or preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion," and a TRO or preliminary injunction is necessary "to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). In this case, the Court determines that Plaintiffs have not satisfied one of the four required prongs: irreparable harm. Having made that determination, the Court does not reach the other three prongs of the TRO analysis.

Plaintiffs claim that Kinder Morgan will clear a "125-foot swatch of occupied [warbler] habitat to construct its pipeline." (Memo. Pls.' Prelim. Injunc., Dkt. 10, at 32). Plaintiffs argue that Kinder Morgan's clearing process will cause a direct take of the warblers and that their habitat will be destroyed. The warblers' habitat is "used by the species for essential biological functions such as breeding, feeding, and sheltering" and that their nesting period begins in late February or early March. (*Id.* at 32–33). Plaintiffs contend that the destruction of warbler habitat will harm Plaintiffs' interests in "observing and protecting" warblers. (*Id.* at 34). Plaintiffs further elaborated on the effect of Kinder Morgan's activities on the warbler at the hearing, explaining that the landowners who moved to the Central Texas Hill Country have an interest in viewing warblers and their ability to view them would be diminished.

While the Court appreciates Plaintiffs' arguments and has concerns about the fate of the warblers whose habitat is in the path of the pipeline, the Court cannot grant a TRO at this juncture when Plaintiffs have not met their burden of a showing of irreparable harm to the species as a whole. *See Aransas Project v. Shaw*, 775 F.3d 641, 663–64 (5th Cir. 2014) (reversing a district court's preliminary injunction because it found that plaintiffs had not proven that there was "a reasonably certain threat of imminent harm to a protected species"). To that point, the Biological Opinion concluded that the proposed action was "not likely to jeopardize the continued existence" of the warbler. (Biological Opinion, Dkt. 12-1, at 48). The Service noted that it "does not expect, directly or indirectly, that the proposed project will reduce appreciably the likelihood of both the survival and recovery of the [warbler] in the wild by reducing the reproduction, numbers, or distribution of [warbler]. (*Id.* at 50). The Service found that there would be impacts to only 0.04% of the breeding habitat available for the species in three identified regions. (*Id.* at 32).

As part of the incidental take statement, the Service specified several reasonable and prudent measures to minimize the incidental take of the warbler. (*Id.* at 55); *see also* 50 C.F.R. § 402.14(i). Importantly, the incidental take statement specifies that Kinder Morgan is prohibited

from clearing vegetation within the warbler habitat from March 1 to July 31. (*Id.* at 56). "Vegetation clearing within defined project workspaces shall be cleared prior to March 1." (*Id.*). Kinder Morgan will implement those conservation measures specified in the Biological Opinion, including the protection of 1,363 acres of occupied warbler habitat (Igua Ranch) located in Travis County. (*Id.* at 43). The Service found that Kinder Morgan's preservation efforts "is anticipated to fully offset impacts to the species." (*Id.* at 48). Accordingly, at this time, the potential injury does not rise to the level of being irreparable. Rather, the injury is limited in terms of takes and destruction of habitat due and the effect will be mitigated by the conservation measures Kinder Morgan has and will take pursuant to the Biological Opinion.[1] In addition, it appears that adequate remedies exist to address future harm, e.g., the requirement that Kinder Morgan establish additional conservation areas that will create "large, contiguous areas of high quality habitat." (*Id.* at 43). "The Service considers the [warbler] able to tolerate the loss of poorer quality habitat when offset with larger acreages of permanently protected high quality habitat." (*Id.*).

---

[1] Plaintiffs also allege irreparable injury with respect to the pipeline construction's effect on the Barton Springs salamander, the Austin blind salamander, the San Marcos salamander, the Fountain darter, the Comal Springs dryopid beetle, and the Comal Springs riffle beetle. Plaintiffs showing as to those species is less compelling than their insufficient showing with respect to the warbler.

## IV. CONCLUSION

Because Plaintiffs have failed to show that the potential harm has risen to the level of irreparable harm that would justify granting the extraordinary relief of a TRO, this Court **DENIES** Plaintiffs' Application for TRO.

**IT IS FURTHER ORDERED** that the parties or counsel acting on their behalf appear by phone for a conference on **February 18, 2020 at 3:30p.m** to set a date for the Court to hear Plaintiffs' motion for preliminary injunction and to set a briefing schedule for the motion for preliminary injunction. Counsel for Plaintiffs shall be responsible for coordinating the call and providing dial-in information at least 24 hours prior to the hearing to the courtroom deputy at julie_golden@txwd.uscourts.gov.

**SIGNED** on February 14, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE