IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:20-CV-138-RP |
| | § | |
| KINDER MORGAN TEXAS PIPELINE, | § | |
| LLC, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before this Court is the Plaintiffs City of Austin, City of San Marcos, Travis County, Hays County, Barton Springs Edwards Aquifer Conservation District, Larry Becker, Arlene Becker, Jonna Murchison, and Mark Weiler's ("Plaintiffs") Application for a Preliminary Injunction ("Preliminary Injunction Application"). (Dkt. 9, 10). Defendants Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC (collectively, "Kinder Morgan") filed a response in opposition. (Dkt. 30). The United States Department of Interior, David Bernhardt, *in his official capacity as Secretary of Interior*, United States Fish and Wildlife Service, and Aurelia Skipwith, *in her official capacity as Director of the U.S. Fish and Wildlife Service*, (collectively, "Federal Defendants") also filed a response in opposition. (Dkt. 44). The Court held a preliminary injunction hearing on March 4, 2020. (Dkt. 55). Having considered the parties' briefing, the arguments presented at the hearing, and the relevant law, the Court will deny Plaintiffs' Preliminary Injunction Application.

# I. BACKGROUND

## A. Factual Background

This case concerns Kinder Morgan's construction of a natural gas pipeline through the Central Texas Hill Country.[1] (Compl., Dkt. 1, at 2). Plaintiffs are local government entities, a groundwater conservation district, and landowners in the Texas Hill Country who seek injunctive relief against Kinder Morgan with respect to the pipeline project. They allege the pipeline's planned route through the Texas Hill Country will travel through "sensitive environmental features, including the Edwards and Trinity Aquifer recharge zones as well as habitat for many endangered species," including the golden-cheeked warbler, the Houston toad, and the Tobusch fishhook cactus.[2] (App. Prelim. Inj., Dkt. 10, at 2).

Plaintiffs bring claims against Kinder Morgan and the U.S. Fish and Wildlife Service ("Service") for violations of the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA"). (Compl., Dkt. 1, at 21–23). Previously, Plaintiffs filed an Application for a Temporary Restraining Order ("TRO Application") to stop Kinder Morgan from clearing 125-feet of golden-cheeked warbler territory to begin pipeline construction. (TRO App., Dkt. 18, at 3). After holding an emergency hearing, the Court denied Plaintiffs' TRO Application, concluding that Plaintiffs had not met their burden of showing irreparable, species-level harm to the warbler. (Order, Dkt. 31).

Plaintiffs now move for a preliminary injunction on the basis of their ESA and NEPA claims. (App. Prelim. Inj., Dkt. 10, at 3). With respect to their ESA claim, Plaintiffs contend that

---

[1] The pipeline will extend beyond the Texas Hill Country. The pipeline will cross 16 Texas counties between Reeves County and Colorado County, ultimately traversing 428 miles. (Kinder Morgan, Resp., Dkt. 30, at 19).
[2] The biological opinion issued by the U.S. Fish and Wildlife Service determined that "any negative consequences to the Austin blind and Barton Springs salamanders due to project construction and operation will be insignificant and discountable." (Biological Op., Dkt. 12-1, at 5). In light of this finding—and Plaintiffs' focus on the harm to the golden-cheeked warbler in their motions and at the hearing—the Court's analysis will focus on the alleged harm caused to the golden-cheeked warbler.

moving forward with the pipeline project without obtaining a Section 10 incidental take permit will result in an unlawful taking of endangered species under Section 9 of the Endangered Species Act. (Compl., Dkt. 1, at 21). Plaintiffs argue Kinder Morgan and the Service manipulated the federal Section 7 consultation process to sidestep the requirements of the Section 10 permitting process for private applicants, specifically the environmental review requirement under NEPA. (App. Prelim. Inj., Dkt. 45, at 14). Without a valid Section 10 permit, Plaintiffs argue any take of endangered species during the clearing and construction of the pipeline outside of the U.S. Corps of Army Engineers' ("Corps") jurisdiction would violate Section 9 of the ESA. (*Id.*). With respect to their NEPA claim, Plaintiffs argue the Service's issuance of the biological opinion and incidental take statement "constitutes major federal action and the Service must comply with the requirements of NEPA before it can take such an action." (Reply, Dkt. 45, at 4). Put another way, Plaintiffs contend that to the extent Kinder Morgan claims the Service's biological opinion and incidental take statement provide it with a safe harbor from take liability for the take of endangered species outside of the Corp's jurisdiction, this constitutes major federal action subject to the requirements of NEPA. (*Id.*).

This case involves an interplay between several regulatory schemes, which the Court will briefly discuss below before turning to the process navigated by Kinder Morgan to secure permission for the pipeline project.

## B. Controlling Regulatory Schemes

### 1. Clean Water Act

When a proposed project involves the waters of the United States, applicants must comply with the Clean Water Act. 33 U.S.C. § 1344. Under Section 404 of the Clean Water Act, the Corps authorizes such projects through individual and general permits, including nationwide permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines

that the activities in such category are similar in nature, will cause only minimal adverse

environmental effects when performed separately, and will have only minimal cumulative adverse

effect on the environment." 33 U.S.C. § 1344(e). When the Corps issues or reissues a nationwide

permit to authorize activities under Section 404 of the Clean Water Act, "it conducts national-scale

cumulative impact assessment in accordance with the National Environmental Policy Act (NEPA)

definition of 'cumulative impact.'" Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg.

1860, 1861 (Jan. 6, 2017). The Corps satisfies its NEPA obligation when it "finalizes the

environmental assessment in its national decision document for the issuance or reissuance of an

NWP." *Id.* Importantly, an NWP verification issued by a district engineer "does not require separate

NEPA documentation." *Id.*

Under its general permitting authority, the Corps issued Nationwide Permit 12, which allows

for utility line construction in waters of the United States "provided the activity does not result in

the loss of greater than 1/2 acre of [U.S. waters] for each single and complete project." (Fed. Defs.'

TRO Opp., Dkt. 29, at 10–11 (citing Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg.

at 1,985)). Some NWPs, like the one at issue in this case, require project proponents "to notify

Corps district engineers of their proposed activities prior to conducting regulated activities, so that

the district engineers can make case-specific determinations of NWP eligibility." Issuance and

Reissuance of Nationwide Permits, 82 Fed. Reg. at 1861. This Preconstruction Notification ("PCN")

provides the district engineer with the opportunity to review a proposed activity to ensure that it

qualifies for NWP authorization. *Id.* When a Corps district receives a PCN, the district engineer

reviews it and determines "whether the proposed activity will result in no more than minimal

individual and cumulative adverse environmental effects." *Id.*

When the Corps evaluates NWP PCNs, "they are not required to conduct NEPA analyses

because the Corps fulfills the requirements of NEPA through the environmental assessments in the

combined decision documents prepared by Corps Headquarters when an NWP is issued, reissued, or modified." *Id.* "The NWP verification can be simply confirmation that a proposed NWP activity complies with the terms and conditions of [NWP 12], and will result in no more than minimal individual and cumulative adverse environmental effects." *Id.*

<u>2. Endangered Species Act</u>

The core protection under the Endangered Species Act ("ESA") is Section 9. ESA § 9; 16 U.S.C. § 1538(a). Section 9 makes it illegal to "take" any member of an endangered species. *Id.* The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" means "an act which actually kills or injures wildlife," including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

However, the incidental taking of an endangered species is permitted under two exceptions embodied in Section 7 and Section 10 of the ESA, codified at 16 U.S.C. § 1536 and 16 U.S.C. § 1539, respectively. Under the Section 10 exception, private parties may apply for an incidental take permit after navigating a comparatively rigorous and time-consuming procedure. 16 U.S.C. § 1539. By contrast, the Section 7 exception provides a procedure through which federal agencies and certain "applicants" may obtain determinations in the form of incidental take statements through a consultation process between the federal action agency and the Service.

Under Section 7, a federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (citing 16 U.S.C. § 1536(a)(2)). Here, the relevant federal action agency is the Corps. Any activity

authorized under a Clean Water Act NWP that may affect a listed species may not proceed "unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. at 1,999. If the Corps determines that a proposed action may affect listed species or critical habitat, it must initiate the formal consultation process with the appropriate wildlife agency—in this case, the Service. 50 C.F.R. § 402.14(a).

Formal consultation is a mandatory process for proposed projects that may adversely affect listed species or critical habitat. *See id.* The process is initiated in writing by the relevant federal agency (here, the Corps) and concludes with the issuance of a biological opinion by the Service. 16 U.S.C. § 1536(b)(3)(A). The biological opinion includes "[a] detailed discussion of the environmental baseline of the listed species and critical habitat; a detailed discussion of the effects of the action on listed species or critical habitat" and concludes with the Service's opinion as to whether the proposed action is likely "to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" as required under Section 7(a)(2). 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14(g)(4), (h). If the Service concludes that jeopardy or adverse modification is likely, "then any take resulting from the proposed action is subject to section 9 liability (unless that take is authorized by other provisions of the [ESA])." *Ctr. for Biological Diversity*, 698 F.3d at 1107.

In cases where the Service concludes that the project will *not* result in jeopardy or adverse modification, but also concludes that the proposed action is likely to result in the "incidental take" of an endangered species, the Service will provide an incidental take statement along with its biological opinion. *Id.* (citing 50 C.F.R. § 402.14(i)). The incidental take statement "[s]pecifies the impact, i.e., the amount or extent, of such incidental take on the species" and "those reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact." 50 C.F.R. § 402.14(i). Any taking of an endangered species in compliance with the terms and conditions

of the incidental take statement is not a prohibited taking under the ESA and no other authorization or permit is required. 16 U.S.C. § 1536(h) and (o)(1); 50 C.F.R. § 402.14(i)(5). The Corps and the applicant must comply with the incidental take statement in its entirety if they wish to be insulated from take liability under Section 9 of the ESA for takes incidental to the project. *See id.*; *Fath v. Texas Dep't of Transportation*, No. 1:16-CV-234-LY, 2016 WL 7442868, at *6 (W.D. Tex. Sept. 6, 2016).

### C. Kinder Morgan's Process

Kinder Morgan did not obtain a Section 10 incidental take permit. Instead, Kinder Morgan engaged in the Section 7 consultation process with the Service and the Corps in accordance with the so-called "Small Federal Handle Process" outlined in letters exchanged between the Service and the Corps in 2017. (Small Handle Process, Dkt. 30-10, at 1–6). According to the agreement between the agencies outlined in these letters, the "Small Federal Handle Process" applies to situations where both of the following conditions apply:

(1) where there is a legitimate Federal nexus to the larger project via activities subject to Clean Water Act or Rivers and Harbors Act of 1899 jurisdiction that cannot be avoided (i.e., but for the federal permit, the larger action could not occur); and

(2) where the effects considered within the biological assessment and biological opinion are all appropriately within the scope of a section 7 consultation (i.e., the direct and indirect effects of the federal action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, and including consideration of cumulative effects).

(*Id.* at 3). Here, the Corps notified the Service that their applicant, Kinder Morgan, would be seeking verification of authorization of certain impacts to waters of the United States under a Nationwide Permit (NWP) 12 for Utility Lines. (Biological Op., Dkt. 12-1, at 6). Pursuant to this process, the Corps provided the Service with a biological assessment for the pipeline project that evaluated the larger project as a whole and included all anticipated effects of the larger project to listed species and critical habitat. (*Id.* at 3; Biological Assess., Dkt. 30-7). Because the biological assessment concluded that the pipeline project may adversely affect protected species, the Corps initiated the formal consultation process with the Service, as required under Section 7. *See* 16 U.S.C. § 1536(a)(2); 50

C.F.R. § 402.14(a). The Service then conducted an analysis to determine whether the pipeline project was "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat." 16 U.S.C. § 1536(a)(2).

On February 3, 2020, the Service issued its biological opinion. *See* 16 U.S.C. § 1536(b)(3)(A). The biological opinion first assessed the environmental baseline of the threatened species and critical habitat. (Biological Op., Dkt. 12, at 32). With respect to the golden-cheeked warbler,[3] the Service analyzed potential warbler breeding habitat within an 800-foot wide corridor within the action area. (*Id.*). As part of this review, the Service determined that the project would destroy a total of 282 acres of potential warbler breeding habitat, which would result in an additional loss of 1,352 acres of potential breeding habitat "when considering a 300-foot buffer from either side of the habitat adjacent to suitable [warbler] habitat."(*Id.* at 33). According to the Service, this projected additional habitat loss would result from fragmentation and edging effects associated with the project. (*Id.*). The Service further noted that while "the majority of the existing habitat within and adjacent to the action area is fragmented and experiencing edge effects from existing roads, utility easements, and agricultural [sic]," it anticipated that the consequences associated with clearing 282 acres of warbler habitat were "reasonably anticipated to reduce some habitat patches to the extent" that they would not be "optimal for breeding and nesting success," would "increase risk of predation, reduce foraging opportunities, and may expose [the warbler] to stressors associated with operation and vegetation management activities." (*Id.* at 43–44).

To minimize the project's impact on the golden-cheeked warbler and its habitat, the Service mandated the implementation of conservation measures, which included "seasonal clearing restrictions; conducting vegetation management outside of the [warbler] breeding season, when

---

[3] Plaintiffs' Preliminary Injunction Application and arguments at the preliminary injunction hearing focused on the pipeline's impact on the golden-cheeked warbler. (*See* App. Prelim. Inj., Dkt. 10; Hr'g, Dkt. 55). Accordingly, the Court's analysis focuses on the golden-cheeked warbler as well.

possible; and voluntary conservation measures associated with the protection of 1,363 acres of occupied [warbler] habitat in recovery region 5 located in Travis County." (*Id.* at 44).

After considering the status of the species, the environmental baseline, the effects of the pipeline project on the species, and cumulative effects, the Service ultimately concluded that "the action, as proposed, is not likely to jeopardize the continued existence of these species." (*Id.* at 48). The Service went on to conclude that it did not "anticipate a reduction in the overall reproduction, numbers, and distribution to the point of jeopardizing their continued existence and recovery as a result of implementing the proposed project." (*Id.*). However, that jeopardy conclusion was expressly predicated on the implementation of "avoidance and minimization measures" to mitigate harm to warbler habitat, which included a prohibition on vegetation clearing during the warbler breeding season, avoidance measures to prevent the spread of oak wilt (which could "further degrade adjacent [warbler] habitat") and the purchase and permanent protection of 1,363 acres of additional warbler habitat to offset potential habitat degradation. (*Id.* at 49).

The Service then issued an incidental take statement outlining "non-discretionary" reasonable and prudent measures "necessary and appropriate to minimize incidental take of the golden-cheeked warbler and Houston toad." (*Id.* at 55–56); *see also* 50 C.F.R. § 402.14(i). Specifically, to be exempt from take liability under Section 9 of the ESA, the Corps and Kinder Morgan "must comply" with several terms and conditions. (*Id.* at 56); *see also* 50 C.F.R. § 402.14(i)(5) ("Any taking . . . which is in compliance with the terms and conditions of [the incidental take statement] is not a prohibited taking under the [ESA]."). Failure to comply with these terms and conditions "will result in loss of Section 9 take coverage for activities occurring outside the Corps' jurisdiction, if not remedied within a reasonable period of time to the satisfaction of the Service." (Biological Op, Dkt. 12-1, at 57; *id.* at 53 ("[T]he Applicant has a continuing duty to comply with the [terms and

conditions of the incidental take statement], in order for the exemption in section 7(o)(2) to apply.")).

As relevant here, the incidental take statement prohibited vegetation clearing of warbler habitat from March 1 through July 31; required that Kinder Morgan, "to the extent practicable," "perform construction activities in [adjacent areas] before March 1, thereby creating a continuous activity that began before the start of the breeding season;" and directed Kinder Morgan and its contractors to prevent the spread of oak wilt by requiring that "all trimming cuts or other wounds to oak trees, including freshly-cut stumps and damaged surface roots . . . be treated immediately with a wound or latex paint to prevent exposure to contaminated insect vectors." (*Id.* at 13).

The biological opinion and incidental take statement did not become effective for the Corps or Kinder Morgan "until the Corps issue[d] all required [Clean Water Act] authorizations for the project." (*Id.* at 53). On February 13, 2020, the Corps issued verification letters under Nationwide Permit 12. (*See e.g.*, NWP 12 Verification, Dkt. 30-8). The verification letters stated that the Corps had "determined the discharge of dredged or fill materials into waters of the United States associated with [the pipeline project] is authorized by Nationwide Permit 12 for Utility Line Activities," but conditioned this authorization upon compliance with the mandatory terms and conditions stated within the biological opinion and incidental take statement. (*Id.* at 1–2). The Corps then "incorporated" the terms and conditions of the biological opinion into its verification letter and stated that "[f]ailure to comply with the terms and conditions [in the biological opinion] would constitute non-compliance with [the Corps] permit" and "invalidate[] the incidental take authorization." (*Id.*). Any take of listed species absent a valid permit "would constitute an unauthorized take" under Section 9 of the ESA. (*Id.*).

Pursuant to that authorization, Kinder Morgan began clearing warbler habitat—both within and outside the Corps's jurisdiction— shortly after the Court denied Plaintiffs' TRO application.

**D. Kinder Morgan's Clearing Activities**

Before Kinder Morgan began clearing warbler habitat, it held a construction kick-off meeting to train Kinder Morgan contractors and subcontractors and ensure compliance with the biological opinion and the terms and conditions of the NWP 12 verification. (Williamson Decl., Dkt. 57-1, at 6). This kick-off meeting included "environmental training that directed personnel to treat all cuts and wounds to trees with latex paint to help prevent the spread of oak wilt." (*Id.*). Moreover, "[a]ll clearing personnel were instructed to maintain compliance with mitigation procedures by painting open tree wounds and stumps after a tree is cut or damaged." (*Id.*). While crews were instructed to "remove all stumps in the trench line" they were also instructed that the "stumps located outside of the trench [were] to be mulched below grade." (*Id.*).

Two days before the scheduled preliminary injunction hearing, Plaintiffs filed an advisory with the Court contending Kinder Morgan had failed to comply with the terms and conditions of the biological opinion and incidental take statement while clearing warbler habitat. (Advisory, Dkt. 53, at 1). Specifically, Plaintiffs identified three conditions of the incidental take statement that Kinder Morgan allegedly violated. (*Id.* at 1–4).

First, Plaintiffs identified oak tree wounds that had not been immediately treated to prevent the spread of oak wilt, as the biological opinion and incidental take statement required. (Letter to Dept. Interior, Dkt. 53-1, at 3; *see also* Biological Op., Dkt. 12-1, at 13 ("Regardless of season, all trimming cuts or other wounds to oak trees, including freshly-cut stumps and damaged surface roots, will be treated immediately with a wound or latex paint to prevent exposure to contaminated insect vectors")). Second, Plaintiffs noted that Kinder Morgan did not finish clearing all warbler habitat by March 1, 2020. (*Id.*). Third, Plaintiffs highlighted the biological opinion's requirement that all vegetation and clearing occur prior to warbler arrival "with construction occurring immediately after to effectively be continuous" to "minimize[] disturbance to nesting [warblers]." (Biological Op.,

Dkt. 12-1, at 56). They argued that "it will be virtually impossible for [Kinder Morgan] to engage in continuous construction . . . for the entire period that warblers are present." (*Id.*).

At the hearing, Kinder Morgan conceded that some oak tree wounds were not immediately treated with latex paint and that they had not finished clearing all warbler habitat in the pipeline's pathway by March 1, 2020, because of microadjustments made to the pipeline's proposed route. (Hr'g, Dkt. 55; *see also* Mody Decl., Dkt. 57-1, at 1–2 ("[Kinder Morgan] completed clearing in all but three small areas of the Pipeline's route with potential golden-cheeked warbler habitat on February 27, 2020.")). According to Kinder Morgan, the clearing crew did not immediately treat oak tree stumps because—pursuant to Kinder Morgan's protocol—the stumps were going to be mulched below grade anyway. (Hr'g, Dkt. 55). When landowners reported concerns with respect to oak wilt prevention compliance in spread 4 of the pipeline project,[4] Kinder Morgan performed a quality check and "discovered previously untreated wounds which were remedied no later than February 29." (Williamson Decl., Dkt. 57-1, at 7).

Kinder Morgan also explained that negotiations with landowners in the path of the pipeline necessitated microadjustments to the pipeline's route that hindered its ability to clear warbler habitat within those microadjustments by the March 1 deadline. (Mody Decl., Dkt. 57-1, at 3 ("There are three areas in spread 4 in which clearing of potential warbler habitat has not been completed as of March 2, 2020, due to the potential for minor adjustments in small segments of the pipeline route.")). Kinder Morgan informed the Court that no further clearing would occur in the three uncleared locations until Kinder Morgan obtained permission to do so from the Service. (Hr'g, Dkt. 55). Kinder Morgan also agreed to notify Plaintiffs and the Court if it obtained such permission from the Service and to refrain from clearing activities in the microadjustments for two business days after providing such notice. (*Id.*).

---

[4] At the hearing, Kinder Morgan explained that pipeline construction would occur over five "spreads." (Hr'g, Dkt. 55). Spread 5 is the final spread of the pipeline project. (*Id.*).

With respect to the "continuous construction" requirement, Kinder Morgan stated that on days when it was not engaged in active construction in the area, it complied with this requirement by having inspectors drive the right of way twice per day to ensure vehicular traffic. (Hr'g, Dkt. 55). Kinder Morgan and the Service acknowledged the absence of concrete guidance on the meaning of "continuous construction" or how best to comply with that requirement. (*Id.*). Nobody from the Service is actively monitoring Kinder Morgan's compliance with respect to this condition. (*Id.*). When regulatory specialist Amanda Aurora was asked whether it might be helpful to have someone on site to oversee Kinder Morgan's construction efforts to ensure compliance with terms in the biological opinion like "continuous activity," she responded that "it depends." (Hr'g, Dkt. 55).

## II. DISCUSSION

### A. Preliminary Injunction Analysis

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

In applying this framework, the Court's analysis, as before, begins and ends with irreparable harm. A Court's power to order injunctive relief in an ESA case "depends, as in all other cases, on whether plaintiffs have established by a preponderance of the evidence, that there is 'a reasonably

certain threat of imminent harm to a protected species.'" *Aransas Project v. Shaw*, 775 F.3d 641, 663–64 (5th Cir. 2014) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000)). While an extinction-level harm to the species is not required for an injunction under the ESA, Plaintiffs must show a "definitive threat of future harm to protected species, not mere speculation." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)). "[A] preliminary injunction will not be issued simply to prevent the *possibility* of some remote future injury." *Winter*, 555 U.S. at 22 (emphasis added). An injunction may issue "only if future injury is 'certainly impending.'" *Aransas Project*, 775 F.3d at 664 (citing *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979).

Notwithstanding the Court's prior ruling, Plaintiffs contend they have sufficiently shown irreparable harm by demonstrating "(1) harm to individual members of warblers that don't reach extinction level yet is still irreparable; (2) a substantial likelihood that Kinder Morgan's clearing and construction activities will spread oak wilt throughout the region, devastating the Central Texas oak forest;[5] (3) diminishment of Plaintiffs' aesthetic, recreational, conservation, and financial interests in the continued quality and quantity of water in the Edwards Aquifer; (4) diminishment of Plaintiffs' aesthetic, recreational, and conservation interests in observing warblers in the future; and (5) destruction of heritage oaks on some Plaintiffs' property." (Reply, Dkt. 45, at 15).[6]

Kinder Morgan contends that the Service's biological opinion and incidental take statement provide "the best evidence that there will be no irreparable harm" and the Court should defer to the

---

[5] "The proposed [pipeline] will cross directly through 44 confirmed oak wilt centers, with an additional 403 oak wilt centers located within the immediate vicinity of the proposed route." (Blair Decl., Dkt. 9-4, at 14). An oak wilt center is a group of either live oaks or red oaks that are infected with oak wilt or have died of oak wilt. (Hr'g., Dkt. 55).

[6] Because Plaintiffs filed their Preliminary Injunction Application, (Dkt. 10), before filing their TRO Application, (Dkt. 18), and filed their Reply in support of their Preliminary Injunction Application after the Court denied their TRO Application, Plaintiffs' Reply represents their most up-to-date arguments on irreparable harm in light of the clearing of warbler habitat that occurred shortly after the Court issued its Order denying Plaintiffs' TRO Application. (*See* Reply, Dkt. 45).

Service's conclusion that the proposed pipeline project "is not likely to jeopardize the continued existence of the species." (Kinder Morgan Resp., Dkt. 30, at 45; Biological Op., Dkt. 12-1, at 48). Kinder Morgan notes that it is bound by the terms and conditions of the biological opinion and incidental take statement designed to prevent irreparable harm to the warblers. (Kinder Morgan Resp., Dkt. 30, at 46). Specifically, Kinder Morgan highlights its obligation to clear warbler habitat by March 1, its imperative to "further minimize potential harm to [warbler habitat]" by adhering to oak wilt prevention measures, including the treatment of wounded oak trees with latex paint "to prevent exposure to contaminated insects, regardless of the season," and its "substantial commitment to offset the loss of warbler habitat" through the purchase and permanent protection of 1,363 acres of high-quality warbler habitat. (*Id.* at 44–49).

As the Court noted in its prior Order, the Service analyzed the potential harm to the warbler and other protected species before issuing its biological opinion[7] and concluded that it did "not expect, directly or indirectly, that the proposed project [would] reduce appreciably the likelihood of both the survival and recovery of the [warbler] in the wild by reducing the reproduction, numbers, or distribution of [warblers]." (Biological Op., Dkt. 12-1, at 50; Order, Dkt. 31, at 6). The Service reached this conclusion for three reasons. First, it concluded that the existing habitat within the action area was likely not optimal warbler breeding habitat in the first place. (Biological Op., Dkt. 12-1, at 49). Second, the exposure of the habitat to construction-related stressors would be of a limited duration. (*Id.*). Third, these stressors to existing habitat would likely be of "limited severity." (*Id.*). These findings—in combination with Kinder Morgan's commitment to offset potential habitat degradation through the purchase and permanent protection of 1,363 acres of high-quality warbler

---

[7] While Plaintiffs and this Court are concerned about Kinder Morgan's noncompliance with the terms and conditions of the biological opinion and question whether Kinder Morgan—in flouting these conditions—has exposed itself to take liability under Section 9 of the ESA, *see infra* Part II.B., Plaintiffs did not raise the validity of the biological opinion in their Preliminary Injunction Application and conceded at the hearing that this issue had been waived. Accordingly, the Court will continue to defer to the jeopardy finding in the Service's biological opinion in evaluating irreparable harm under the preliminary injunction framework.

habitat—led the Service to conclude the pipeline project was "not likely to jeopardize the continued existence" of the protected species. (*Id.* at 50). Plaintiffs' have not challenged the conclusions of the biological opinion. The Court therefore defers to the Service's jeopardy conclusion—reached after extensive analysis of the environmental baseline and the effects of the proposed action—that the potential injury to protected species does not rise to the level of irreparable harm.

Nevertheless, the Court acknowledges, and does not take lightly, Plaintiffs' evidence that Kinder Morgan has violated mandatory terms and conditions of the biological opinion and incidental take statement specifically designed to mitigate harm. (Advisory, Dkt. 53, at 1–4); *see infra* Part II.B. The Service's conclusion that the pipeline project would not jeopardize the continued existence of the warbler and other species was predicated on Kinder Morgan's compliance with reasonable and prudent mitigation and conservation efforts. (Biological Op., Dkt. 12-1, at 55 ("[T]he Service has determined that this level of anticipated take is not likely to jeopardize the continued existence of the golden-cheeked warbler and Houston toad taking into consideration the status of those species, the degree of impact to the species caused by the proposed pipeline, and considering conservation measures for the conservation of these species to which [Kinder Morgan] has committed.")). Taking the Service at its word, compliance with the mandatory "reasonable and prudent measures" outlined in the incidental take statement was "necessary and appropriate to minimize incidental take of the golden-cheeked warbler and Houston toad." (*Id.*). In light of Kinder Morgan's noncompliance with express conditions of the biological opinion aimed at mitigating harm to the warbler, its repeated citation to these terms to dispute Plaintiffs' allegations of potential irreparable harm is far less persuasive than it was at the TRO stage.

Even so, the burden to show irreparable harm remains with Plaintiffs, and the Court concludes they have not demonstrated "a reasonably certain threat of imminent harm to a protected species," Kinder Morgan's noncompliance with the terms of the biological opinion notwithstanding.

*Aransas Project*, 775 F.3d at 663–64. As a preliminary matter, Kinder Morgan completed clearing potential warbler habitat in all but three areas of the pipeline's route prior to the preliminary injunction hearing. (Hr'g., Dkt. 55; Mody Decl., Dkt. 57-1, at 1–2). Injunctions are forward-looking remedies that may issue "only if *future* injury is certainly impending." *Aransas Project*, 775 F.3d at 664 (emphasis added). Whatever harm resulted from Kinder Morgan's past clearing activities cannot be remedied through a preliminary injunction. *See id.* And because these past harms cannot be prevented by a preliminary injunction, they cannot form the basis of preliminary injunctive relief.

With respect to the three uncleared microadjustments, Kinder Morgan agreed to maintain the status quo and refrain from clearing activities in those areas until it received approval from the Service. (Hr'g, Dkt. 55). And while "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," it is an important factor bearing on the question of whether a court should exercise its power to enjoin the defendant from renewing the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 193 (2000). Moreover, should Kinder Morgan clear additional warbler habitat after the March 1 deadline and without pre-approval from the Service, it would risk potential take liability under Section 9 of the ESA and the civil and criminal penalties that would follow. The Court concludes that the threat of take liability is sufficient to deter any future harm caused by resumption of clearing activities in the remaining three areas. *Id.* ("[F]ederal courts should aim to ensure the framing of relief no broader than required by the precise facts.") (internal quotations omitted).

Plaintiffs' other alleged harms—including the increased degradation of warbler habitat from the spread of oak wilt and the allegedly deleterious effect on water quality— are too speculative and thus do not warrant injunctive relief. At the hearing, Plaintiffs' expert, David Vaughn, explained that oak wilt spreads by attacking the vascular system of an oak tree, and that once a single oak tree

becomes infected, the oak wilt will spread through the common root system, infecting and ultimately killing large groups of oak trees. (Hr'g, Dkt. 55). He further explained that oak wilt is most commonly spread through connected root systems, but that it can also be transmitted by beetles carrying infected spore mats from infected trees to untreated wounds, independent of a connected root system. (*Id.*). In areas with many exposed wounds, Vaughn explained the danger of spreading oak wilt increases because of the increased food supply for potentially infected beetles. (Hr'g, Dkt. 55).

While Plaintiffs contend that "[t]he unavoidable spread of oak wilt from clearing activities (both in and near warbler habitat) between February 1 and June 30 is certain to cause irreparable injury—both by taking warblers via ongoing loss of habitat and by injuring Plaintiffs' interest in the health and vitality of the trees on their property," the conditions required for that harm to occur are neither imminent nor reasonably certain. (Reply, Dkt. 45, at 17). Indeed, Vaughn's photographic evidence demonstrates that the triggering condition for the spread of oak wilt occurred—Kinder Morgan did not immediately treat oak tree wounds as required by the biological opinion. (Hr'g, Dkt. 55; Oak Tree Report, Dkt. 58-2, at 1–28). From there though, the causal chain becomes increasingly attenuated by surmise and speculation. Plaintiffs cannot show that any of the exposed oak tree wounds were actually infected during Kinder Morgan's clearing activities or that they will be infected during its ensuing construction activities.[8] (Hr'g, Dkt. 55). Even if they could, Plaintiffs have not indicated how they might link the spread of oak wilt to Kinder Morgan's clearing or construction activities in an area where the spread of oak wilt is already present, widespread, and projected to

---

[8] Vaughn testified that he did not observe any signs of oak wilt on the three ranches that he visited with untreated oak tree wounds, likely because infection cannot be immediately detected, further complicating Plaintiffs' ability to show a reasonably certain threat of future harm. (Hr'g, Dkt. 55).

continue, independent of Kinder Morgan's activities. (Blair Decl., Dkt. 9-1, at 11).[9] Finally, the alleged irreparable harm posed by oak wilt spread relies on an additional assumption—that Kinder Morgan's failure to immediately treat oak wounds will infect the root system of oak trees located on Plaintiffs' properties or the oak trees in warbler breeding habitat. (Reply, Dkt. 45, at 17–18). "Such speculation built upon further speculation does not amount to a "reasonably certain threat of imminent harm" and does not warrant injunctive relief. *Friends of Lydia Ann Channel v. United States Army Corps of Engineers*, 701 F. App'x 352, 357 (5th Cir. 2017).

Plaintiffs' allegation of harm in the form of "diminishment of their aesthetic, recreational, conservation, and financial interests in the continued quality and quantity of water in the Edwards Aquifer" likewise does not rise to the level of irreparable harm. (Reply, Dkt. 45, at 15). The biological opinion contains a mitigation plan to minimize the likelihood that sediments or other possible contaminants would enter groundwater and adversely affect the water quality or habitat of the Austin blind salamander or the Barton Springs salamander. (Biological Op., Dkt. 12-1, at 3). Moreover, the biological opinion requires Kinder Morgan to "take all necessary measures to avoid accumulation of liquids and condensate; thus, avoiding any potential contamination due to leaks within the recharge zone of the Edwards Aquifer." (*Id.* at 5). In light of these mitigation measures, the biological opinion concluded that "[p]otential harm to salamanders at locations geographically removed from the proposed project due to degradation of habitat in the form of reduced water quality resulting from operation and maintenance activities is expected to be discountable (i.e. extremely unlikely to occur)." (*Id.* at 4). Harm that is "extremely unlikely to occur" is not a

---

[9] It is worth noting once more that Kinder Morgan has already cleared warbler habitat in all areas but the three microadjustments. (Mody Decl., Dkt. 57-1, at 1). Any oak wilt spread resulting from Kinder Morgan's clearing activity has already occurred and enjoining further construction activity is unlikely to undo the damage already done. *See Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-CV-1301-IEG(POR), 2010 WL 1526382, at *10 (S.D. Cal. Apr. 15, 2010) ("The grant of an injunction at this late stage cannot 'unring the bell.'").

"definitive threat of future harm" warranting a preliminary injunction. (*Id.*); *Nat'l Wildlife Fed'n*, 886 F.3d 803 at 819.

Because Plaintiffs have not shown harm that is either imminent or reasonably certain, they have failed to show irreparable harm as required for a preliminary injunction. The Court recognizes the preliminary injunction framework produces a frustrating result in this case. In essence, Kinder Morgan defends against Plaintiffs' allegation of irreparable harm by pointing to a no jeopardy finding in a biological opinion premised on adherence to terms and conditions the evidence suggests they subsequently violated. *See infra* Part II.B. But Plaintiffs have nevertheless moved for a preliminary injunction, and the Court is bound to hold Plaintiffs to their burden on irreparable harm, a showing they have failed to make.

However, the Court finds Plaintiffs' evidence that Kinder Morgan has violated the terms and conditions of the incidental take statement compelling, and concludes that these violations draw the continued validity of the biological opinion and incidental take statement into question. Because Kinder Morgan has not secured a Section 10 permit, any taking that is not in compliance with the incidental take statement would be a prohibited taking under the ESA. 50 C.F.R. § 402.14 ("Any taking . . . which is in compliance with the terms and conditions of [an incidental take statement] is not a prohibited taking under the Act, and no other authorization or permit under the Act is required"). As the parties prepare for the merits phase of this lawsuit, the Court takes this opportunity to synthesize the evidence of Kinder Morgan's noncompliance with the terms of the biological opinion and the Court's accompanying concerns.

## B. Violations of the Incidental Take Statement

Kinder Morgan opted to secure a safe harbor from take liability under Section 9 of the ESA through the Section 7 consultation process with the Service.[10] It did not obtain a Section 10 incidental take permit. Thus, Kinder Morgan's insulation from take liability under Section 9 depends on the validity of the biological opinion and incidental take statement. 16 U.S.C. § 1536(o). At the hearing, Plaintiffs presented evidence to support their allegation that Kinder Morgan has failed to comply with the clearance, oak wilt prevention, and continuous construction requirements outlined in the biological opinion and incidental take statement, drawing the continued validity of the incidental take statement—and the safe harbor it provides—into doubt. Plaintiffs' three allegations of noncompliance and the evidence submitted by both parties at the hearing are discussed below.

### 1. Oak Wilt Prevention

To prevent the spread of oak wilt, the biological opinion imposed the following condition on Kinder Morgan's clearing activities: "Regardless of season, all trimming cuts or other wounds to oak trees, including freshly-cut stumps and damaged surface roots, will be treated immediately with a wound or latex paint to prevent exposure to contaminated insect vectors." (Biological Op., Dkt. 12-1, at 13). At the hearing, Plaintiffs offered pictures of untreated oak branches and stumps taken by arborist Vaughn during a February 22, 2020 visit to three ranches in the action area: John Buvens

---

[10] Because Plaintiffs did not meet their burden on irreparable harm, the Court does not reach the question of whether Plaintiffs demonstrated a substantial likelihood of success on their ESA or NEPA claims. Nevertheless, the Court questions Kinder Morgan's use of the so-called "Small Federal Handle Process" for situations "where the Corps involvement is limited to making a permitting decision for a small component of a large project." (Small Handle Process, Dkt. 30-10, at 1). If this practice were indeed an old, commonplace process "followed across the country," as Kinder Morgan and the Federal Defendants claim, (Kinder Morgan Resp., Dkt. 30, at 40; Hr'g, Dkt. 55), the Court questions why the Service and the Corps exchanged letters in 2017 "clarifying the consultation process under section 7 of the [ESA] when the [Corp] is considering permitting an action where the Corps' involvement is limited to making a permitting decision for a small component of a larger project;" why the Service and the Corps needed to develop "training materials and tools to assist section 7 practitioners from both agencies to implement this consultation approach" in November 2017, or why neither Defendant could provide the Court with a single case referring to the legitimate use of the Section 7 consultation process by a private applicant to secure a safe harbor from take liability for project areas beyond the Corps's limited jurisdiction.

Ranch, Scott Johnson Ranch, and Pete Walsh Ranch. (Oak Tree Report, Dkt. 58-2, at 1–28). At the John Buvens Ranch, Vaughn photographed three untreated stumps and two untreated branches. (*Id.* at 1–7). While there, Vaughn did not observe clearing activity, but noted that a crew did show up to set up fencing and gates. (Hr'g, Dkt. 55). Although Vaughn could not determine exactly how recently the stumps and branches had been cut, he noted that the wounds appeared fairly fresh because he could still see saw dust present on the tree stumps. (*Id.*).

After leaving the John Buvens Ranch, Vaughn visited the Scott Johnson Ranch, where he again photographed untreated branches and stumps. (Oak Tree Report, Dkt. 58-2, at 8–16). He additionally photographed a broken and untreated tree limb, which Vaughn noted could result in additional untreated wounds if the wind blew and continued to rip the limb. (*Id.* at 14; Hr'g, Dkt. 55). The clearing crew was not present on the Scott Johnson Ranch during Vaughn's visit between 1:00 p.m. and 2:00 p.m. (Hr'g., Dkt. 55).

While visiting the Pete Walsh Ranch, Vaughn photographed untreated tree limbs, stumps, and branches. (Oak Tree Report, Dkt. 58-2, at 17–28). During Vaughn's visit, clearing was ongoing. (Hr'g, Dkt. 55). At the hearing, Vaughn testified that some of the wounds he photographed were treated with latex paint after he photographed them, but they were not treated immediately after wounding. (*Id.*). Vaughn spoke at length with the clearing supervisor, who acknowledged that the crew should be treating the tree wounds with latex paint, but could not do so because he had been given only one spray can of paint. (*Id.*).

Plaintiffs also submitted a declaration from Heath Frantzen ("Frantzen"), a ranch owner in Gillesppie County, Texas. (Frantzen Decl., Dkt. 58-5). On February 15 and 16, 2020, a construction crew cleared approximately 9.131 acres through his property for the pipeline right of way. (*Id.* at 1). Frantzen states that the crew "damaged numerous mature oak trees and failed to take action to protect damaged oak trees against the spread of oak wilt." (*Id.*). Specifically, Frantzen notes that the

construction crew "did not paint over the areas of damaged oak trees with sealant to prevent the spread of oak wilt." (*Id.*). He attached 23 photographs and a video to his declaration. (*Id.*). He attests that the photographs of damaged and untreated oak trees were taken on February 29, 2020—13 days after the construction crew cleared the area and exposed the wounds. (*Id.*).

Kinder Morgan's Director of Project Management, Kevin Mosley ("Mosley"), testified to an "assembly-line" clearing and pruning process in which crewmembers operating heavy machinery would traverse the action area first to clear trees followed closely behind by the pruning team, which would repair tree wounds as soon as it was safe to do so. (Hr'g, Dkt. 55). According to Mosley, inspectors would follow shortly after to ensure pruning occurred in compliance with the terms of the biological opinion. (*Id.*). Mosley did not dispute Frantzen's declaration that damaged oak trees were left untreated on his property for 13 days. (Frantzen Decl., Dkt. 58-5, at 1; Hr'g, Dkt. 55). In fact, Mosley testified that he was not surprised to learn that untreated stumps remained in the right of way after the clearing crew came through because, under Kinder Morgan's protocol, the exposed stumps were going to be mulched below grade anyway. (Hr'g, Dkt. 55). While Mosley stated that the mulching crew followed "pretty closely" behind the clearing crew, he later conceded on cross examination that, on average, "at least a few days" passed between clearing and mulching. (*Id.*).

According to Mosley, once Kinder Morgan received complaints from landowners about the untreated stumps, Kinder Morgan decided to change this protocol. (*Id.*). "To be sensitive to landowner concerns," Kinder Morgan now treats stumps and limbs in the right of way that are going to be mulched below grade. (*Id.*).

The Court notes that Kinder Morgan presented no evidence to dispute that damaged oak trees remained untreated on Frantzen's property for 13 days after the construction crew cleared the area. In fact, Kinder Morgan conceded that it could not claim perfect compliance with the oak wilt mitigation measures mandated by the biological opinion and incidental take statement. (*See* Frantzen

Decl., Dkt. 58-5, at 1; Hr'g, Dkt. 55). While there is bound to be some level of imperfect implementation in a project this size, the Court finds that Kinder Morgan's protocol of leaving freshly cut stumps exposed until the mulching crew could come through and mulch them below grade amounts to more than mere implementation error. Kinder Morgan's protocol was *not* to immediately treat freshly cut stumps in the right of way because they were going to be mulched over anyway.  On average—far from following closely on the heels of the clearing crew in "assembly-line" fashion—the mulching crew took at least a few days to mulch the tree stumps below grade. (Hr'g., Dkt. 55). This protocol is fundamentally at odds with the immediacy requirement mandated in the biological opinion. (*See* Biological Op., Dkt. 12-1, at 13). And unlike other mitigation measures in the biological opinion, the imperative to "immediately" treat freshly cut stumps and damaged surface roots with latex paint is not subject to any qualifying "to the extent practicable" language. (*See* Biological Op., Dkt. 12-1, at 13).

At the hearing, the Service contended that failure to comply with the terms and conditions of the incidental take statement results in a loss of take protection "only if not remedied within a reasonable period of time to the satisfaction of the Service." (Biological Op., Dkt. 12-1, at 57). Yet the Service also conceded that it lacked a mechanism for monitoring compliance on the ground and instead relied on reports from impacted individuals and self-reporting from the Corps and Kinder Morgan. (Hr'g., Dkt. 55).

Under the terms of its biological opinion, the Service "assume[s] responsibility for compliance, monitoring, and enforcement of the Applicant Action Area" outside of the Corps' limited jurisdiction. (Biological Op., Dkt. 12-1, at 53). If the amount or extent of incidental taking is exceeded, or the proposed action "is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion" reinitiation of consultation is required. 50 C.F.R. § 402.16(a). "This requirement provides the [Service] with the

opportunity—and the obligation—to reexamine altered projects to ensure that any changes will not place species in jeopardy or risk degradation to critical habitat." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012); (*see also* Small Handle Process, Dkt. 30-10, at 4 ("Reinitiation is triggered by, among other factors, exceedance of the extent of taking specified in the incidental take statement regardless of where such taking occurs.")). "When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings." *Ctr. for Biological Diversity*, 698 F.3d at 1108. Under such circumstances, the incidental take statement "no longer insulates the agency or applicant from the ESA's substantial civil and criminal penalties." *Id.* at 1115.

At the hearing, the Service noted that reinitiation of consultation *could* be a consequence of Kinder Morgan's noncompliance with the terms of an incidental take statement, but it also stated that not every violation would rise to the level of requiring a reassessment of the Service's no jeopardy conclusion. (Hr'g. Dkt. 55). The Service could not provide a meaningful metric for when a violation of an express mitigation measure would trigger a reassessment of the no jeopardy conclusion.

The Court questions why the Service would include an express mitigation term in its biological opinion, grant Kinder Morgan a safe harbor from take liability contingent upon abiding by such a term, and then conclude a violation of that term does not necessarily trigger reinitiation. The impact of Kinder Morgan's noncompliance with a mandatory condition of the biological opinion arguably constitutes "new information" that "reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," thus triggering the Service's obligation to reinitiate consultation. 50 C.F.R. § 402.16; *see also Ctr. for Biological Diversity* , 698 F.3d at 1114 ("[I]f a non-federal party promises to take action mitigating the impact of a federal

action on listed species but fails to do so, the contemplated protections of listed species may never materialize.").

The Court further questions how a violation of the oak wilt prevention condition could be "remedied within a reasonable period of time to the satisfaction of the Service." (Biological Op, Dkt. 12-1, at 57). The Service mandated *immediate* treatment. (*See id.* at 13). Kinder Morgan did not treat "all trimming cuts or other wounds to oak trees, including freshly-cut stumps and damaged surface roots" *immediately.* (*Id.*; Hr'g, Dkt.55). Indeed, Kinder Morgan's clearing protocol left oak tree stumps in the right of way untreated before the mulching crew came through, which, on average, left freshly cut stumps untreated for a few days. (Hr'g, Dkt. 55). Even if Kinder Morgan immediately treated all oak tree wounds moving forward, the contemplated potential harm resulting from delayed treatment has already occurred.

At this time, Plaintiffs have not moved to invalidate the biological opinion or incidental take statement based on Kinder Morgan's noncompliance with its express terms, and the Court accordingly makes no such finding here. The Court only cautions Kinder Morgan that should the incidental take statement later be invalidated, Kinder Morgan will no longer be insulated from civil and criminal liability under the ESA for any takes incidental to the pipeline project.

### 2. Completion of Clearing Prior to March 1, 2020

The biological opinion and the incidental take statement require that Kinder Morgan complete all clearing of any potential golden-cheeked warbler habitat before March 1, 2020. (Biological Op., Dkt. 12, at 13). According to Kinder Morgan, negotiations with landowners along the proposed pathway required microadjustments to the route. (Hr'g., Dkt. 55). To accommodate landowners along the adjusted pipeline route, Kinder Morgan did not clear warbler habitat in those areas prior to March 1. (*Id.*). Other than the three microadjustments, Kinder Morgan cleared all warbler habitat along the pipeline route within the required timeframe. (Mody Decl., Dkt. 57-1, at 1).

Kinder Morgan further represented that it had voluntarily ceased clearing activities in these remaining areas and would not resume clearing activity until it obtained approval from the Service. (Hr'g, Dkt. 55).

The Court notes the Service's unqualified prohibition on clearing activities after March 1, 2020 throughout the biological opinion. (*See, e.g.*, Biological Op., Dkt. 12-1, at 57 ("[V]egetation clearing shall not occur from March 1 to July 31"; "[Kinder Morgan] will avoid clearing potential [warbler] habitat from Project Workspaces during the [warbler] breeding season (March 1 through July 31).")). In light of the Service's previous inclusion of a hard, March 1 deadline to mitigate harm to the warbler and its habitat, the Court would question how any post-March 1 clearing approval from the Service would not raise arbitrary and capricious concerns.

### 3. Continuous Activity

The biological opinion imposes the following additional mitigation measure:

> Within [warbler] habitat in [the action area] vegetation clearing shall not occur from March 1 to July 31. Vegetation clearing within defined project workspaces shall be cleared prior to [warbler] arrival *with construction occurring immediately after to effectively be continuous, and minimizing disturbance to nesting* [warblers].

(Biological Op., Dkt. 12-1, at 56–57) (emphasis added). At the hearing, the parties more or less agreed about the intended purpose behind this requirement: to ensure warblers did not nest adjacent to the right of way during pauses in construction activity only to be disturbed by the resumption of construction activity, which could affect their ability to nest and breed. (Hr'g, Dkt. 55). But the parties could not agree on the meaning of "continuous" construction activity. (*Id.*).

SWCA environmental consultant Amanda Aurora stated that the continuous construction requirement was intended to be implemented "in good faith." (Hr'g, Dkt. 55). She indicated that the Service would be responsible for monitoring the good-faith implementation of this requirement, but did not know whether Kinder Morgan had asked for guidance from the Service on how best to comply. (*Id.*). When pressed for what might constitute good-faith implementation, she said it might

look like having equipment and people in the area on a regular basis, taking into account weather conditions and weekends. (*Id.*). When pressed further, Aurora testified that too many externalities made concrete guidance impossible and that the requirement was merely precautionary. (*Id.*).

Mosley defined continuous construction activity differently, indicating that he understood the requirement to mean not taking breaks and continuing to work through the area until it was complete. (*Id.*). To comply with this requirement, Mosley stated that inspectors were instructed to drive the right of way twice per day. (*Id.*). When asked how he would respond if construction crews failed to maintain continuous activity, he admitted that he was not sure how he would find out about noncompliance, but if a landowner said something, he would handle it. (*Id.*).

The Service also failed to provide a concrete definition of continuous activity or a metric by which good-faith implementation of the term might be measured. (Hr'g, Dkt. 55). Instead, the Service pointed to a caveat in the biological opinion that required Kinder Morgan to perform continuous construction activity before the start of breeding season "to the extent practicable." (Biological Op., Dkt. 12-1, at 13).

The Court has concerns about the validity of a mandatory term in the incidental take statement that neither Kinder Morgan nor the Service, the agency tasked with enforcing the term, can concretely define or measure.

In making these factual findings and highlighting its concerns, the Court again notes that Plaintiffs have not moved to invalidate the incidental take statement at this time and that Kinder Morgan and the Service dispute whether the ESA allows citizens to enforce the terms of a biological opinion or an incidental take statement in the first place. (Hr'g, Dkt. 55). Nevertheless, Plaintiffs have alleged a claim for a Section 9 violation under the ESA. (Compl., Dkt. 1, at 21–22). As the parties move into the merits phase of the litigation, important questions remain regarding Kinder

Morgan's safe harbor from take liability under Section 7 in light of its noncompliance with the terms of the incidental take statement.

## III. CONCLUSION

For these reasons, **IT IS ORDERED** that Plaintiffs' Preliminary Injunction Application, (Dkt. 9), is **DENIED**.

SIGNED on March 19, 2020.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE