# IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

CITY OF AUSTIN, et al.,          )

                                  )

    Plaintiffs,               )

                                  )

    v.                      )    Case No. 1:20-cv-00138-RP

                                  )

KINDER MORGAN TEXAS PIPELINE,   )

LLC, et al.,                )

                                  )

    Defendants.           )

                                  )

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Federal Defendants, the U.S. Fish and Wildlife Service ("Service"); the U.S. Department of Interior; David Bernhardt, in his official capacity as Secretary of Interior; and Aurelia Skipwith, in her official capacity as Director of the Service, submit this combined cross-motion for summary judgment on the claims against Federal Defendants in Plaintiffs' Second Amended Complaint (claims 2, 4-8, and 10) and opposition to Plaintiffs' motion for partial summary judgment regarding the proposed Permian Highway Pipeline ("PHP"), ECF No. 82 ("Pls. Mot.").

The vast majority of the PHP is being constructed on private land. For the places where the pipeline will cross waters of the United States under the jurisdiction of the United States Army Corps of Engineers (the "Corps"), Kinder Morgan requested and received Clean Water Act ("CWA") authorization from the Corps. Specifically, the Corps verified that activities related to the construction of portions of the PHP qualified for use of Nationwide Permit 12 ("NWP 12"), which covers utility line activities and can only be utilized if the proposed activities have minimal impacts. Before the Corps verified that the proposed activities qualified for use of NWP 12, the Corps consulted with the Service under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, because the project may affect ESA-listed species. At the end of this consultation, the Service issued a detailed 64-page biological opinion ("BiOp") and incidental take statement ("ITS"), and later amended the BiOp/ITS, finding that the Corps' CWA authorizations and Kinder Morgan's construction and operation of the PHP is not likely to jeopardize (or adversely affect) any listed species.

In their motion, Plaintiffs advance no challenge to the Service's no-jeopardy conclusions for ESA-listed species. Nor have Plaintiffs brought any claim against the Corps challenging its CWA verifications under NWP 12. Indeed, the Corps is not even a defendant. Rather, Plaintiffs raise three issues that implicate the Service, none of which has merit.

First, in claim 1 of their second amended complaint, Plaintiffs incorrectly contend that Kinder Morgan has violated ESA Section 9's prohibition on the take of listed species on the theory that Kinder Morgan cannot lawfully obtain an exemption from Section 9 through the Service's BiOp/ITS issued in the Section 7 consultation.  Pls. Mot. 18-24.  While this claim technically is not advanced against Federal Defendants, the Service would be impacted by a ruling in favor of Plaintiffs on this claim.  Because Kinder Morgan is an "applicant" for a Corps action that underwent ESA Section 7 consultation, the Service appropriately provided Kinder Morgan with an exemption for all anticipated take associated with the PHP.  The BiOp and ITS here properly analyze and identify all take expected to occur from the pipeline, regardless of where that take is expected to occur in the PHP project area, and includes terms and conditions applicable to Kinder Morgan as necessary to minimize that take.  Under the statute and regulations, Kinder Morgan then is not subject to liability under ESA Section 9 for activities conducted in compliance with the ITS.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

Second, Plaintiffs argue that, if ESA Section 7 affords an incidental take exemption to Kinder Morgan, the Service was required to perform a National Environmental Policy Act ("NEPA") analysis for the PHP.  Pls. Mot. 24-34.  Plaintiffs again are wrong.  The Service did not take "major federal action" under NEPA because the Service acted only as a consulting agency and does not have "federal control or responsibility" over the pipeline and did not approve the pipeline.  Instead, under the ESA, the Service determined that the pipeline, if constructed as proposed, is unlikely to jeopardize the continued existence of listed species. Further, the ESA and its implementing regulations require the Service to make a decision about whether the project will affect listed species under the ESA based on the best scientific and commercial data available.  50 C.F.R. § 402.14.  The Service is thus unable to consider

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

information that would be produced during the NEPA process, which is more broadly focused on harm to the human environment. In addition, it takes much longer to produce an environmental impact statement ("EIS") than allowed by the ESA regulations' deadlines for producing a BiOp and ITS, indicating that Congress did not intend the Service to prepare an EIS for the issuance of a BiOp and ITS. The Court should therefore find that NEPA analysis is not required.

Third, Plaintiffs argue that the incidental take coverage afforded by ESA Section 7 is no longer effective because on April 15, 2020, the U.S. District Court for Montana vacated and enjoined the Corps' NWP 12. Pls. Mot. 34-37. However, the U.S. Supreme Court later stayed the vacatur and injunction of NWP 12, except as to the project at issue in the D. Montana case. NWP 12 thus remains in force for all other projects. Plaintiffs nevertheless insist that the D. Montana decision is "persuasive" authority that this Court should adopt. Federal Defendants disagree, but the legal validity of NWP 12 is simply not an issue before the Court. The Corps is not a defendant, there is no administrative record for NWP 12 before the Court, and thus the Court lacks the ability to find NWP 12 unlawful or invalid. Plaintiffs' attempt to circumvent this fatal problem by claiming that the BiOp/ITS somehow became ineffective based on the District of Montana decision finds no support in that document or under the law. A Section 7 BiOp analyzes the impact of the proposed agency action on listed species. The Service is not tasked under the ESA with examining whether the action is otherwise legally valid, and thus there is no conclusion by the Service on that issue for the Court to review in this case.

## II.     LEGAL FRAMEWORK

### A.     Endangered Species Act

Congress enacted the ESA, 16 U.S.C. § 1531 et seq., to conserve and protect endangered and threatened species and the ecosystems upon which they depend. *See* 16 U.S.C. § 1531(b).

Once a species is listed, it is afforded certain protections under the ESA.[1]

Section 9 of the ESA generally prohibits the taking of any member of a fish or wildlife species listed as endangered, absent an applicable exemption, and these prohibitions can be extended to threatened species. 16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d).

Section 7 of the ESA establishes the standards and procedures that federal agencies must observe where their actions may affect listed species. Section 7 requires that each federal agency (the "action agency") consult with the Service (or NMFS, depending on the species) (the "consulting agency") to ensure that any "action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any listed species or adversely modify or destroy its designated critical habitat. 16 U.S.C. § 1536(2). If an action agency determines that a proposed action may affect a listed species, the agency must pursue either informal or formal consultation. 50 C.F.R. §§ 402.13, 402.14. If the agency determines that the proposed action is "likely to adversely affect" listed species or designated critical habitat, the action agency must engage in formal consultation. 50 C.F.R. §§ 402.13(c), 402.14(a)-(b). Formal consultation concludes with the issuance of a BiOp. Id. § 402.14.[2]

Section 7 expressly applies to agency actions that approve a private or other non-federal entity application for a federal permit, license, or other authorization. 16 U.S.C. § 1536 (containing multiple references to the participation of such federal permit or license "applicants" in the Section 7 process). Among other things, ESA Section 7 provides that, where the Service

---

[1] Responsibility for the ESA is divided between the Secretaries of the Interior and Commerce. The Secretary of the Interior, who is generally responsible for terrestrial species, has delegated its responsibility to the Service. The Secretary of Commerce, who is responsible for most marine species, has delegated its responsibility to the National Marine Fisheries Service ("NMFS").

[2] The Service's BiOp for the PHP applies the recently amended Section 7 regulations. The Service and NMFS stated they "do not intend for these regulatory changes to alter how we analyze the effects of a proposed action." 84 Fed. Reg. 44,976, 44,977 (Aug. 27, 2019).

finds that the agency action under review — here the Corps' verification of activities under NWP 12 for the PHP — is not likely to cause jeopardy to listed species but may result in incidental take, the Secretary "shall provide the Federal agency and the *applicant concerned, if any*, with a written statement" that "specifies the impact of such incidental taking on the species," "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and "sets forth the terms and conditions . . . that must be complied with by the Federal agency *or applicant (if any)*." 16 U.S.C. § 1536(b)(4) (emphasis added).

The ITS must include the incidental take "reasonably certain to occur" as a result of the agency action, 50 C.F.R. § 402.14(g)(7), whether from activities of the agency or the permit applicant, and include terms and conditions to minimize all such take. *Id*. § 402.02 ("Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency *or applicant*.") (emphasis added); *id*. § 402.14(i)(1)(ii) and (iv) (terms and conditions must be written for agency and applicant). ESA Section 7(o)(2) then provides, without any qualification or limitation, that "any taking" that occurs as a result of an activity conducted in compliance with the terms and conditions of an ITS is exempt from liability under Section 9. 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5) (no further authorization for "take" required where addressed in Section 7 ITS).

For private or non-federal governmental projects that have no access to the Section 7 process because no federal permit or other federal agency authorization is required, an ESA Section 10 incidental take permit ("ITP") is an option to obtain an exemption from ESA Section 9. 16 U.S.C. § 1539(a); Congressional Research Service, The Endangered Species Act: A Primer, at 22 (Sept. 8, 2016) ("For actions by private parties that might take a listed species, but *without any federal nexus* such as a loan or permit, the [Service] may issue permits to allow

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

'incidental take' of species for otherwise lawful actions.") (citing Section 10(a)) (emphasis added). Section 10 is an optional process. *Save Our Springs All. v. Norton*, No. A-05-CA-683-SS, 2007 WL 958173, at *4 (W.D. Tex. Feb. 20, 2007) ("The Court notes that the Section 10 permitting process is and has been a voluntary program: it is up to each developer whether or not to request a Section 10 permit."). A Section 10 ITP also is not mandatory for the Service to address any particular situation. 16 U.S.C. § 1539(a)(2)(A) (Service "may issue" an ITP).

## B.   National Environmental Policy Act

"Congress passed NEPA 'to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment.'" *Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 314-15 (5th Cir. 2020) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983)). NEPA requires that environmental information be available and subject to comment, review, and analysis by officials and citizens prior to making decisions. 40 C.F.R. § 1500.1(b). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Thus, a court may not require agencies "to elevate environmental concerns over other, admittedly legitimate, considerations." *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228 n.2 (1980) (per curiam).

NEPA requires agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "An environmental impact statement is 'a detailed statement by the responsible official' regarding, among other things, the 'environmental impact of the proposed action' and 'any adverse environmental effects which cannot be avoided should the proposal be implemented.'" *Gen. Land Office*, 947 F.3d at 314 (quoting 42 U.S.C. § 4332(C). To determine if an action requires an EIS, the agency may do an Environmental Assessment ("EA"), a document that briefly describes the proposal, examines

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

alternatives, and considers environmental impacts. 40 C.F.R. §§ 1501.4(b) (2019), 1508.9; *Fund for Animals v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996). The agency is entitled to considerable deference in the Court's consideration of whether it complied with NEPA. *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). When the resolution of the issues involves primarily issues of fact and "requires a high level of technical expertise [it] is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

**C.     Clean Water Act**

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a). Section 404 of the CWA authorizes the Corps to regulate discharges of dredged and fill material into waters of the United States through the issuance of permits. 33 U.S.C. § 1344. The Corps may issue individual permits or general permits. *See* 33 U.S.C. § 1344(a), (e). Individual permits are issued on a case-by-case basis after a process that involves site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. *See generally* 33 C.F.R. Pts. 323, 325. "The [Corps] may issue general permits (including nationwide permits), rather than individual permits, for 'any category of activities' that has 'only minimal adverse environmental effects when performed separately, and will only have minimal cumulative adverse effect on the environment.'" *La. Crawfish Producers Ass'n W. v. Mallard Basin*, No. 6:10-cv-1085, 2019 WL 171693, at *8 n.13 (W.D. La. Jan. 10, 2019) (quoting 33 C.F.R. § 330.1(b); 33 U.S.C § 1344(e)(1)). "After the Corps has promulgated a general permit, with public notice and an opportunity for a hearing, regional staff members

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

consider requests for "verifications" of projects thereunder." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39 (D.C. Cir. 2015).

Under its general permitting authority, the Corps issued NWP 12, which allows construction of utility lines in waters of the United States "provided the activity does not result in the loss of greater than 1/2-acre of [U.S. waters] for each single and complete project." *Issuance and Reissuance of Nationwide Permits*, 82 Fed. Reg. 1,860, 1,985 (Jan. 6, 2017). The permit covers "the construction, maintenance, repair, and removal of all utility lines throughout the nation," including utility lines "carrying resources (like water, fuel, and electricity)." *Sierra Club v. Bostick*, 787 F.3d 1043, 1058 (10th Cir. 2015); *see also* 82 Fed. Reg. at 1,985 (defining "utility line" to include "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose"). The Corps conducted a NEPA analysis when it reissued NWP 12. 82 Fed. Reg. at 1,866-68. "The [Corps'] practice is to perform a NEPA analysis for general permits in advance of their promulgation, and not to conduct additional NEPA analysis when it verifies specific activities under the general permits." *Sierra Club*, 803 F.3d at 39-40 (citing *Bostick*, 787 F.3d at 105; *Snoqualmie Valley Pres All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1158 (9th Cir. 2012) (per curiam)).

**D.     Standard of Review Applicable to the Claims Against Federal Defendants**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). Because the court need not and, indeed, may not, "find" underlying facts, there are no material facts essential to the court's resolution of this action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-85 (1990). Because an administrative review proceeding such as this one does not implicate the possibility of a trial, if the Court were to conclude from a review of the

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

administrative record that the agency's decision was arbitrary or capricious, the remedy would be to remand the matter for reconsideration. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam).

The agencies' decisions are subject to the judicial review standards of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The APA standard affords great deference to agency decision-making and the agency's action is presumed valid. *See Overton Park*, 401 U.S. at 415-16. The standard of review is narrow, meaning that the Court's review is limited to a determination as to whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The agency must provide a 'satisfactory explanation' for its action, and 'a court is not to substitute its judgment for that of the agency,'" but "a decision of less than ideal clarity" may be upheld "if the agency's path may be reasonably discerned." *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) (citations omitted). The scope of judicial review of a final agency action also is limited to "the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted). The "focal point for judicial review [of an agency decision] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. at 142.

## III.   FACTUAL BACKGROUND

The PHP is a 42-inch outer diameter natural gas pipeline that will be approximately 428.54 miles long and will extend from the Waha Interconnect in Reeves County, Texas, to the delivery point in Colorado County, Texas. FWS000884-85. Formal and informal consultation for the project under ESA Section 7 began on June 25, 2019. FWS000882. After about 18 months of communications between the Service, the Corps, and Kinder Morgan (the "Applicant"), the Service issued its corrected BiOp/ITS on February 3, 2020. FWS000878.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

In the BiOp, the Service thoroughly analyzes the effects of the PHP on listed species in the entire project area. FWS000878-928. As the BiOp explains, "[p]ursuant to the Act's section 7 implementing regulations, even though the Corps has jurisdiction over a small extent of the overall PHP project, potential consequences to species must be considered for the entire pipeline." FWS000883. Therefore, the "action area" examined in the BiOp includes both the "Corps action area" and the "Applicant action area." FWS000884-87. As described in the BiOp, Kinder Morgan will undertake numerous measures to minimize impacts on listed species in both the Corps and Applicant action areas. FWS000879-81, 887-92, 920. Similarly, the ITS contains terms and conditions to minimize incidental take expected to occur from the project in both the Corps and Applicant action areas. FWS000931-35.

In the BiOp, the Service finds that the PHP is not likely to jeopardize the continued existence of, nor adversely modify critical habitat of, the endangered golden-cheeked warbler ("GCWA"), the Houston toad, or the threatened Tobusch fishhook cactus. FWS000924-28. Pursuant to informal consultation, the Service also concurred with the Corps' determination that its authorizations may affect, but are not likely to adversely affect, the Austin blind salamander and the Barton Springs salamander. FWS000879-81. The BiOp/ITS then states that, "[u]nder the terms of section 7(b)(4) and section 7(o)(2), taking by the Corps and/or [Kinder Morgan] that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act, provided that such taking is in compliance with this Incidental Take Statement." FWS000928-29. That ITS further states, with respect to any departure by Kinder Morgan from the terms and conditions of the ITS, that "[a]ny failure by the Applicant to comply with the terms and conditions stated herein will result in loss of Section 9 take coverage for

activities occurring outside of the Corps' jurisdiction, if not remedied within a reasonable period of time to the satisfaction of the Service." FWS000933.

On May 4, 2020, the Service issued an amended BiOp/ITS following reinitiation of ESA consultation based on Kinder Morgan's request to reroute the pipeline in certain areas and new information regarding alleged failures by Kinder Morgan to properly treat for oak wilt in some cleared areas. FWS002260. The amended BiOp/ITS requires Kinder Morgan to undertake substantial additional measures and mitigation to address the oak wilt issues. FWS002264-65, 2268-89. In the amended BiOp/ITS, the Service determines that the project as a whole and Kinder Morgan's "lapses in oak wilt treatment, with the corrective action it has taken to date and the additional future commitments it has made regarding oak wilt described above, will not likely jeopardize the continued existence of the GCWA." FWS0002270-71.

## IV.    ARGUMENT

### A.    ESA Section 7 affords incidental take coverage to applicants, like Kinder Morgan, for a federal agency authorization.

In their motion for partial summary judgment, Plaintiffs assert that the "plain language" and "structure" of the ESA foreclose any "non-federal entity" from obtaining an exemption from the ESA's take prohibition through ESA Section 7, that "no [Service] regulation" provides for such an exemption, and that the BiOp and ITS here affording a take exemption to Kinder Morgan are "inconsistent with decades of settled practice." Pls. Mot. 6, 17-19, 22, 24. The exact opposite is true. The plain language of Section 7 and the Service's implementing regulations expressly afford "applicants" such as Kinder Morgan an exemption from liability under ESA Section 9 for "any taking" addressed in the ITS. "In evaluating the clarity of Congressional direction" on a question of statutory interpretation, courts "apply the 'traditional tools of statutory interpretation,' including 'text, structure, purpose, and legislative history.'" *Rodriguez-*

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

11

*Avalos v. Holder*, 788 F.3d 444, 450 (5th Cir. 2015) (per curiam). Here, the text, purpose, structure, and legislative history of the ESA all contradict Plaintiffs' argument and support the conclusion that Congress intended Section 7 to afford a take exemption to applicants for a federal permit or other authorization like Kinder Morgan. Even if the plain language of the statute (and longstanding agency regulations) did not resolve this issue against Plaintiffs, which they do, the Service's interpretation of ESA Section 7 is entirely consistent with the structure and purposes of the ESA and Congressional intent and thus is entitled to deference by this Court.

As an initial matter, while Plaintiffs emphasize that ESA Section 7 and the regulations are "focused exclusively on the 'agency action,'" Pls. Mot. 20-22, federal agency actions that require Section 7 consultation plainly include the approval of permits or other authorizations necessary for development activities by a private or non-federal governmental entity. This is demonstrated by multiple references in ESA Section 7 to the participation of "applicants" for a federal approval in the Section 7 process.[3] Indeed, Section 7 allows an "applicant" to request that an agency perform early consultation where "the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

---

[3] For example, Section 7 provides that, "[i]n the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days," except when the agency takes certain steps, and the period cannot be extended beyond 150 days without the consent of the "applicant." 16 U.S.C. § 1536(b)(1)(B). Similarly, Section 7 provides that after conclusion of the Section 7 process, the Service "shall provide to the Federal agency *and the applicant, if any,* a written statement setting forth the [consulting agency's] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Id*. § 1536(b)(3)(A) (emphasis added). *See also id*. § 1536(d) (federal agency and "applicant" subject to requirement not to take action that would foreclose formulation of alternatives where proposed agency approval would cause jeopardy); *id*. § 1536(g) (ESA "committee" take exemption process that may be requested by agency or "applicant").

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

Most importantly, Section 7 expressly provides for the Service to issue an incidental take statement — exempting the take identified and addressed in that statement from ESA Section 9 — to both the federal agency *and the applicant* at the end of the Section 7 process. Specifically, where the Service finds that the effects of the agency action on listed species are not likely to cause jeopardy to listed species, but are likely to result in incidental take, the Service must "provide the Federal agency *and the [permit] applicant concerned*, if any, with a written statement" that, inter alia, "specifies the impact of such incidental taking on the species," "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and "sets forth the terms and conditions . . . that must be complied with by the Federal agency *or applicant (if any)*." *Id*. § 1536(b)(4) (emphasis added). The fact that ESA Section 7 explicitly refers to the participation of permit applicants in the process, and requires the Service to provide such applicants with a document providing an exemption from Section 9, alone are grounds to reject Plaintiffs' argument that affording a take exemption for such applicants through the Section 7 process is inconsistent with the ESA.

And, contrary to Plaintiffs' assertion that Section 7 cannot provide a take exemption for "non-federal" entities, the ESA and Section 7 regulations expressly define an "applicant" for purposes of ESA Section 7 to include private entities like Kinder Morgan. In the Section 7 regulations, applicant "refers to *any person*, as defined in section 3(13) of [the ESA], who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. ESA Section 3(13) in turn defines "person" to include "an individual, corporation, partnership, trust, trust, association, *or any other private entity*." 16 U.S.C. § 1532(13) (emphasis added). *See also* 51 Fed. Reg. 19,926, 19,931 (June 3, 1986) (preamble to original Section 7 regulations making clear that a permit "applicant" includes

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

"corporations" and "all other legal entities"). Thus, ESA Section 7 and the Service's longstanding regulatory definition of "applicant" together expressly authorize the Service to provide an ITS affording take coverage to private, non-federal entities like Kinder Morgan.

Plaintiffs nevertheless claim that a "nonfederal entity is an 'applicant' only with respect to actions that require formal approval from a Federal agency, not with respect to the entire project," and they argue that "[o]utside of the Corps Action Area, PHP did not need CWA approval from the Corps." Pls. Mot. 22. Contrary to this argument, Kinder Morgan qualifies as an "applicant" because it required "formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. That Corps approval, through verification of the use of NWP 12, was not necessary in areas outside of the Corp's regulatory jurisdiction does not alter this fact. More importantly, the scope of the "take exemption" afforded by ESA Section 7 is not limited or defined in terms of the portions or areas of a project that require federal approval.

Rather, ESA Section 7(o)(2) provides, without any qualification or limitation, that "*any* taking that is in compliance with the terms and conditions specified in [the ITS] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2) (emphasis added). Nothing in this statutory language limits the take exemption to a portion of the incidental take identified and addressed in the ITS, or a subset of the project area; rather, by the plain terms of the statute, "*any* taking" in compliance with the terms and conditions of the ITS is exempt from Section 9. Consistent with this plain statutory language, the Service's Section 7 regulations state that *any* incidental take in compliance with the ITS is afforded an exemption. *See* 50 C.F.R. § 402.14(i)(5) ("*Any taking* which is subject to [an ITS] and which is in compliance with the terms and conditions of that statement *is not a prohibited taking under*

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

*the Act, and no other authorization or permit under the Act is required*.") (emphasis added).
Here, the original and amended ITS include terms and conditions to minimize all take expected
to occur from the PHP, regardless of the location of that take. FWS000931-35; FWS002271-73.
Thus, by operation of the plain language of Section 7, and consistent with the Section 7
regulations, Kinder Morgan is afforded a take exemption through the Section 7 process. *See
Chevron, U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984) ("If the intent of
Congress is clear, that is the end of the matter; for the court, as well as the agency, must give
effect to the unambiguously expressed intent of Congress.").

Consistent with the plain language of Section 7 and the regulations, multiple courts have
found that any incidental take in compliance with an ITS is exempt from Section 9, including
take in areas outside of the federal agency's regulatory control. Indeed, to our knowledge, every
court that has decided this issue has rejected Plaintiffs' argument that a Section 10 permit is
required in the circumstances here. *See, e.g., Friends of the Wild Swan v. Babbitt*, 168 F.3d 498,
1999 WL 38606, at *1-2 (9th Cir. 1999) (rejecting plaintiff's argument that a Section 10 ITP was
required for "activities of Plum Creek and the State of Montana over which the federal
government has no regulatory authority," and finding that, where there is "triggering event for
section 7 consultation," all take analyzed in the BiOp and contemplated in the ITS is exempt
from Section 9); *Wild Equity Inst. v. City & Cty. of San Francisco*, No. C 11-00958 SI, 2012 WL
6082665, at *4 (N.D. Cal. Dec. 6, 2012) (Section 10 permit not required for local government for
its activities contemplated by an ITS, even though many of the ITS terms and conditions related
to take from ongoing activities at a public golf course that clearly were not within the Corps'
regulatory jurisdiction); *Friends of Merrymeeting Bay v. Topsham Hydro Partners Ltd. P'ship*,
No. 2:11-cv-37-GZS, 2013 WL 145623, at *4 (D. Me. Jan. 14, 2013) (Section 7(o) "indicates

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

that any taking — whether by a federal agency, private applicant, or other party — that complies with the conditions set forth in the incidental take statement is permitted") (citation omitted).

Plaintiffs do not argue, nor could they, that the Service unlawfully analyzed the impact of the entire PHP on listed species and included terms and conditions in the ITS to address and minimize *all* incidental take expected to occur from the project. The Section 7 regulations and case law required the Service in this case to analyze all effects of the Corps' action, including in areas outside the Corps' regulatory control. *See* 50 C.F.R. § 402.02 (the "effects of the action" examined in a BiOp are "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action"; "[e]ffects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action"); *see also*, *e.g.*, *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373-74 (5th Cir. 1976) (requiring Section 7 BiOp to consider the impacts of private development on a listed species that would be caused by a federal highway project); *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 696, 699, 703-04 (5th Cir. 2010) (construction of a quarry on private property was an indirect effect of federal approval of rail line examined in Section 7 consultation).

Likewise, under Section 7 and the regulations, the ITS must include the take "reasonably certain to occur" as a result of the agency action, 50 C.F.R. § 402.14(g)(7), whether from activities of the federal agency *or the permit applicant*, and include terms and conditions to minimize all such take. *Id*. § 402.02 ("Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or *applicant*") (emphasis added); *id*. § 402.14(i)(1)(ii) and (iv) (terms and conditions must be written for agency and applicant); 16 U.S.C. § 1536(b)(4). Here, take was reasonably certain to

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

occur in areas outside the Corps' regulatory jurisdiction as a consequence of the Corps' action. Thus, all take reasonably certain to occur from the project had to be addressed in the ITS, regardless of where it occurred. In short, while Plaintiffs are correct that Section 7 is "focused" on federal agency actions, the Service must analyze all of the effects to listed species caused by the federal agency action, including incidental take that is expected to occur in private or non-federal areas, and must include terms and conditions in the ITS to minimize all such take.

Plaintiffs wrongly argue that this approach — and the resulting take exemption afforded to Kinder Morgan by operation of Section 7(o)(2) — was newly developed in 2017 letters between the Service and the Corps. Pls. Mot. 3, 13, 22. The agency's regulatory language at 50 C.F.R. § 402.14(i)(5) interpreting Section 7(o)(2) and providing that "any taking" in compliance with an ITS is exempt from Section 9 was adopted *more than 30 years ago*. 54 Fed. Reg. 40,338, 40,346-40,347 (Sept. 29, 1989) (preamble to this regulation explaining that "if the incidental take statement applies and if the action complies with the terms and conditions of that statement," the "biological opinion plus the incidental take statement operate as an exemption under section 7(o)(2) of the ESA," and further stating that, for private projects subject to federal permitting, "there is no need for a separate conservation plan" under ESA Section 10). Even before adopting this regulatory language, in the preamble to the original Section 7 regulations adopted in 1986, the Service and NMFS stated that the ITS "operates to exempt the Federal agency *and any permit or license applicant involved* from the section 9 'taking' prohibitions under the Act if the subsequent implementation of the action is consistent with the terms and conditions of the incidental take statement." 51 Fed. Reg. at 19,926 (emphasis added).

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

The Service's and NMFS' joint ESA Section 7 Consultation Handbook,[4] released in 1998, further undermines Plaintiffs' assertion that the approach taken for the PHP is "novel" or contrary to agency practice. The Handbook describes a very similar fact pattern to the PHP, in which a private developer seeks a federal wetland fill permit for a proposed access road to a housing development. Section 7 Handbook at 4-18. The Handbook states that the "action area" to be analyzed in the Section 7 consultation would include the private housing development, even where the applicant could choose an alternative access route that would avoid the need for a federal permit. *Id*. ("Whether or not the applicant can build a road that does not impact the wetland, the analysis of the effects of the [proposed agency action of granting the permit] still encompasses the proposed development."). The Handbook states that only if the applicant was instead considering "the alternative [route] with no Federal nexus" should the applicant "be advised of the need for acquiring a section 10(a)(1)(B) permit." *Id*.

Consistent with the Section 7 regulations dating back to the 1980s and the 1998 Consultation Handbook, the Service and NMFS for many years have issued incidental take statements under Section 7 to non-federal permit applicants, where a federal agency permit or other authorization was required for only a portion of the project area. Very commonly, the effects of a federal permit or authorization on listed species will extend to areas outside of the agency's regulatory jurisdiction, yet the Service routinely will (1) analyze whether incidental take in those non-federal areas will jeopardize the species and (2) include terms and conditions in the ITS to minimize take in those areas. In these past cases — which obviously long predate the 2017 letter exchange between the Service and the Corps — the private or non-federal

---

[4] Available at https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

governmental permit applicant obtained an ESA take exemption without a Section 10 permit.[5] Similarly, in 2003, the Service, NMFS, and two major federal land management agencies entered into a memorandum of understanding that where private applicants seek a right-of-way across federal lands to enable development on non-federal land, the ESA Section 7 process would apply and examine the effects of the private development on listed species where those effects were reasonably certain to occur, and found that, if the applicant abides by the measures in the Section 7 incidental take statement related to the development activities on non-federal land, "the applicant has ESA coverage for any associated take."[6]

Ignoring this long history of the Service doing exactly what they claim is unlawful, Plaintiffs rely on the fact that the Corps expressed a desire to develop training materials for agency field personnel applying the 2017 letter exchange, suggesting that training would only be required if the letter exchange reflected an entirely new approach to Section 7.  Pls. Mot. 13. However, the mere fact that agency field personnel needed training — including with respect to many details such as the content of the necessary documents such as the Corps' biological

---

[5] For example, in 2003, the Service issued a BiOp/ITS affording a take exemption to a private developer for a 1,500-acre residential development in Brazos County, Texas, containing only 1.28 acres within the Corps' jurisdiction.  In 2004, the Service similarly issued a BiOp and ITS to a municipal utility district for a water pipeline between Lake Georgetown and the City of Round Rock, Texas, where the facilities would utilize some Corps property and require CWA authorization, but the 13-mile line would mainly cross private property. The Service provided an ITS affording an exemption from Section 9 to this non-federal entity.  The Court may properly take judicial notice of these BiOps under Federal Rule of Evidence 201.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (The "district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [the agency], which were matters of public record directly relevant to the issue at hand.").  These BiOps are available at https://www.fws.gov/southwest/es/Documents/R2ES/Navasota_Ladies_Tresses_Indian_Lakes_BO_FWS.pdf and https://www.fws.gov/southwest/es/Documents/R2ES/Bone_Cave_harvestman_BCMUD_BO_USACE.pdf (last visited July 28, 2020).

[6] *See* https://www.fws.gov/guidance/sites/default/files/documents/Right-of-Way-policy-for-FS-BLM-NOAA-2003.pdf. (last visited July 28, 2020).

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

assessments — does not mean that the Service for the first time ever in 2017 interpreted Section 7 to afford a take exemption to non-federal entities that require federal approvals for a project to proceed. The long-established Section 7 regulations, the 1998 Consultation Handbook, and past agency practice going back long before 2017 disprove that assertion. And, as the Service noted in the 2017 correspondence with the Corps, the ESA and regulations require that the "biological opinion and associated incidental take statement consider effects that occur outside the jurisdiction of the agency," which "has sometimes resulted in extended negotiations as our staff have attempted to address the dual responsibilities of the Service and the Corps." FWS000001. The clear implication is that the letter exchange did not create a new approach to Section 7, but rather memorialized existing practice in order to educate agency personnel about, and ensure consistent application of, the existing requirements of Section 7 and the regulations.[7]

Even were the Court to conclude that the plain language of the statute did not resolve this issue, it is well-established that an agency is entitled to deference for its interpretation of ambiguous provisions in a statute that it is charged with implementing. *Chevron*, 467 U.S. at 842-43. Under *Chevron*, if Congress "has not directly addressed the precise question at issue" and the statute is "silent or ambiguous," *id.* at 843, the court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844; *see also United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001). Courts "have long recognized that considerable weight should be accorded to an executive

---

[7] Plaintiffs also point to a statement in the letter exchange that a private applicant for a federal authorization relying on the Section 7 process for its take coverage may "face some exposure" to an ESA citizen suit without seeking a Section 10 permit, suggesting this observation reflects a "lack of conviction" by the Service in its interpretation. Pls. Mot. 23. This argument is contradicted by the Service's statements in the letter exchange itself that the approach outlined is required by and consistent with the statute and regulations. FWS000001.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

department's construction of a statutory scheme it is entrusted to administer." *Id*. Here, the Service's interpretation of Section 7 is entitled to *Chevron* deference because that interpretation is reflected in the agency's Section 7 regulations that have the force of law, *Mead*, 553 U.S. at 226-27, but the Service's interpretation likewise would be entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, (1944). *See Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017) (finding that *Skidmore* deference applied to a less formal agency interpretation in part because as here, it was consistent with earlier and later pronouncements by the agency).

As explained above, the Service (and NMFS) have long found — beginning with their adoption of the joint Section 7 regulations in 1986 — that (1) an ITS properly addresses all take expected to occur from federal agency approval of a project and (2) ESA Section 7(o)(2) then affords the non-federal applicant for such approval a take exemption for activities conducted in compliance with the ITS, as is the case here. The Service at the same time expressly found that a Section 10 permit is not required for the applicant in these circumstances. 51 Fed. Reg. at 19,926; 54 Fed. Reg. at 40,346-47; Section 7 Handbook at 4-18**.** Under the *Chevron* standard**,** courts "normally accord particular deference" to such "an agency interpretation of 'longstanding' duration." *Barnhart v. Walton*, 535 U.S. 212, 215, 220 (2002) (citing *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 522, n. 12 (1982)).

Nor can Plaintiffs argue that the Service's approach to Section 7 is inconsistent with the purposes of the statute. The purpose of the ESA is to protect and conserve listed species and, specifically in Section 7, to ensure that federal agency actions do not jeopardize listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). Here, the Service's approach to Section 7 resulted in a thorough and fulsome analysis in the BiOp of all of the consequences to listed species of the Corps' approvals for the PHP, and the inclusion of protective measures in

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

the ITS applying to the Corps and/or Kinder Morgan as necessary to minimize the incidental take expected to occur to listed species in the whole project area. The only contrary "evidence" cited by Plaintiffs is the reinitiation of Section 7 consultation for the Corps' verifications for the PHP in light of new information regarding potential additional effects on listed species. Pls. Mot. 39. But that only shows that the Section 7 process is working as intended to address any new information that becomes available and warrants additional analysis or protective measures.[8]

The legislative history also is relevant in assessing both whether Congress has clearly expressed its intent on a matter, and the reasonableness of an agency's interpretation of a statute that it administers. *Rodriguez-Avalos*, 788 F.3d at 450; *Texas Coal. of Cities for Util. Issues v. FCC*, 324 F.3d 802, 809-810 (5th Cir. 2003). Here, the legislative history confirms that Congress did not intend ESA Section 10 to be the mandatory process for non-federal entities like Kinder Morgan to obtain an incidental take exemption under the circumstances here, as Plaintiffs claim. Pls. Mot. 19. In the 1982 amendments to the ESA, Congress addressed a perceived inconsistency in the operation of Sections 7 and 9. While Section 7 as enacted in 1973 implicitly enabled federal agencies and applicants to take listed species following Section 7 consultation, Section 9 prohibited any taking, even if not likely to result in jeopardy. As the history explains:

> Another concern raised by industry was that of resolving conflicts between Section 7 and Section 9. After complying with the rigorous demands of the Section 7 consultation process, the applicant or Federal agency receives no assurance that any incidental and unintentional takings contemplated under a Section 7 consultation will not be prosecuted under Section 9 which prohibits any taking.

---

[8] In fact, if Kinder Morgan had obtained a take exemption through the Section 10 process, no such reinitiation of Section 7 consultation could have occurred, and under the "no surprises" rule applicable to Section 10 take permits, Kinder Morgan would not have been required to take any additional conservation measures to respond to changed circumstances. 50 C.F.R. § 17.22.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

H.R. Rep. No. 97-567, at *15 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2815.  Congress

recognized that a similar dilemma was faced by landowners who could not participate in the

Section 7 process because their developments did not require a federal approval.  In order to

resolve these problems, Congress created two exemptions from the Section 9 take prohibition:

> For the applicant [for a permit] who consults with the Secretary under the
> Section 7 process, the Secretary shall provide him with a written statement
> on what permissible incidental taking may occur.  For private land owners,
> the Committee designed a solution through the permit provisions of
> Section 10 by authorizing the Secretary to issue permits to individuals
> who demonstrate that the taking of an endangered species will be
> incidental to, but not the purpose of, the lawful activity they will perform.

*Id*. Thus, Congress originally intended Section 10 for landowners and developers that have "no

need of a federal permit" and thus "have no access" to the Section 7 consultation process.  *Id*.

Kinder Morgan had access to Section 7 and thus did not need to obtain a Section 10 permit.

Finally, even if some aspects of the approach taken by the Service for the PHP as

described in the 2017 letter exchange was new or a refinement of past agency practice, that

would not make that approach or the Service's interpretation of Section 7 unreasonable.  As set

forth above, the approach taken for the PHP is entirely consistent with the text, structure,

purpose, and legislative history of the ESA.  Further, the exact approach described in the 2017

letter exchange was later subjected to notice-and-comment rulemaking during the recent 2019

revisions to the Section 7 regulations, which applied to the BiOp/ITS here.  For those revisions,

"[a] few commenters suggested that the 'effects' of the action should not include 'effects' that an

agency lacks the legal authority to lessen, offset, or prevent in taking the action."  84 Fed. Reg. at

44,990.  The Service and NMFS declined to limit their analysis of the effects of federal agency

action in this manner, explaining that, while they and action agencies "sometimes struggle with

the concept of reviewing the consequences from other activities not under the action agency's

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

control," that is "a required analysis" necessary to comply with Section 7. *Id*. The Service and NMFS then further explained that, when they write an ITS for a project like the PHP with some areas not under federal regulatory control, the proper approach is to "assign responsibility of specific terms and conditions of the incidental take statement to the federal agency, the applicant, or both." *Id*. That is exactly what happened in the ITS and amended ITS. FWS000931-35; FWS002271-89. Section 7(o)(2) and the regulations then provide that "any taking" for activities in compliance with the ITS is exempt from Section 9.

For all of these reasons, the Court should reject Plaintiffs' argument that Kinder Morgan was required to obtain a Section 10 permit and that Kinder Morgan would violate ESA Section 9 solely by relying on the safe harbor afforded by the BiOp and ITS issued under Section 7.

**B.    Federal Defendants are entitled to summary judgment on Plaintiffs' NEPA claim because the Service was not required to conduct a NEPA analysis.**

Pipeline cases such as this one present an unusual situation from the NEPA perspective because the pipeline itself is not a federal action; it is being built by a private company on private property largely outside federal jurisdiction. The Corps has jurisdiction only over very limited aspects of the project — no authorized activity results in the loss of greater than 0.5 acres of waters of the United States and therefore the project has minimal impacts on waters of the United States — and, but for these jurisdictional areas, no NEPA analysis would be done at all because private parties do not need to conduct a NEPA analysis. The Corps satisfied its NEPA obligation with respect to its verifications for those limited aspects of the project by conducting a NEPA analysis on NWP 12, and Plaintiffs have not challenged that analysis.

To satisfy its ESA obligations, the Corps consulted with the Service on the effects of the issuance of the verifications on listed species. In conducting its analysis, the Service must consider the impacts to listed species of the project even in areas outside the Corps' Clean Water

Act jurisdictional waters. *See* 50 C.F.R. § 402.02 (requiring analysis of "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action"). The ESA also *requires* the Service to issue an ITS if it determines that the project is not likely to result in jeopardy but that some take of species will occur. 16 U.S.C. § 1536(b)(4) (stating that the Service "*shall* provide the Federal agency and the applicant concerned" an ITS after concluding consultation if no violation of Section 7(a)(2) would result and if anticipated take is reasonably certain to occur (emphasis added)); 50 C.F.R. § 402.14(i) (stating that if incidental take of species will not violate Section 7(a)(2) "the Service will provide with the biological opinion a statement concerning incidental take").

Plaintiffs argue that if the Service issues an ITS to provide take coverage to Kinder Morgan for areas outside the Corps' jurisdiction, it must conduct a NEPA analysis for the entire pipeline. Pls. Mot. 24-34. This argument is without merit for several reasons. First, because the Service's role in this case is as a consulting agency under the ESA, not an action agency, the Service's preparation of a BiOp and ITS does not constitute a "major federal action" under NEPA. The Service does not have "federal control or responsibility" over the pipeline, as it did not approve the pipeline. Instead, under the ESA, the Service determined that the pipeline, if constructed as proposed, is unlikely to jeopardize (or adversely affect) the continued existence of listed species. Consequently, no NEPA analysis is required.

Second, NEPA analysis is not required because the Service lacks discretion to act on information that would be generated during the NEPA process. The ESA and its implementing regulations require the Service to consider only whether the proposed action will have an impact on listed species, and constrain its ability to make changes to the proposed action where, as here, the Service finds that the proposed action will not result in jeopardy to the continued existence of

listed species. The NEPA process would require the Service to consider factors beyond impacts to species and to consider project alternatives, including a no-action alternative. The ESA thus does not allow the Service to act on information generated during the NEPA process, and in accordance with Fifth Circuit precedent, NEPA analysis is not required.

Third, the ESA regulations establish deadlines for the consultation process that are incompatible with the deadlines for completing the NEPA process. This indicates that Congress did not intend the Service to produce an EIS when issuing a BiOp and ITS. As such, this Court should find that Congress did not intend the Service to prepare NEPA documents before issuing a BiOp and ITS.

### 1.    The Service did not take a "major federal action" requiring NEPA.

Plaintiffs' NEPA claim fails primarily because the ITS was not a "major federal action" that would require a NEPA analysis. NEPA's procedural obligations, including the requirement to analyze environmental impacts through an EA or EIS, apply only to a federal agency when it is undertaking a "major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The current Council on Environmental Quality ("CEQ") regulations[9] define "action" as "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies. . . ." 40 C.F.R. § 1508.18(a). "Federal actions tend to fall within one of" four categories, only one of which — "approval of specific projects, such as construction or management activities located in a defined geographic area" — is relevant here. 40 C.F.R. § 1508.18(b)(4); *see* Pls. Mot. 24.

"We are cognizant that '[t]he purpose of NEPA is to require that *federal* decision-makers consider the environmental consequences of *their* actions before deciding to proceed.'" *Save*

---

[9] The NEPA regulations have been updated and the new regulations go into effect on September 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020).

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

*Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1134 (5th Cir. 1992) (per curiam) (citing *Swain v. Brinegar*, 542 F.2d 364, 369 (7th Cir. 1976) (en banc)); *see also Atlanta Coal. on Transp. Crisis v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1344 (5th Cir. 1979) (noting that "Congress did not intend NEPA to apply to state, local, or private actions"). Non-federal actions — like the pipeline here — become "major federal actions" only if they are "potentially subject to Federal control and responsibility." *Id.* at 1348 n.19; *see also* 40 C.F.R. § 1508.18. "Federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA.'" *Save Barton Creek*, 950 F.2d at 1134 (quoting *Vill. of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 (10th Cir. 1990)). Courts have held, however, that "[t]he United States must maintain decisionmaking authority over the [non-federal action] in order for it to become a major federal action." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102 (9th Cir. 2007) (citing *Ka Makani 'O Kohala Ohana Inc. v. Water Supply,* 295 F.3d 955, 960-61 (9th Cir. 2002)).

Plaintiffs assert that the Service undertook "major federal action" under NEPA because, by issuing the ITS, the Service "both granted approval for and exerts continuing control over the construction of the PHP in the Applicant Action Area with the [BiOp]/ITS." Pls. Mot. 26. The Service's ITS was not a "major federal action" for two reasons.

### a.    The Service acted as a consulting agency.

First, the Service issued the BiOp and ITS in its role as a *consulting* agency under the ESA, not an action agency. *See Bennett v. Spear*, 520 U.S. 154, 173-74 (1997). In consultation, the Service acts in response to another agency's request for consultation on the effects of proposed actions on listed species and renders a BiOp as to the anticipated impacts of that activity. *See* 16 U.S.C. § 1536(a)(2) and (b)(3). The BiOp is a scientific examination of impacts to the listed species, concluding with the Service's scientific opinion on whether the proposed

action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat. *See, e.g., Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009) (noting that a BiOp is based on "the best scientific and commercial data available" and "is itself a scientific determination deserving deference") (citations omitted). The BiOp and ITS are not a permit or an approval of pipeline construction, but instead a scientific prediction of the anticipated impact to the species and associated level of take that is likely to result from the proposed action.

Further, as this Court has noted, and Plaintiffs emphasize, the Biological Opinion and ITS are not self-effectuating: "the Biological Opinion and the Incidental Take Statement do not become effective for the Corps or the applicant until the Corps issues all required Clean Water Act authorizations for the project." Order (ECF No. 31) at 4; Pls. Mot. 27-28. The Service, therefore, does not have sufficient control over Kinder Morgan's action to constitute major federal action. *See Ka Makani*, 295 F.3d at 960 (finding no federal action when agency lacks "the degree of decision-making power, authority, or control over the [project] needed to render it a major federal action"); *see also Save Barton Creek*, 950 F.2d at 1135 (finding that in order to constitute major federal action "the federal agency must possess actual power to control the non-federal activity" (citation omitted)).

### b.    The Service did not approve the pipeline construction.

Second, the Service did not approve, and does not have control over, the pipeline. The pipeline is a private endeavor, built largely on private lands. Kinder Morgan determined the route the pipeline would take, obtained necessary property rights, set the construction schedule, and provided all funding for the pipeline. Notably, the Service's BiOp and ITS do not approve the pipeline or its construction. Instead, the BiOp analyzes the proposed action's potential impacts on federally-listed species and determines that it is not likely to jeopardize these species'

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

continued existence. And because the proposed action is expected to result in incidental take, the ITS provides take coverage to Kinder Morgan and the Corps as long as they implement the ITS's terms and conditions. This scientific judgment is not an approval of the pipeline or even fill of jurisdictional waters, but a scientific prediction of the pipeline's impacts on listed species.

The Service's limited role in pipeline construction is insufficient to make the ITS a "major federal action." Under the ESA regulations, the Service, having found that the proposed action is not likely to jeopardize the continued existence of the species, can only propose "reasonable and prudent measures, along with the terms and conditions that implement them," that do not "alter the basic design, location, scope, duration, or timing of the action" and involve only "minor changes" to the project. 50 C.F.R. § 402.14(i)(2). These terms and conditions are entirely focused on minimizing take of listed species. 50 C.F.R. § 402.14(i)(1)(iii).

Here, the terms and conditions, among other things, prevent clearing in GCWA habitat between March 1 and July 31, require construction after clearing to be effectively continuous to minimize disturbances to nesting GCWA, and require temporary fill, construction material, and other debris to be removed immediately after completion of activities covered by the BiOp that result in habitat alteration. FWS000932-34. The ITS also requires notification of dead, injured, or sick GCWA or Houston toads. FWS000933. Kinder Morgan also purchased over 1,000 acres of property that contain high-quality habitat for species, including the GCWA, to be transferred to the Balcones Canyonlands National Wildlife Refuse to further minimize project impacts. FWS000889. The terms and conditions thus do not address items outside of ESA concerns. They do not prevent construction between March 1 and July 31 in areas that are not GCWA habitat, for example. They do not dictate the pipeline's route or construction methods. In short, they simply do not exert sufficient control over the project such that private action becomes a

federal action. "'Marginal' federal action will not render otherwise local action federal." *Ka Makani*, 295 F.3d at 960 (quoting *Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir. 1985)).

The cases Plaintiffs cite demonstrate only that courts have required a larger degree of control than exists here to transform a non-federal action into a "major federal action" for NEPA purposes. In *City of Dania Beach v. FAA*, 485 F.3d 1181, 1189 (D.C. Cir. 2007), the action agency issued a letter that authorized the use of secondary runways to alleviate traffic congestion at a major airport. The court held that the FAA was required to comply with NEPA because the program would increase "the number of takeoffs and landings over noise-sensitive residential areas near the airport" and could cause "'major' ecological, aesthetic, or health effects." *Id*. This direct agency authorization of action is far different than the Service's recommendations, via ESA consultation, to protect species.

In *Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985), the National Institute of Health ("NIH") approved the release by University of California scientists of a genetically engineered organism into the environment. As an initial matter, the case did not decide whether the University's conduct was a "major federal action" because the government conceded that it had taken major federal action and that NEPA was required. *Id*. at 153. Instead, the case decided that the University's private action could be enjoined based on a NEPA violation because federal regulations required NIH approval. *Id*. at 155. The court held therefore that its "power to enforce NEPA extends to private parties where 'non-federal action cannot lawfully begin or continue without the prior approval of a federal agency.'" *Id*. at 155. The case is therefore irrelevant. But, in any event, construction of the pipeline here lawfully began before the Service issued its BiOp/ITS and portions of pipeline construction outside the

action areas identified by the BiOp can continue without federal approval. FWS000887; ECF No. 30 at 9 (noting in February that construction had been underway for five months).

Plaintiffs' reliance on *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), to argue that the BiOp and ITS required NEPA review is misplaced. First, that case is out-of-circuit and not binding on this Court. Second, the facts in *Ramsey* are vastly different from the facts here. *Ramsey* involved a fish management plan for the Columbia River system where the National Marine Fisheries Service was both the consulting agency and the action agency. *Id.* at 444. In addition, parties who were not federal agencies or applicants under Section 7 were nevertheless covered by the terms of the incidental take statement. *Ramsey*, 96 F.3d at 442. Here, the Corps (not the Service) is the action agency for the aspects of the project within Clean Water Act jurisdictional waters and completed NEPA review in reissuing NWP 12, and no party beyond Kinder Morgan, the applicant under Section 7, is covered by the ITS.

Courts have noted the limited nature of *Ramsey*'s holding. *See Sierra Club*, 803 F.3d at 45 ("This case is thus unlike *Ramsey*, in which the National Marine Fisheries Service issued a BiOp and ITS and was, under the particular circumstances of that case, also the agency that authorized the species-taking action, thus making the Service's Section 7 ITS, standing alone, "functionally equivalent to a permit.") (citation omitted); *City of Santa Clarita v. U.S. Dep't of the Interior*, No. CV02-00697 DT (FMOx), 2006 WL 4743970, at *19 (C.D. Cal. Jan. 3, 2006) ("*Ramsey* did not involve an incidental take statement issued by federal consultant agency to a separate federal action agency that authorized the project, as is the case here."), *aff'd*, 249 F. App'x 502 (9th Cir. 2007); *Sw. Ctr. for Biological Diversity v. Klasse*, No. CIV S-97-1969 GEB JF, 1999 WL 34689321, at *11 (E.D. Cal. Apr. 1, 1999) ("The limiting language contained in [*Ramsey*] evinces that it did not intend [the Service] to file NEPA documents every time it issues

an incidental take statement to a federal agency"). As such, the case is neither binding nor persuasive authority for the Court. The Court should find that the Service has not taken major federal action requiring NEPA analysis.

### 2.   NEPA is not required because the Service could not consider information generated in the NEPA process.

NEPA requires federal agencies, "to the fullest extent possible," to include an EIS in proposals for major federal actions significantly affecting the environment. 42 U.S.C. § 4332. "NEPA does not require agencies to prepare an environmental impact statement if the agency's discretion is constrained by law such that it could not consider the information that would be contained in such a statement as part of its decisionmaking process." *Gen. Land Office*, 947 F.3d at 319 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769-70 (2004)). Where a federal agency has no discretion, it cannot conduct a meaningful analysis of alternatives — the "heart" of an EA or an EIS. *See* 40 C.F.R. § 1502.14. "It would not . . . satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform." *Gen. Land Office*, 947 F.3d at 320 (quoting *Pub. Citizen*, 541 U.S. at 769).

The Fifth Circuit's recent holding that NEPA does not apply to the Service when it makes listing decisions under Section 4 of the ESA because the Service does not have authority to consider environmental factors is instructive. *Id.* Under Section 4, parties may petition to add or remove a species from the endangered and threatened species lists. *Id.* at 314 (citing 16 U.S.C. § 1533(b)(3)). Within 90 days of receiving such a petition, the Service should issue a finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). The Fifth Circuit held that, because the ESA constrains the Service to consider certain specified factors and "requires

decisions about whether a species is or is not endangered or threatened to be made 'solely on the basis of the best scientific and commercial data available,'" the Service could not consider the information that would be contained in an EIS and NEPA, therefore, was not required. *Gen. Land Office*, 947 F.3d at 320 (citing 16 U.S.C. §§ 1533(a)(1), (b)(1)(A)). Other courts have similarly held that NEPA is not required when the Service "has no discretion to consider the environmental impact of [its] actions." *See Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (holding that NEPA is not required for designation of critical habitat for listed species).

NEPA is not required here because the Service does not have discretion to consider environmental factors other than those relating directly to the project's impacts on listed species. In formal consultation, the Service is concerned solely with the impact of a proposed project on listed species or their critical habitat and is required to make its decision based on "the best scientific and commercial data available." 50 C.F.R. § 402.14(d); *see id*. § 402.14(d) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat."); *id*. § 402.14(g). Further, in cases where no jeopardy will result and there is evidence that take is reasonably certain to occur, the Service *must* issue an ITS. *Id*. § 402.14(i); 16 U.S.C. § 1536(b)(4) (stating that the Service "*shall* provide the Federal agency and the applicant concerned" an ITS after concluding consultation if no violation of Section 7(a)(2) would result and if anticipated take is reasonably certain to occur (emphasis added)); *see Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1242 (holding that the ESA requires "the issuance of an [ITS] when the 'resultant incidental take of listed species will not violate section 7(a)(2)'") (citation omitted).

NEPA, on the other hand, requires consideration of the broader environmental impacts of proposed actions outside the scope of their impact on listed species. For example, the current

NEPA implementing regulations require agencies to consider, among other things, the proposed action's impact on historic or cultural resources and the "degree to which the proposed action affects public health or safety." *See* 40 C.F.R. §§ 1502.16, 1508.27(b). Under NEPA, whether an "action may adversely affect an endangered or threatened species or its habitat" under the ESA is only one of many considerations. *See id.* § 1508.27.

Thus, the NEPA process would generate a great deal of information that is irrelevant to the Service's decision under the ESA. The Service cannot consider whether a proposed project has a significant impact on cultural resources, for example, because the ESA requires it to consider only the impact on listed species and their habitat. If a proposed project would not jeopardize the continued existence of a listed species or its habitat but would result in take the ESA requires the Service to issue an ITS, regardless of the proposed action's impact on other environmental resources. In short, the Service simply would not be able to act on information generated in a NEPA document. An EIS "cannot insure the agency made an informed decision and considered environmental factors where the agency has no authority to consider environmental factors." *Gen. Land Office*, 947 F.3d at 320 (quoting *Pac. Legal Found. v. Andrus*, 657 F.2d 829, 836 (6th Cir. 1981). Preparing NEPA documentation under these circumstances "is a waste of time." *Id.*

The conflict between the ESA and NEPA is perhaps most obvious when considering alternatives. As noted, the Service must issue an ITS if it finds that the proposed action will not violate Section 7(a)(2). 50 C.F.R. § 402.14(i). In the ITS, the Service can only require reasonable and prudent measures that are necessary or appropriate to minimize the impact of incidental take on the species. 50 C.F.R. § 402.14(i)(2). These reasonable and prudent measures cannot "alter the basic design, location, scope, duration, or timing of the action and may involve

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

only minor changes." 50 C.F.R. § 402.14(i)(2).  In short, the Service can impose only limited changes on a proposed project.

NEPA, on the other hand, requires an examination of all reasonable alternatives, including a "no-action" alternative.  *See City of Shoreacres v. Waterworth*, 420 F.3d 440, 450 (5th Cir. 2005) ("This alternatives analysis, described by the relevant regulation as 'the heart of the environmental impact statement[,]' must '[r]igorously explore and objectively evaluate all reasonable alternatives' to the proposed action, including the 'no-action alternative' in which it is assumed that the project does not go forward." (quoting 40 C.F.R. § 1502.14)).  It would make little sense for the Service to consider a no-action alternative given that the Service is required to issue a BiOp and *must* issue an ITS if the proposed action is likely to result in incidental take.  Similarly, because the ESA allows the Service to propose only "reasonable and prudent measures" directed at minimizing take, and those measures can propose only "minor changes" that do not "alter the basic design, location, scope, duration, or timing of the action," the Service cannot engage in the robust analysis of alternatives that NEPA contemplates.  As the Fifth Circuit held in *General Land Office*, therefore, the Service need not go through the NEPA process when "it could not consider the information that would be contained in such a statement as part of its decisionmaking process."  *See Gen. Land Office*, 947 F.3d at 319 (citation omitted).

Plaintiffs also complain that the Section 7 process bypasses public comment, which is an important part of the NEPA process.  Pls. Mot. 33.  NEPA is a procedural statute and its public participation requirements are designed to ensure that the agency makes transparent and well-informed decisions.  *See, e.g., Methow Valley*, 490 U.S. at 349.  "This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a

35

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

decision." *California. v. Block*, 690 F.2d 753, 771 (9th Cir. 1982) (citing *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979). On the other hand, it is well-established that public participation is not required as part of the Section 7 consultation process. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 660 n.6 (2007) (citing 51 Fed. Reg. at 19,928). This is perhaps because the ESA regulations require the Service to "issue a biological opinion using the best scientific and commercial data available," 50 C.F.R. § 402.14(f), and does not allow environmental trade-offs. Instead, the ESA requires that the Service consider the impacts on listed species and their habitat, and minimize jeopardy and take to the extent possible. Thus, the Service would not be able to consider much of the public comment it would receive during the NEPA process, and NEPA analysis is not required.

### 3. The regulatory deadlines for concluding consultation conflict with NEPA's deadlines.

Another indication that Congress did not intend the Service to undertake NEPA analysis when issuing a BiOp and ITS is that the deadlines contained in the ESA conflict with NEPA's deadlines. Once formal consultation is initiated, the ESA and implementing regulations require the Service to conclude consultation within 90 days and to issue a BiOp within 45 days after the conclusion of consultation. 16 U.S.C. § 1536(b)(1)(B); 50 C.F.R. §§ 402.14(e), (g)(4). Where, as here, the consultation involves an applicant, the consultation cannot be extended more than 60 days without the applicant's consent. 16 U.S.C. § 1536(b)(1)(B); 50 C.F.R. § 402.14(e). Thus, in these circumstances, it is the applicant, not the Service, that has ultimate control over the final timing of the BiOp. If an applicant does not consent to a further extension, the agency would have to issue a BiOp within 195 days. 16 U.S.C. § 1536(b)(1)(B)(ii).

EISs, however, take much longer to produce. Under the current regulations:

> Before publishing its final EIS on a proposed project, an agency must: (1) publish in the Federal Register a notice of intent to prepare an EIS, 40 C.F.R. §§ 1508.22, 1501.7; (2) gather input on the scope of issues the EIS should address (this is called scoping), *id*. § 1501.7; (3) prepare a draft EIS and publish that document in the Federal Register, *id*. §§ 1502.9, 1506.10(a); (4) provide the public an opportunity to comment on the draft EIS and respond to those comments, *id*. § 1503.4; (5) prepare the final EIS, *id*. § 1502.9; and (6) prepare and issue a record of decision, *id*. § 1505.2. [10]

*Jamul Action Comm. v. Chaudhuri*, 837 F.3d 958, 965 (9th Cir. 2016) (finding an irreconcilable conflict between the mandatory agency deadline in NEPA and the Indian Gaming Regulatory Act, which required a decision within 90 days). If the Court were to assume "it takes no time to respond to the public's view on scope and implementation, prepare a draft EIS, and incorporate public comments into the final EIS, the shortest time frame in which [the agency] could prepare an EIS would be one hundred and twenty days." *Id*. In reality, EISs often take much longer: a recent CEQ report found that the average time for completion of an EIS and issuance of a Record of Decision was over 4.5 years and the median was 3.6 years. *See, e.g.*, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 1,684, 1,687 (Jan. 10, 2020); *Jamul*, 837 F.3d at 965 ("In keeping with the Supreme Court's analysis, we have previously assumed that it takes an agency at least 360 days to prepare an EIS." (citing *Jones v. Gordon*, 792 F.2d 821, 825 (9th Cir. 1986)).

Thus, absent the applicant's consent to a significant extension, it would be nearly impossible for the Service to prepare an EIS before it issued a BiOp and ITS.[11] This is yet

---

[10] While the timeframes for completing an EA are generally shorter, an agency must complete an EIS if it determines that the proposed action is likely to have a significant impact on the human environment. Thus, because an agency could not prepare an EIS within the ESA's timeframe for issuing a BiOp, it would make little sense to require preparation of an EA.

[11] Courts outside of the Fifth Circuit have suggested that the ESA's consent provisions provide the agencies with sufficient flexibility such that this timing conflict does not necessarily preclude an action agency from conducting NEPA analysis. *See, e.g., San Luis Delta and Mendota v. Jewell*, 747 F.3d 581, 648-649 (9th Cir. 2014). While we disagree with those decisions, they are distinguishable here in any event. Those cases did not involve authorizing third-party applicants

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

another indication that Congress did not intend for the Service to prepare a NEPA document when it issues a BiOp and ITS. The Court should therefore conclude that NEPA analsyis is not required.

**C.   The Court should reject Plaintiffs' argument that the BiOp/ITS are no longer effective based on the D. Montana decision regarding the Corps' NWP 12.**

Finally, Plaintiffs argue that the BiOp and ITS affording a take exemption to Kinder Morgan are "invalid" and "not effective" because the BiOp/ITS are purportedly "[p]redicated on the [i]ssuance" of valid CWA authorizations, and NWP 12 is allegedly "invalid" because the U.S. District Court for the District of Montana vacated and enjoined NWP 12 on the basis that the Corps had failed to perform ESA consultation for NWP 12. Pls. Mot. 34-37 (citing *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, – F. Supp. 3d –, CV-19-44-GF-BMM, 2020 WL 1875455, at *7 (D. Mont. Apr. 15, 2020). Plaintiffs' argument fails on multiple grounds.

First, over a week before Plaintiffs filed their summary judgment brief, the U.S. Supreme Court stayed the D. Montana District Court's vacatur and injunction of NWP 12, except as applied to the Keystone XL pipeline at issue in that case. *Army Corps of Eng'rs v. N. Plains Res. Council*, – S. Ct. –, No. 19A1053, 2020 WL 3637662 (July 6, 2020). Thus, NWP 12 remains valid and in force for all projects other than Keystone XL. Plaintiffs effectively ask the Court to undo the Supreme Court's stay and treat NWP 12 as vacated and enjoined nationally.

Second, while Plaintiffs urge the Court to rely on the Montana District Court's "reasoning" to conclude that "the Corps violated the ESA when issuing NWP 12," Pls. Mot. 35-37, the Court cannot do so because the Corps is not a defendant and NWP 12 has not been challenged in this case. Agency action is presumptively valid under the standard of review.

---

but instead involved the Federal agencies' own activities. Thus, the Federal agencies had discretion over the timing of completion of consultation without the need to obtain consent of an applicant.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

*Associated Builders & Contractors of Tex. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 220 (5th Cir. 2016). To obtain a contrary finding by this Court that NWP 12 is "invalid" on the claimed basis, Plaintiffs would have needed to sue the Corps — which they have not done — and allege it was required to consult under the ESA for NWP 12. Because Plaintiffs have not challenged NWP 12, the Court also does not have an administrative record for NWP 12. Plaintiffs essentially ask the Court to reach a conclusion that an agency acted unlawfully without that agency before it to defend itself and without any record for the agency's decision.

In addition, ESA failure-to-consult claims can only be brought under the ESA citizen-suit provision, and only after providing a 60-day notice of intent to sue the agency that allegedly failed to consult. 16 U.S.C. § 1540(g)(1)(A), (2)(A)(i); *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 517-522 (9th Cir. 1998); *Hallstrom v. Tillamook Cty.,* 493 U.S. 20, 26-28 (1989) (failure to strictly comply with notice requirements requires dismissal); *Consol. Envtl. Mgmt., Inc.-Nucor Steel La. v. Zen-Noh Grain Corp.*, 981 F. Supp. 2d 523, 541 (E.D. La. 2013). The ESA notice requirements "are mandatory conditions precedent to commencing suit" which a court lacks discretion to disregard. *Sierra Club v. Yuetter*, 926 F.2d 429, 437 (5th Cir. 1991) (quoting *Hallstrom*). Plaintiffs have not provided any 60-day notice of intent to sue the Corps for failure to consult on NWP 12. Thus, the Court is precluded from hearing any claim that NWP 12 is unlawful on ESA grounds.

Third, Plaintiffs misconstrue the Service's BiOp/ITS. Plaintiffs rely on a statement in the original February 3, 2020 BiOp/ITS that, "[t]his biological opinion and incidental take statement do not become effective for the Corps or the Applicant until the Corps issues all required CWA authorizations for the project." FWS000929; Pls. Mot. 34. The natural reading of this sentence is that the original BiOp/ITS became effective once the Corps issued its CWA verifications for

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

the project on February 13, 2020.  *See* ECF No. 10-9.  The statement simply refers to the

issuance of the Corps' verifications.   It does not make the effectiveness of the BiOp/ITS

contingent on whether the Corps' underlying NWP 12 authorization is legally valid or not.  The

Service also did not state, and did not intend to state, that the BiOp/ITS could later become

ineffective for any reason.  This fact is confirmed by the Service's amended BiOp/ITS issued on

May 4, 2020, which does not contain any statement regarding the effective date because by then

the Corps' verifications had been issued.  FWS002270-73.

Furthermore, the premise of Plaintiffs' argument — that the effectiveness of the

BiOp/ITS is contingent on the continued legal validity of the proposed agency action reviewed in

the ESA consultation — is flawed.  As discussed above for Plaintiffs' NEPA argument, in a

Section 7 consultation, the Service acts in response to another agency's request for consultation

on the effects of a proposed action on listed species, and it renders a BiOp as to whether the

activity is likely to cause jeopardy to such species.  *See* 16 U.S.C. § 1536(a)(2) and (b)(3).  The

Service is not equipped to, nor does it look behind or render any opinion on whether the

proposed action is otherwise legally valid.  *See, e.g.*, *Center for Biological Diversity v. FWS*,

450 F.3d 930, 942 (9th Cir. 2006) (Service not required to ensure that a proposed action

complies with all other Federal and state laws before issuing a BiOp or ITS).  As a result, there is

no conclusion by the Service on that issue for this Court to review in the context of judicial

review of the BiOp/ITS or the Service's actions.  To obtain a judicial finding that the underlying

agency action reviewed in a BiOp/ITS is unlawful, Plaintiffs were required to challenge that

agency action.  Here, Plaintiffs have not challenged the Corps' verifications or NWP 12 under

which they were issued.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

Given that the legal validity of the Corps' verifications or NWP 12 is not properly before the Court, Federal Defendants need not brief that issue here. But the United States clearly disagrees with the Montana District Court's decision, appealed it to the U.S. Court of Appeals for the Ninth Circuit, and obtained a stay in relevant part from the Supreme Court. Among other things, Plaintiffs rely on the Montana decision for the erroneous proposition that listed species are not adequately protected by project-specific ESA consultation, without additional consultation by the Corps at the nationwide, programmatic level for NWP 12. Pls. Mot. 36. Putting aside that the Montana Court misunderstood how NWP 12 operates, here the Corps engaged in full ESA consultation on the permitted activities, resulting in the issuance of the BiOp/ITS. As Plaintiffs concede, Kinder Morgan could fulfill its CWA obligations for the PHP by obtaining an individual, project-specific CWA Section 404 permit from the Corps without relying on NWP 12. *Id*. at 34-35. In that event, the only ESA consultation would be the very same project-specific one for the PHP that has already occurred here. Finding NWP 12 unlawful or invalid therefore would not ensure any additional Section 7 analysis or protections for listed species impacted by the PHP. For all of these reasons, the Court should reject Plaintiffs' argument that the BiOp/ITS became ineffective based on the District of Montana decision.

**D.     The Court Should Grant Summary Judgment to Federal Defendants as to Claims Abandoned by Plaintiffs.**

Plaintiffs have abandoned a number of their claims against Federal Defendants. Pls. Mot. 1 (seeking summary judgment only as to claims 1, 2, 3, 7, and 10). The Court ordered Plaintiffs to submit a summary judgment motion for all claims that can be resolved on an administrative record by July 14, 2010. ECF No. 78 at 2. Claims 4-6 in substance allege that the Service is "maladministering" the ESA, which are APA claims reviewed on an administrative record. ECF 72 at 31-32; *Bennett v. Spear*, 520 U.S. at 171-74; *Tex. Comm. on Nat. Res. v. Van Winkle*, 197

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

F. Supp. 2d 586, 595 (N.D. Tex. 2002).  Claim 8 also is an APA claim reviewed on the record. ECF 72 at 33.  Because Plaintiffs have failed to move for summary judgment on these claims as required by the Court's Order, the Court should view them as abandoned and grant summary judgment to Federal Defendants on claims 4-6 and 8.  *See Aguirre v. Valerus Field Sols., L.P.*, Civil Action No. H-15-3722, 2019 WL 2570069, at *13 (S.D. Tex. Jan. 23, 2019).  If the Court does not deem these claims abandoned, Federal Defendants request an opportunity to file further briefing in response to any further briefing from Plaintiff on them.

## V.     CONCLUSION

The Service's interpretation of Section 7 to afford a take exemption to a non-federal permit applicant like Kinder Morgan is fully consistent with the text, purposes, structure, and legislative history of Section 7, as well as longstanding agency regulations and practice. Plaintiffs' argument to the contrary that Kinder Morgan was required to obtain a Section 10 permit has no support in statute, regulations or case law.  Plaintiffs' NEPA claim also fails because the Service did not take major federal action requiring NEPA, and the ESA does not allow the Service to consider information that would be generated in the NEPA process.  The Court should also reject Plaintiffs' request that the Court treat NWP 12 as invalid because that issue is not properly before the Court, and in any event, the effectiveness of the BiOp/ITS is not predicated on this issue.  For the foregoing reasons, the Court should deny Plaintiffs' motion for partial summary judgment and grant summary judgment to Federal Defendants on all claims.[12]

Dated: July 28, 2020

JEAN E. WILLIAMS
Deputy Assistant Attorney General

---

[12] If the Court rules for Plaintiffs on any claim, Federal Defendants request that the Court provide an opportunity for the parties to submit additional briefing on remedy and next steps in this case in light of any claims remaining before the Court and the status of the project at that time.

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

*s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE
Colorado Bar No. 33223
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1487
Facsimile: (303) 844-1350
Email: Devon.McCune@usdoj.gov


SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

*s/ Clifford E. Stevens, Jr.*
CLIFFORD E. STEVENS, JR.
Senior Trial Attorney, DC Bar No. 463906
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 353-0368
Facsimile: (202) 305-0275
Email: Clifford.Stevens@usdoj.gov

*Attorneys for Federal Defendants*

Federal Defendants' Opposition and Cross-Motion for Summary Judgment

## CERTIFICATE OF SERVICE

I hereby certify that, this 28th day of July, 2020, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Devon Lehman McCune*

Devon Lehman McCune

Federal Defendants' Opposition and Cross-Motion for Summary Judgment