IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:20-CV-138-RP |
| | § | |
| KINDER MORGAN TEXAS PIPELINE, | § | |
| LLC, et al., | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

Before the Court are Defendants Kinder Morgan Texas Pipeline LLC and Permian Highway Pipeline, LLC's (together, "Kinder Morgan") motion to dismiss, (Dkt. 93), and Federal Defendants the United States Department of Interior, David Bernhardt, *in his official capacity as Secretary of Interior, the United States Fish and Wildlife Service* (the "Service"), and Aurelia Skipwith's, *in her official capacity as Director of the U.S. Fish and Wildlife Service*, ("Federal Defendants," and with Kinder Morgan "Defendants") motion to dismiss, (Dkt. 96). Plaintiffs City of Austin, City of San Marcos, Travis County, Hays County, Barton Springs Edwards Aquifer Conservation District, Larry Becker, Arlene Becker, Jonna Murchison, and Mark Weiler ("Plaintiffs") filed a response, and Defendants replied. (Dkts. 97, 99, 100). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motions should be granted.

## I. BACKGROUND

This case concerns Kinder Morgan's construction of a natural gas pipeline (the "Pipeline") through the Central Texas Hill Country.[1] (Compl., Dkt. 1, at 2). Plaintiffs are local government entities, a groundwater conservation district, and landowners in the Texas Hill Country who seek

---

[1] The pipeline will extend beyond the Texas Hill Country. The pipeline will cross 16 Texas counties between Reeves County and Colorado County, ultimately traversing 428 miles. (Dkt. 72, at 21; Dkt. 30, at 19).

injunctive relief against Kinder Morgan with respect to the pipeline project. They allege the Pipeline's route through the Texas Hill Country will travel through "sensitive environmental features, including the Edwards and Trinity Aquifer recharge zones as well as habitat for many endangered species," including the golden-cheeked warbler, the Houston toad, and the Tobusch fishhook cactus. (App. Prelim. Inj., Dkt. 10, at 2).

Kinder Morgan began clearing warbler habitat—both within and outside the U.S. Corps of Army Engineers' (the "Corps") jurisdiction—shortly after the Court denied Plaintiffs' TRO application in February 2020. (Order, Dkt. 31). As of November 2020, construction of the Pipeline was complete. (Status Report, Dkt. 92; Mody Decl., Dkt. 93-1, at 1). As of January 2021, all construction authorized by the Corps under Nationwide Permit 12 ("NWP 12") was complete and "[n]o planned construction work of any of kind remain[ed]." (Mody Decl., Dkt. 93-1, at 1).

Plaintiffs bring claims against Kinder Morgan for alleged violations of the Endangered Species Act ("ESA") and the mandatory terms and conditions of the Service's biological opinion and incidental take statement. (2d. Am. Compl., Dkt. 1, at 29–34). They bring claims against the Service for alleged violations of the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA"). (*Id.*).

### B. Plaintiffs' Claims for Relief

In their Second Amended Complaint, Plaintiffs assert ten claims for relief. (2d. Am. Compl., Dkt. 72, at 29–34). As Plaintiffs noted in their motion for partial summary judgment, their claims are "interrelated and at their heart raise the basic point that Service could not evade its NEPA responsibilities by issuing an incidental take statement rather than an incidental take permit ("ITP") to Kinder Morgan." (Pls.' Mot. Part. Summ. J., Dkt. 82, at 19). Plaintiffs' ten claims for relief are briefly summarized below.

### 1. Claim 1–Violations of ESA Section 9

Plaintiffs assert that "[a]bsent a valid Section 10 ITP, Kinder Morgan lacks lawful authorization to take endangered or threatened species in connection with construction, operation, and maintenance of the [Pipeline], and thus is violating and will continue to violate Section 9 of the ESA" by "killing, harming, wounding, and harassing" endangered species. (2d. Am. Compl., Dkt. 72, at 29–30) (citing 16 U.S.C. § 1539(a)(1)(B); 16 U.S.C.  § 1532(19))).

### 2. Claim 2—Violations of ESA Section 7

Plaintiffs allege that because a federal court "vacated NWP 12 in a nationwide injunction based on the Corps' failure to comply with Section 7 of the ESA when NWP 12 was reissued in 2017," the NWP 12 verifications provided to Kinder Morgan by the Corps on February 13, 2020 are ineffective and invalid. (2d. Am. Compl., Dkt. 72, at 30). And if the NWP 12 verifications are invalid, then Plaintiffs contend the Section 7 consultation process undertaken by the Defendants, the reinitiated Section 7 consultation and the May 4, Addendum to the biological opinion "are also invalid and a violation of Section 7, because they are premised on an invalid nationwide permit." (*Id.*).

### 3. Claim 3—Violation of ESA Section 9

Because the NWP 12 permit is invalid and the biological opinion, [incidental take statement or "ITS"], and May 4 Addendum to the Biological Opinion are ineffective absent valid Corps authorization under the Clean Water Act ("CWA"), Plaintiffs contend Kinder Morgan "lacks lawful authorization to take endangered or threatened species in connection with construction, operation, and maintenance of the [Pipeline], and is thus violating and will constitute to violate Section 9 of the ESA. (*Id.* at 30–31 (citing 16 U.S.C. § 1538(a)(1)(B))).

### 4. Claim 4—Violations of ESA Section 7

Plaintiffs argue that the biological opinion and ITS "contain mandatory terms and conditions that are vague, imprecise, indeterminate, impossible to comply with, and impossible to monitor and enforce." (*Id.* at 31). According to Plaintiffs, these vague terms invalidate the Biological Opinion and ITS because these mandatory terms and conditions cannot be monitored or enforced. (*Id.*). And without a valid Biological Opinion and ITS, Plaintiffs contend Kinder Morgan lacks a safe harbor from Section 9 liability under the ESA. (*Id.*).

### 5. Claim 5—Violations of ESA Section 7

Plaintiffs allege that the Service did not, as required for a formal consultation under 50 C.F.R. § 402.14(g)(1), "review all relevant information provided by the [Corps] or otherwise available" when it reinitiated consultation for the Pipeline because it did not consider "either: (1) the *Northern Plains* ruling, the invalidity of NWP 12, and the effect of that invalidity on the [biological opinion] and ITS; or (2) the evidence of extensive additional warbler habitat in the [Pipeline] project area, the failure of the original [biological assessment] and [biological opinion] to identify that habitat, and their impact undermining the Service's original no jeopardy conclusions." (*Id.* at 32).

### 6. Claim 6—Violations of ESA Section 7

Plaintiffs argue that the Service violated Section 7 of the ESA by not reinitiating consultation to consider "[t]he six submissions of evidence of extensive warbler habitat that was not identified in the February 3, 2020 BA and BO." (*Id.* at 32 (citing 50 C.F.R. § 402.16(a)(2)) ("[R]einitiation of consultation is required and shall be requested by the Federal agency or by the Service . . . if new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered.").

### 7. Claim 7—Violations of NEPA

If Kinder Morgan can obtain a safe harbor from ESA Section 9 liability through the Section 7 consultation process, then Plaintiffs contend the Service's issuance of the biological opinion and ITS purporting to offer that safe harbor "constitutes a major federal action affecting the quality of the human environment" necessitating compliance with NEPA. (*Id.* at 32). And because the Service has not prepared an [environmental impact statement] or an [environmental assessment] subject to public comment before issuing the biological opinion and ITS to Kinder Morgan, the Service violated NEPA. (*Id.* at 32–33 (citing 42 U.S.C. § 4332(C))).

### 8. Claim 8—Violations of the APA

Plaintiffs contend the Small Handle Process "constitutes a significant amendment to the ESA's regulatory framework governing Section 7 consultation between the agencies" and that the Service adopted this process and policy "without public notice or comment." (*Id.* at 33). Thus, say Plaintiffs, the Service's adoption of the Small Handle Process "is arbitrary, capricious" and did not comply with the procedures required by law under the APA. (*Id.*).

### 9. Claim 9—Violations of the Mandatory Terms and Conditions of the BO and ITS[2]

As established at the preliminary injunction hearing, Kinder Morgan failed to comply with the mandatory terms and conditions of the biological opinion and ITS designed to prevent oak wilt when it did not immediately treat wounded oak trees with latex paint, (*Id.* at 34). Plaintiffs argue that Kinder Morgan's noncompliance with the mandatory terms and conditions of the biological opinion and ITS renders them invalid. And without a valid biological opinion or ITS, Plaintiffs assert Kinder Morgan has no safe harbor from ESA Section 9 liability. (*Id.*).

---

[2] Plaintiffs did not to respond to PHP's cross-motion for summary judgment on Claim 9. (*See* Dkt. 87). As such, Claim 9 can no longer furnish a basis for relief. *See Black v. N. Panola School Dist.*, 461 F.3d 584, 592 (5th Cir. 2006); *Hargrave v. Fiberboard Corp.*, 710 F.2d. 1154, 1164 (5th Cir. 1983); *Arias v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00418-L, 2019 WL 2770160 at *2 (N.D. Tex. July 2, 2019).

**10. Claim 10—Declaration of Invalidity of NWP 12 as applied to the Biological Opinion, ITS, and the Reinitiated Consultation**

Finally, Plaintiffs seek a declaratory judgment that Kinder Morgan is not exempt from, and enjoys no safe harbor from liability under the ESA and that NWP 12 as applied, the biological opinion, the ITS, and the May 4 Addendum to the Biological Opinion are void, invalid, and of no effect. (*Id.* at 34–35).

### C. Procedural History

Previously, Plaintiffs filed an Application for a Temporary Restraining Order ("TRO Application") to stop Kinder Morgan from clearing 125-feet of golden-cheeked warbler territory to begin pipeline construction. (TRO App., Dkt. 18, at 3). After holding an emergency hearing, the Court denied Plaintiffs' TRO Application, concluding that Plaintiffs had not met their burden of showing irreparable, species-level harm to the warbler. (Order, Dkt. 31).

Plaintiffs then moved for a preliminary injunction on the basis of their ESA and NEPA claims. (App. Prelim. Inj., Dkt. 10, at 3). The crux of Plaintiffs' argument was Kinder Morgan and the Service had manipulated the federal Section 7 consultation process to sidestep the requirements of the Section 10 permitting process for private applicants, specifically the environmental review requirement under NEPA. (App. Prelim. Inj., Dkt. 45, at 14). Without a valid Section 10 permit, Plaintiffs argued any take of endangered species during the clearing and construction of the Pipeline outside of the Corps jurisdiction would violate Section 9 of the ESA and result in irreparable harm to endangered species and their habitat. (*Id.*). Plaintiffs also alleged harm in the form of "diminishment of their aesthetic, recreational, conservation, and financial interests in the continued quality and quantity of water in the Edwards Aquifer." (Reply, Dkt. 45, at 15).

With respect to their NEPA claim, Plaintiffs argued that if the Service's issuance of the biological opinion and incidental take statement provides a safe harbor similar to an incidental take

permit under Section 10 for areas outside of the Corp's jurisdiction, then the provision of that safe harbor constitutes a major federal action subject to the requirements of NEPA. (*Id.* at 26). NEPA requires every federal agency to prepare a report assessing the likely environmental consequences of every proposal for a major federal action and to make that report open for public comment before deciding whether to undertake the proposed action. *See* 42 U.S.C. § 4332(c). It is undisputed that the Defendants did not engage in this process.

At the preliminary injunction hearing, Plaintiffs also presented evidence demonstrating that Kinder Morgan had failed to comply with the oak wilt prevention and continuous construction requirements outlined in the incidental take statement. (Order, Dkt. 59, at 21). Plaintiffs alleged that this noncompliance cast doubt on the continued validity of the incidental take statement and the safe harbor it allegedly provided. (*Id.*).

The Court did not reach the merits of Plaintiffs' ESA and NEPA claims at the preliminary injunction phase because the Court concluded that Plaintiffs had not met their burden to show irreparable harm. (Order, Dkt. 59, at 20). Nevertheless, the Court found Plaintiffs' evidence that Kinder Morgan had violated the terms and conditions of the incidental take statement compelling and agreed that this noncompliance called the continued validity of the biological opinion and incidental take statement into question. (*Id.*). Specifically, the Court found that Kinder Morgan had failed to comply with the imperative to "immediately" treat freshly cut stumps and damaged surface roots with latex paint to prevent oak wilt. (*Id.* at 24). Indeed, the Court found that "Kinder Morgan's protocol was not to immediately treat freshly cut stumps in the right of way because they were going to be mulched over anyway," an approach the Court determined was "fundamentally at odds with the immediacy requirement mandated" in the biological opinion and incidental take statement. (*Id.*). The Court also noted the Service's inability to provide a concrete definition of "continuous activity" or a metric by which good-faith implementation of that term might be measured. (*Id.* at 28). The

Court again expressed concern about the validity of a safe harbor premised on compliance with a term in the incidental take statement that neither Kinder Morgan nor the Service, the agency allegedly tasked with enforcing the term, could concretely define or measure. (*Id.*).

While Kinder Morgan and the Service argued that it had a valid safe harbor from take liability for the entire Pipeline under Section 7, the Service conceded that it lacked a mechanism for monitoring compliance with the terms and conditions of that safe harbor, relying instead on reports from impacted individuals and self-reporting from Kinder Morgan. (*Id.*). As the parties prepared for the merits phase of this lawsuit, the Court was left pondering how a safe harbor from take liability could be premised on compliance with terms and conditions in an incidental take statement that the Service had no mechanism for enforcing. (*Id.* at 20).

In July 2020, all parties moved for summary judgment (Dkts. 82, 85, 86). While those motions were pending, Kinder Morgan filed a status report alerting the Court that the Pipeline was mechanically complete and fully operational. (Status Report, Dkt. 92). Kinder Morgan further reported that "[a]ll clearing, trenching, and drilling activities are complete" and anticipated that all work on the construction of the Pipeline would be complete by November 20, 2020. (*Id.* at 1). Lastly, Kinder Morgan said it would file an appropriate motion by December 11, 2020 if it found that the completion of construction affected Plaintiffs' claims. (*Id.*). On December 17, 2020, Kinder Morgan filed a motion to dismiss claims 1 and 3 of Plaintiffs' complaint based on construction of the Pipeline being complete. (Kinder Morgan Mot. Dismiss, Dkt. 93). A month later, Federal Defendants likewise filed a motion to dismiss the remainder of Plaintiffs' claims—Claims 2, 4–8, and 10 on the same basis. (Fed. Defs. Mot. Dismiss, Dkt. 96).

## II. MOTIONS TO DIMISS

## A.  LEGAL STANDARD

### 1.   Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

Article III of the Constitution confines federal courts to adjudicating actual "cases" and "controversies." U.S. CONST. art. III, § 2. Under the case or controversy requirement, "[t]he parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Spencer v. Kemna*, 523 U.S. 1, 7, (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)). "This means that, throughout the litigation, a plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Lewis*, 494 U.S. at 477). "As a general rule, any set of circumstances that eliminates actual

controversy after the commencement of a lawsuit renders that action moot." *Env't Conservation Org. v. City of Dall.*, 529 F.3d 519, 527 (5th Cir. 2008) (internal quotation omitted).

"If a dispute has been resolved or if it has been evanesced because of changed circumstances, including the passage of time, it is considered moot." *American Med. Ass'n v. Bowen*, 857 F.2d 267, 270 (5th Cir. 1988) (citation omitted). If a case becomes moot, it deprives the Court of jurisdiction and should be dismissed under Rule 12(b)(1) of the Federal Rules of Procedure. *See* Fed. R. Civ. P. 12(b)(1); *Spencer*, 523 U.S. at 7 (holding case becomes moot when it "no longer presents a case or controversy under Article III, § 2 of the Constitution"); *Env't Conservation Org.*, 529 F.3d at 525 ("If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents"). The burden of demonstrating mootness "is a heavy one." *Bank of New York Mellon v. Inthirath*, 2018 WL 1703126, at *3 (N.D. Tex. Mar. 22, 2018), *report and recommendation adopted*, No. 4:17-CV-00853-O-BP, 2018 WL 1702472 (N.D. Tex. Apr. 6, 2018) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632–633 (1953)).

## 2.   Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## B. DISCUSSION

Defendants move to dismiss Plaintiffs' respective claims against them for lack of subject matter jurisdiction, arguing that because construction of the Pipeline has already been completed, Plaintiffs' claims are moot. (Dkt. 93; Dkt. 96). Kinder Morgan also moves to dismiss Plaintiffs' claims under Rule 12(b)(6). (Dkt. 93). The Court will address each motion to dismiss in turn.

1. Kinder Morgan's Motion to Dismiss Claims 1 and 3

*a. Motion to Dismiss under Rule 12(b)(1)*

Kinder Morgan moves to dismiss claims 1 and 3 as they relate to pipeline construction, because, as the Pipeline is complete, there is no "live" controversy between the parties, and the Court is unable to fashion effective relief with regard to harm stemming from construction of the Pipeline. (Dkt. 93, at 15–16). First, Kinder Morgan argues that "no controversy exists as to whether

construction of the Pipeline may cause take because there is simply no further construction to undertake." (Dkt. 93, at 17). Second, Defendants posit that this Court cannot issue the injunctive or declaratory relief Plaintiffs seek because the Court cannot enjoin past actions, and any ordered relief would be "ineffective." (Dkt. 93, at 18–19).

Plaintiffs respond that their claims brought under the ESA remain justiciable because "[t]he relief that remains available is significant to the Plaintiffs." (Dkt. 97, at 3). Specifically, Plaintiffs insist that the harms alleged in claims 1 and 3 "are ongoing, regardless of whether initial construction is finished" because those claims "allege that construction of the [Pipeline] without a valid safe harbor under the ESA will result in imminent and unlawful take of endangered species." (Dkt. 97, at 4). Plaintiffs suggest that in the absence of an injunction halting construction of the Pipeline, the Court could nonetheless fashion relief by ordering Kinder Morgan to "a) refoliate the right of way created by the construction to decrease edge effects; b) further alleviate the spread of Oak Wilt through more aggressive remediation measures; c) undertake measures to decrease predators; and d) otherwise mitigate the ongoing adverse impacts that construction is currently having on the Golden-Cheeked Warbler." (Dkt. 97, at 5–6).

The ESA, under which Plaintiffs bring claims 1 and 3, provides that "any person may commence a civil suit on his own behalf . . . to enjoin any person . . . who is alleged to be in violation of any provision of the ESA or regulations issued under the ESA's authority." 16 U.S.C. § 1540(g). Plaintiffs' claims with regard to construction are moot, as the alleged take has already occurred and this Court is not authorized to issue relief for harm that has already occurred under the citizen-suit provision under which Plaintiffs bring their claims against Kinder Morgan. While courts have "broad discretion in shaping remedies," they may not offer remedies in statutorily authorized citizen suits for "wholly past violations." *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir.1986); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 (1987).

Courts in this Circuit have found that claims alleging a violation of the ESA are rendered moot upon completion of construction of the project. *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Engineers*, 217 F.3d 393, 397 (5th Cir. 2000) ("Now that the construction on the retail complex has been substantially completed . . . there would be no meaningful relief for [plaintiff].""); *Aquifer Guardians in Urb. Areas v. U.S. Fish & Wildlife Serv.*, 555 F. Supp. 2d 740, 744 (W.D. Tex. 2008) ("[E]ven if this Court were to [grant plaintiff's requested relief], the action's effect would be nullified because the construction is already complete."). Here, the Service found that take, whether authorized or not, was only likely to occur during the construction phase of the Pipeline and it is undisputed that construction of the Pipeline is complete. (*See* Biological Op., Dkt. 12-1; Status Report, Dkt. 92; Mody Aff., Dkt. 93-1).

While Plaintiffs suggest a slew of alternative forms of equitable relief this Court might issue in the absence of an injunction halting construction, the fact remains that this Court may not offer injunctive or declaratory relief for past violations of the ESA. (Dkt. 97, at 4–5); *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991) (finding that court could "theoretically grant" relief where statute authorized prospective relief and uncertainty remained as to pending agency review."); *Bayou Liberty*, 217 F.3d at 397 (finding requests for declaratory and injunctive relief moot where construction complete); *see also Aquifer Guardians.*, 555 F. Supp. 2d at 744 (same). Although Plaintiffs' suggestions for alternative equitable relief may be available to remedy ongoing or imminent harm stemming from the operation or maintenance of the Pipeline, these remedies cannot cure past harm caused by construction of the Pipeline even if Kinder Morgan was not lawfully authorized to engage in take during construction. Furthermore, a declaration that Kinder Morgan "'engaged in a take' would not remedy any past violations." *Breaux v. Haynes*, No. CV 15-769-JJB-RLB, 2017 WL 5158699, at *6 (M.D. La. Aug. 3, 2017), *report and recommendation adopted*, No. CV 15-769-JJB-RLB, 2017 WL 5202873 (M.D. La. Aug. 21, 2017).

Plaintiffs cite to *Boerschig* for the proposition that this Court has "more than sufficient authority to issue injunctive relief if it concludes that [Kinder Morgan's] construction activities were conducted in violation of the ESA." (Dkt. 97, at 7) (citing *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701 (5th Cir. 2017)). Yet that court found that plaintiff's appeal was not moot where construction was completed during the pendency of an appeal of a motion for preliminary injunction. *Boerschig*, 872 F.3d at 704. Specifically, the court in *Boerschig* stated that "when the defendant completes the act to be enjoined despite having notice of the request for injunctive relief, the plaintiff is not deprived of appellate review." *Id.* Here, in contrast, Plaintiffs did not appeal our denial of their request for a preliminary injunction and there is no pending appeal regarding Plaintiffs' request for injunctive relief. The Court is unpersuaded that this narrow exception to the mootness doctrine can be stretched to apply to the facts at hand in the absence of any pending appellate review of requested equitable relief.

Finding that the completion of construction of the Pipeline renders Plaintiffs' claims with regard to construction moot, the Court retains subject-matter jurisdiction over claims 1 and 3 only so far as they pertain to operation and maintenance of the Pipeline.

    *b. Motion to Dismiss under Rule 12(b)(6)*

Kinder Morgan next moves to dismiss Plaintiffs' claims against it under Rule 12(b)(6) for failure to state a claim, calling Plaintiffs' claims regarding post-construction take of endangered species "vague, implausible, and conclusory." (Dkt 93, at 19). Specifically, Kinder Morgan maintains that Plaintiffs have failed to allege any facts, even if true, to show that operation and maintenance of the Pipeline will unlawfully take an endangered species. (Dkt. 93, at 20). In their response, Plaintiffs argue that they have pleaded sufficient facts to show an imminent risk of take to both the golden-cheeked warbler and other aquatic species as a result of operation and maintenance of the Pipeline. (Dkt. 97, at 8–10).

Section 9 of the ESA makes it unlawful to "take" a species listed as endangered or threatened. *See* 16 U.S.C. § 1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).[3] "Harm" to a species within the definition of a "take" may be "indirect, in that the harm may be caused by habitat modification, but habitat modification does not constitute harm unless it "actually kills or injures wildlife." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924–25 (9th Cir. 2000). In order to show a risk of imminent take in violation of Section 9 of the ESA warranting injunctive relief, Plaintiffs must plead facts sufficient to show that "that there is 'a reasonably certain threat of imminent harm to a protected species.'" *Aransas Project v. Shaw*, 775 F.3d 641, 663–64 (5th Cir. 2014) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir.2000)).

The crux of the parties' dispute centers around their proffered interpretations of the biological opinion issued by the Service. (Bio. Op., Dkt. 12-1). While Plaintiffs contend that the biological opinion "recognizes that that operation and maintenance of the PHP will likely cause future take," Kinder Morgan maintains that Plaintiffs have failed to demonstrate how any "impacts" on the species described in the biological opinion "will rise to the level of unlawful take." (Dkt. 97, at 8–9; Dkt. 99, at 13). The Court agrees. While Plaintiffs allege that there is an imminent risk of take to the golden-cheeked warbler and other aquatic species, even taking their allegations as true, they fail to plausibly state a claim for a violation of Section 9 of the ESA. (Am. Compl., Dkt. 72, at 22–25).

---

[3] To "harass" a species under the definition of a "take" means to perform an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. As Defendants point out, Plaintiffs do not allege facts in their complaint regarding how Kinder Morgan "would operate the Pipeline in a way to intentionally or negligently annoy protected species." (Dkt. 99, at 20). Plaintiffs did not raise this issue in their response to Kinder Morgan's motion to dismiss, and as such the Court will not address it.

First, the parties dispute whether the operation and maintenance of the Pipeline is likely to cause an imminent take of the golden-cheeked warbler. While Plaintiffs contend that the biological opinion "recognizes that the operation and maintenance of the [Pipeline] will likely cause future take," Kinder Morgan accuses Plaintiffs of "lifting text from the Biological Opinion's analysis of possible effect or 'anticipated take' to jump to the unwarranted conclusion that such take is reasonably certain to occur after construction has been completed." (Dkt. 97, at 9; Dkt. 99, at 13).

The portion of the biological opinion at issue states that "[p]ost-construction ROW vegetation maintenance is expected to occur on a routine basis, and to the maximum extent practicable, the Applicant will perform maintenance outside of the [golden-cheeked warbler] breeding season to avoid additional impacts to the species." (Dkt. 12-1, at 38). As Kinder Morgan points out, if it fails to comply with the requirement to perform maintenance outside of the golden-cheeked warblers' mating season, that violation is one that the Service would enforce, not Plaintiffs; there is no allegation or evidence to suggest Kinder Morgan has not or will not comply with this requirement to reduce the ongoing impacts on the golden-cheeked warbler. (Dkt. 99, at 13). In addition, the biological opinion concludes that "operation of the [Pipeline] is not expected to result in additional impacts not already considered within this [biological opinion]." (Dkt. 12-1, at 49).

The biological opinion also noted the "long-term exposure to stressors" that may plague the golden-cheeked warbler due to the Pipeline, including "reduced breeding success and nest survival, reduced foraging, reduced patch size, increased exposure to predators due to loss of canopy cover and increased edge effects, and reduced amount of available nesting habitat and nesting material." (Dkt. 12-1, at 48). While Plaintiffs allege these indirect impacts "will likely cause future take," they fail to explain how the continued "exposure to stressors" outlined in the biological opinion and alleged in their complaint could conceivably rise to the level of take, especially given that neither their complaint nor their response include any facts suggesting that the ongoing impacts on the

16

golden-cheeked warbler will lead to its death or injury as required to constitute a take under the statute. (Dkt. 97, at 9); *see also* 16 U.S.C. § 1532(19). The Court thus finds that Plaintiffs have failed to plead facts raising the plausible inference that that operation or maintenance of the Pipeline is likely to cause a "threat of imminent harm" to the golden-cheeked warbler. *Aransas Project*, 775 F.3d at 663–64.

Second, the parties dispute whether the operation and maintenance of the Pipeline is likely to cause an imminent take of endangered aquatic species. Kinder Morgan calls Plaintiffs' allegations regarding aquatic species "even more speculative," arguing that Plaintiffs' assertions of potential harm amount only to "general risks that may attend operating and maintaining a pipeline." (Dkt. 93, at 20; Dkt. 99, at 13). In support of their contention that they have "precisely and specifically pleaded potential harms to aquatic species related to operation and maintenance," Plaintiffs point to their allegations regarding the likelihood of groundwater degradation or the potential for a hazardous material spill. (Dkt. 72, at 24) (alleging that "[t]he degradation in groundwater quality that is likely to occur from the construction, operation, and maintenance of the [P]ipeline is likely to 'take' many members of these species" and that "hazardous material spills pose a potentially significant threat to the species."). Plaintiffs further cite to the declaration of their expert to show that operation of the Pipeline will present an immediate threat to aquatic species. (Dkt. 97, at 9–10; Herrington Decl., Dkt. 18-6, at 2) (finding that the "operation phase" of the Pipeline will "present significant risks to Barton Springs and its continued existence as endangered species habitat" including due to the "modification of habitat in the form of degraded spring water").

However, with regard to aquatic species, the biological opinion explicitly found that the Pipeline is "not likely to adversely affect the Austin blind salamander and the Barton Springs salamander" but is "likely to adversely affect" the Houston Toad. (Dkt. 12-1, at 2). In addition, the biological opinion noted that potential harm to salamanders "due to degradation of habitat in the

17

form of reduced water quality resulting from operation and maintenance activities is expected to be discountable (i.e. extremely unlikely to occur)." (Dkt. 12-1, at 5). Plaintiffs call the scenarios under which a take of aquatic species may occur "practically realistic," while failing to acknowledge that the potential harms resulting from hazardous spills or water degradation depend on "the occurrence of catastrophic failures of the Pipeline." (Dkt. 97, at 9; Dkt. 99, at 12). As such, Plaintiffs' allegations regarding potential harm to aquatic species due to Pipeline maintenance constitute "mere speculation," and do not rise to the level of a "definitive threat of future harm" to protected aquatic species. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)). The Court must similarly dismiss Plaintiffs' claims 1 and 3 with regard to potential take of aquatic species due to operation and maintenance of the Pipeline.

## 2.   Federal Defendants' Motion to Dismiss

Federal Defendants move to dismiss Plaintiffs' claims against them—Claims 2, 4–8, and 10—under Rule 12(b)(1) for lack of subject matter jurisdiction. (Dkt. 96). Federal Defendants argue that "the NEPA claim is moot because pipeline construction has been completed," and as such, the Court can no longer "grant Plaintiffs' requested relief." (Dkt. 96, at 9). Federal Defendants next argue that Plaintiffs' remaining claims challenging the ESA Section 7 biological opinion and incidental take statement are moot, and in any event, Plaintiffs lack standing to bring such claims now that construction of the Pipeline is complete. (Dkt. 96, at 10). The Court will address each of these arguments in turn.

Federal Defendants ask the Court to dismiss claim 7, Plaintiffs' NEPA claim, as moot, arguing that it presents a procedural challenge that is no longer a live controversy in the wake of the completion of the Pipeline construction. (Dkt. 96, at 7–9). Plaintiffs respond that Federal Defendants' argument fails on three grounds. First, Plaintiffs argue that because their alleged harms

extend past the construction phase, their NEPA claim is not moot and the Court may still fashion appropriate relief by ordering Federal Defendants to prepare an environmental assessment that complies with NEPA. (Dkt. 97, at 12–13). Plaintiffs contend that they have asserted NEPA violations concerning operation and maintenance of the Pipeline, yet as Federal Defendants point out, Plaintiffs cite only to their ESA Section 7 complaint to support this contention. (Dkt. 97, at 13; Dkt. 100, at 4). Regardless, because the underlying claims regarding Kinder Morgan's ability to obtain a safe harbor from ESA section 9 are moot, the Court finds that the harms underpinning Plaintiffs' NEPA claim are similarly moot as construction of the Pipeline is complete.

Even assuming Plaintiffs meant to cite to their NEPA claim and the Court were able to locate allegations of ongoing harm due to the alleged NEPA violation, the Court agrees with Defendants that it cannot order effective relief. Plaintiffs contend that because there has been no NEPA review at all, Fifth Circuit precedent holds that Plaintiffs' NEPA claim cannot be found to be moot because of "the lack of any meaningful available relief." (Dkt. 97, at 13) (citing *Benavides v. Hous. Auth. of City of San Antonio*, 238 F.3d 667, 670 (5th Cir. 2001)). Plaintiffs insist that the Fifth Circuit has drawn a "sharp and important distinction between claims of mootness based on project completion where the required review was conducted and is challenged as inadequate and claims of mootness based on project completion where there has been no review at all." (Dkt. 97, at 13) (citing *Benavides*, 238 F.3d at 670). Yet the Court in *Benavides* found the claims moot because they sought "prospective relief" and emphasized that "there is no evidence on the record that further agency review could possibly affect the substantially-completed [project]." *Benavides*, 238 F.3d at 670. Plaintiffs here similarly request prospective relief under NEPA—asking the Court to order the Service to engage in a NEPA analysis before (re)issuing the biological opinion and incidental take statement—and have not presented evidence that such a review would mitigate the harms already caused by construction or prevent any alleged future harm.

While Plaintiffs rely on *Vieux Carré*[4] for the proposition that the Service's failure to perform a NEPA analysis distinguishes this case from others counseling dismissal of their claims, the *Benavides* court emphasized that in *Vieux Carre* "it was the combination of the uncertainty surrounding the pending agency review and the partial state of the construction that contributed to the viability of the plaintiff's claims." *Benavides*, 238 F.3d at 670. Importantly, in *Vieux Carre*, that statute at issue required prospective compliance, which contributed to the "uncertainty" as to the pending agency review and availability of relief. *Vieux Carre*, 948 F.2d at 1444–45. Here, in contrast, there is no pending agency review, prospective relief is not authorized by the ESA, and construction is complete. As such, this case is more akin to those cited by Federal Defendants finding that even if this Court were to order the Service to conduct a NEPA analysis, "this action would not have any effect because the construction authorized by the permit has been…completed." *Bayou Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs*, 217 F.3d 393, 396 (5th Cir. 2000).

Lastly, Plaintiffs posit that because their NEPA claims "arise as part of a challenge to the [Service's] ESA review process," they are substantive in nature and thus distinguishable from the "NEPA-focused cases cited by Federal Defendants." (Dkt. 97, at 14). Federal Defendants respond that Plaintiffs' NEPA claim is in fact procedural because it contends "that the Service should have conducted a NEPA analysis before it issued the [biological opinion]/[incidental take statement]," and argue that Plaintiffs seek to hold this case to a "different mootness standard because its NEPA claim is based on the ESA." (Dkt. 100, at 7). Plaintiffs cite to *Ware*[5] to support their contention that NEPA is a "necessary component" of the ESA's substantive obligation requiring consultation with the Service. (Dkt. 97, at 15). In *Ware*, however, plaintiffs sought "relief from noise brought on by the highway" which could be remedied by a "new, [Federal Aid Highways Act]-compliant noise

---

[4] 948 F.2d 1436 (5th Cir. 1991).
[5] *Ware v. U.S. Fed. Highway Admin.*, 255 F. App'x 838, 839 (5th Cir. 2007).

analysis," whereas here Plaintiffs' requested relief—ordering the Service to conduct a NEPA analysis—will do nothing to remedy any past take caused by the construction of the Pipeline. 255 F. App'x at 839. Furthermore, having dismissed Plaintiffs' claims alleging ongoing take of endangered species, there is no ongoing harm for the Court to remedy at this point.

Federal Defendants next move to dismiss the remainder of Plaintiffs' claims brought under the ESA and APA for mootness and lack of standing based on the same premise that "any take from construction has already occurred and the Court cannot provide effective relief to Plaintiffs for any such past alleged harm." (Dkt. 96, at 11). Plaintiffs respond by arguing once again that the challenged incidental take has not already occurred and asking the Court to resolve Plaintiffs' claims even if they are found moot because they are capable of repetition yet evading review. (Dkt. 97, at 15–17). Having found that Plaintiffs' alleged injury, the take of endangered species (whether authorized or not) has already occurred, the Court similarly finds that Plaintiffs' claims brought under the ESA and APA that challenge the Service's issuance of an incidental take permit under Section 7 of the ESA for Kinder Morgan's construction-related activities must be dismissed as moot since they do not present a live controversy for which this Court could offer an effective remedy. *See supra* Section 2(B)(1)(a).

The Court rejects Plaintiffs' argument that their claims fit within the exception to the mootness doctrine for issues capable of repetition yet evading review. The capable-of-repetition doctrine "applies only in exceptional situations . . . where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Bayou Liberty*, 217 F.3d 393, 398 (5th Cir. 2000). Plaintiffs cannot meet either prong to show that their claims merit the application of such an exception. First, Plaintiffs lament the "strictness of judicially created standards for obtaining a preliminary injunction

in NEPA and ESA challenges," yet their failure to obtain a preliminary injunction does not mean their claims are "inherently capable of evading review." *Id.* at 399 ("[W]hile [plaintiff] was not successful in the present action in getting an injunction, this does not mean that upon the proper evidentiary showing actions such as these are inherently capable of evading review.").

Second, although Plaintiffs contend that they will be "regularly" subject to major federal actions that require NEPA review and threaten endangered species, they have presented no evidence to suggest that this is the case. *Id.* at 398 (plaintiff met second prong where it "ha[d] shown that there is an expectation of future development in the Bayou Liberty area that may create the types of problems with flooding and destruction of the wet-lands complained about . . . in the current litigation."). Even if Plaintiffs are subject to this same type of action in the future, Plaintiffs would nonetheless have the "opportunity to challenge the action, and any new agency action would require its own decision that could be challenged in district court." (Dkt. 100, at 11); *see also Bayou Liberty*, 217 F.3d at 399 ("In a future action if the Corps issues a permit for development on wet-lands in the Bayou Liberty area [plaintiff] will have an opportunity to challenge that new permit and seek injunctive relief to insure NEPA compliance."). Thus, Plaintiffs' proposed exception to the mootness doctrine does not apply here.

The Court finds that because the alleged harms that underpin Plaintiffs' remaining claims have already occurred, Plaintiffs' claims against Federal Defendants' are moot and must be dismissed.

### IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Kinder Morgan's Motion to Dismiss, (Dkt. 93), is **GRANTED**. **IT IS FURTHER ORDERED** that Federal Defendants' motion to dismiss, (Dkt. 96), is **GRANTED**. Plaintiff's amended complaint, (Dkt. 72), is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FINALLY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, (Dkt. 82), Kinder Morgan's Cross Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment, (Dkt. 85), and Federal Defendants' Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Cross Motion for Summary Judgment, (Dkt. 86), are now **MOOT**.

The Court will enter final judgment by separate order.

**SIGNED** on March 25, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE